‑

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

BALLAST ADVISORS, LLC,                          Case No. 23-CV-3769 (PJS/TNL)

               Plaintiff,

v.
                                                ORDER

SCOTT A. PETERSON; MELINDA M.
BRADLEY; MMX WEALTH PARTNERS,
LLC; and MMX WP, LLC,

               Defendants.

---

Matthew T. Boos and Melissa Hodge, FREDRIKSON & BYRON, P.A., for plaintiff.

Joel Andersen, Andrew Takuya Sako, and Katie M. Connolly, NILAN JOHNSON LEWIS PA, for defendants Scott Peterson and MMX WP, LLC.

Jackson Kennedy and Tracey Holmes Donesky, STINSON LLP, for defendants Melinda Bradley and MMX Wealth Partners, LLC.

Plaintiff Ballast Advisors, LLC ("Ballast") brought this action against former employees Scott Peterson and Melinda Bradley, as well as against MMX WP, LLC (Peterson's current employer) and MMX Wealth Partners, LLC (Bradley's current employer).  Ballast asserts a host of breach-of-contract and tort claims arising out of Peterson's alleged breach of non-solicitation and confidentiality agreements with Ballast.  This matter is now before the Court on defendants' motions to dismiss Ballast's

claims. For the reasons that follow, the Court grants the motions as to some but not all claims.

## I. BACKGROUND

Ballast is a national financial-services firm based in Minnesota. Am. Compl. ¶ 14, ECF No. 14. In 2017, Ballast hired Peterson as an investment advisor. *Id.* ¶ 15. Peterson was tasked with selling and providing investment-management and financial-planning services to prospective and existing clients. *Id.* ¶ 16. In 2019, Peterson relocated from Minnesota to Florida, where he remained employed by Ballast, and where he began working with Bradley (who was also employed by Ballast).[1] *Id.* ¶¶ 15, 22. Bradley worked as Peterson's client-service manager. *Id.* ¶¶ 21–22. In the course of their employment, Peterson and Bradley had access to Ballast's confidential information—most notably, the names of current and prospective clients and personal and financial information regarding those clients. *Id.* ¶¶ 18, 23.

At Peterson's suggestion, Bradley resigned from Ballast in June 2022 to work as an operations director for defendant MMX Wealth Partners, a Florida company formed by a mutual friend of Peterson's and Bradley's. *Id.* ¶¶ 36–37, 55–56, 60. A few months later, on September 23, 2022, Ballast and Peterson executed a new employment agreement ("2022 Agreement"), which contained the non-solicitation and

---

[1]Ballast hired Bradley in December 2019 as an at-will employee subject to no restrictive covenants. *Id.* ¶¶ 20, 33.

confidentiality provisions that are the focus of this litigation. *Id.* ¶ 24; Emp. Agmt. 5–6, ECF No. 14-1.

Peterson took a paid leave of absence from Ballast beginning in December 2022 and continuing until sometime in January 2023. Am. Compl. ¶ 130. Peterson behaved suspiciously during his leave of absence. On December 2, 2022, Peterson formed MMX WP in Florida. *Id.* ¶¶ 5, 48. Then, Peterson emailed at least two clients telling them to call his personal phone number—an unusual and discouraged practice within Ballast. *Id.* ¶¶ 64–65. Finally, Peterson forwarded an email chain with one of his clients to Peterson's personal email account. *Id.* ¶ 67. Ballast was not aware of any of these activities.

On February 3, 2023—shortly after Peterson returned from his leave of absence—Peterson resigned from Ballast, effective immediately. *Id.* ¶ 38. Ballast promptly terminated Peterson's access to its trading and report systems, but re-authorized limited access after Peterson promised to honor his restrictive covenants and agreed to a two-week wind-down period during which he would transition his clients to other Ballast advisors. *Id.* ¶¶ 39–44. But during and immediately after the wind-down period, Peterson again behaved suspiciously. Peterson emailed a client with instructions to call his personal cell phone number, emailed another client with instructions to send all future emails to his personal email address, and forwarded an email chain with a client

to his personal email account. *Id.* ¶¶ 64, 67–68. In addition, Peterson twice connected external hard drives to his Ballast work laptop and searched "how do I download files from my laptop to google drive." *Id.* ¶ 70. Again, Ballast was not aware of any of these activities at the time.

Once the wind-down period ended, Peterson began providing investment-advisory services through MMX WP (the company he had formed during his leave of absence). *Id.* ¶ 47. On March 17, 2023, MMX WP (Peterson's company) and MMX Wealth Partners (Bradley's employer) entered a consulting-services agreement under which MMX Wealth Partners would provide MMX WP with professional referrals, office space, and administrative support in exchange for quarterly payments. *Id.* ¶¶ 57–58. Pursuant to that agreement, Bradley began working for Peterson, performing essentially the same functions that she had performed for him at Ballast. *Id.* ¶¶ 56, 59.

Soon after Peterson became registered to provide investment services through MMX WP, about 60 clients left Ballast, at least 40 of whom Peterson had worked with at Ballast. *Id.* ¶ 62. Peterson is currently providing investment services to at least some of those clients. *Id.* ¶¶ 74–75. Multiple other Ballast clients have reported receiving communications from Peterson attempting to lure them away from Ballast. *Id.* ¶ 63.

In this lawsuit, Ballast alleges that Peterson has breached the non-solicitation and confidentiality provisions of the 2022 Agreement, as well as various statutory and

common-law duties.  Ballast also asserts that Bradley, MMX WP, and MMX Wealth

Partners are liable for the damage caused by Peterson.  The defendants now move to

dismiss all claims against them.

## II. ANALYSIS

### A.  Standard of Review

In deciding a motion to dismiss for failure to state a claim under Fed. R. Civ.

P. 12(b)(6), a court must accept as true all of the factual allegations in the complaint and

draw all reasonable inferences in the plaintiff's favor.  *Perez v. Does 1–10*, 931 F.3d 641,

646 (8th Cir. 2019).  Although the factual allegations need not be detailed, they must be

sufficient to "raise a right to relief above the speculative level."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007).  The complaint must "state a claim to relief that is

plausible on its face."  *Id.* at 570.

Ordinarily, if the parties present, and the court considers, matters outside of the

pleadings, a Rule 12(b)(6) motion must be treated as a motion for summary judgment.

Fed. R. Civ. P. 12(d).  But the court may consider materials that are necessarily

embraced by the complaint, as well as any exhibits attached to the complaint, without

converting the motion into one for summary judgment.  *Mattes v. ABC Plastics, Inc.*, 323

F.3d 695, 697 n.4 (8th Cir. 2003).

*B. Breach of Contract*

1. Consideration

Peterson first argues that the non-solicitation and confidentiality restrictions to which he agreed in 2022 lacked independent consideration. A restrictive covenant imposed after an employee has already begun work requires new, independent consideration. *Safety Ctr., Inc. v. Stier*, 903 N.W.2d 896, 898–99 (Minn. Ct. App. 2017). "The adequacy of consideration for restrictive covenants signed during an ongoing employment relationship will depend upon the facts of each case." *Freeman v. Duluth Clinic, Inc.*, 334 N.W.2d 626, 630 (Minn. 1983). Ballast alleges—and the 2022 Agreement expressly states[2]—that Peterson received the following as consideration for agreeing to the non-solicitation and confidentiality restrictions: (1) a one-time bonus of $500; (2) a new benefit payable on death, disability, or retirement; and (3) continued employment. Emp. Agmt. 1, 4.

That should be the end of it, but Peterson attempts to introduce evidence from outside the four corners of the amended complaint to show that the $500 bonus that he received was not, in fact, consideration for the restrictive covenants. But in order to consider Peterson's evidence, the Court would have to turn his motion to dismiss into a

_____

[2]The 2022 Agreement is attached to the amended complaint, and thus the Court can consider it without converting the motions to dismiss into summary-judgment motions.

summary-judgment motion, *see* Fed. R. Civ. P. 12(d), which the Court has no interest in doing.  Whether the bonus was actually paid in consideration for Peterson agreeing to the non-solicitation and confidentiality provisions is a matter for discovery and can be revisited when a full factual record is developed.  At this point, what matters is that the amended complaint plausibly *alleges* that the $500 bonus was paid as independent and adequate consideration for the restrictive covenants.[3]

### 2.  Enforceability

Peterson next argues that the non-solicitation and confidentiality clauses are overly broad.  To be enforceable, a restrictive covenant must be reasonably necessary to protect the employer's legitimate business interests while not unduly burdening the employee's right to pursue his profession.  *Dynamic Air, Inc. v. Bloch*, 502 N.W.2d 796, 799 (Minn. Ct. App. 1993); *Bennett v. Storz Broad. Co.*, 134 N.W.2d 892, 899 (Minn. 1965). In determining the enforceability of a restrictive covenant, Minnesota courts generally consider "the nature and character of the employment, the time for which the restriction is imposed, and the territorial extent of the locality to which the prohibition extends." *Bennett*, 134 N.W.2d at 899.

---

[3]In light of the Court's holding about the $500 payment, the Court need not consider Peterson's arguments regarding the other contractually-identified consideration.

Peterson argues that his restrictive covenants are overly broad because they contain no geographic limitation. But Minnesota courts have squarely held that "the reasonableness of both . . . nonsolicitation and confidentiality covenants . . . should be examined without regard to . . . territorial limitation," because soliciting customers or disclosing confidential information "would be harmful to the employer regardless of where the competitor is located." *Dynamic Air*, 502 N.W.2d at 800. Hence, Peterson's restrictive covenants are not unenforceable because they lack a geographic limit.

Peterson's other overbreadth arguments are better. First, Peterson argues that the non-solicitation agreement prohibits Peterson from accepting Ballast clients who approach him on their own initiative—that is, without prompting from Peterson—thereby depriving Ballast's clients of the right to work with the financial advisor of their choice.[4] Second, Peterson argues that the non-solicitation clause's definition of "Client"

---

[4]The Court views this as a major concern. In finance, as in medicine and law, clients develop longstanding relationships with trusted experts to whom they disclose their most sensitive information and on whom they depend to advise them with respect to their most important decisions. Thus, at least in this Court's opinion, a strong argument can be made that contractual restrictions that interfere with a client's ability to continue to seek financial, medical, or legal advice from her longtime financial advisor, doctor, or lawyer should be invalid as against public policy. Such restrictions not only interfere with "the right of a party [i.e., the financial advisor, doctor, or lawyer] to work and earn a livelihood," but also with the right of the party's clients or patients to choose to remain in a relationship with that party. *See Freeman*, 334 N.W.2d at 630–31. It is one thing to say that a financial advisor cannot solicit or initiate contact with a former client; it is quite another to say that the financial advisor's former employer can effectively bar the *client* from continuing her relationship with her

(continued...)

encompasses more persons and entities than is necessary to protect Ballast's legitimate business interests. And third, Peterson points out that the confidentiality clause has no time limit and defines "Confidential Information" to include client names. As Peterson argues, the problem with perpetual confidentiality clauses that are deemed to apply to client names is that they function as perpetual non-solicitation and non-compete clauses.

Although Peterson raises important questions, those questions cannot be addressed on a motion to dismiss. *See Bennett*, 134 N.W.2d at 899–900 (reasoning that the validity of a restrictive covenant is highly fact-dependent and thus often inappropriate for resolution as a matter of law). Peterson's arguments touch on a number of factual issues that need to be explored in discovery, so that the Court has a full factual record before ruling on those arguments. For that reason, Peterson's motion to dismiss is denied without prejudice to Peterson raising these arguments again on motion for summary judgment or at trial.

---

[4](...continued)

financial advisor, even if the financial advisor has not solicited or even initiated contact with that client.

3.  Breach

Peterson argues that Ballast has not plausibly alleged that he breached the non-solicitation and confidentiality clauses.  Ballast's amended complaint is strangely reticent in accusing Peterson of breaching the clauses, but, taking all inferences in Ballast's favor, the Court finds that Ballast has "nudged [its] claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

To recapitulate:  While still employed by Ballast, Peterson set up the company through which he now competes with Ballast, told several Ballast clients to contact him through his personal phone number or email address, forwarded email chains with clients to his personal email account, connected external hard drives to his Ballast laptop, and searched the Internet for instructions about how to upload files to Google Drive.  Shortly thereafter, Ballast began receiving reports from clients that Peterson had been soliciting their business.  Finally, many of Ballast's now-former clients did in fact follow Peterson to his new firm.

These allegations, taken together, give rise to a plausible inference that Peterson breached both the non-solicitation and confidentiality provisions of the 2022 Agreement.  For the most part, Peterson's opposing arguments examine and attempt to explain away each allegation in isolation, but a "complaint should be read as a whole,

not parsed piece by piece to determine whether each allegation, in isolation, is

plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

Peterson also criticizes Ballast for pleading certain facts "on information and

belief." But as this Court has explained:

> The Eighth Circuit has squarely held that a claim that is
> based on facts alleged on information and belief can meet
> the heightened pleading standard of Rule 9(b). . . .
> Obviously, if allegations pleaded on information and belief
> can satisfy the heightened pleading standard of Rule 9(b),
> such allegations can satisfy the lower pleading standard of
> Rule 8. . . .
>
> Moreover, any categorical rule regarding information-and-
> belief pleading would be impossible to administer because
> there is no common understanding among judges and
> lawyers as to what it means to plead something on
> "information and belief." On one extreme, lawyers
> sometimes use "information and belief" to mean something
> like "I hope this is true, but I really have no idea." On the
> other extreme, lawyers sometimes use "information and
> belief" to mean "I have a lot of evidence that this is true, but
> I'm not absolutely certain." Most information-and-belief
> pleading falls between these extremes. It is simply not
> possible to ground a categorical rule on such a chameleonic
> phrase.

*Cole v. Does*, 571 F. Supp. 3d 1033, 1039–40 (D. Minn. 2021).

Having carefully examined the amended complaint, the Court finds that Ballast's

"belief is based on sufficient factual material that makes the inference of culpability

plausible." *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 954 (8th Cir.

2023).  And thus, drawing all reasonable inferences in favor of Ballast, the Court finds

that the amended complaint plausibly alleges that Peterson breached his employment

agreement by soliciting Ballast clients and by misusing Ballast's confidential

information.

### C.  Misappropriation of Trade Secrets & Confidential Information

Peterson argues that Ballast has not adequately pleaded claims of

misappropriation of trade secrets and confidential information.  The Court disagrees.

Under the Minnesota Uniform Trade Secrets Act ("MUTSA"), misappropriation

of trade secrets requires the existence of a trade secret and the improper acquisition,

disclosure, or use of that trade secret.  Minn. Stat. § 325C.01.  "A trade secret is

information that must (1) not be generally known or readily ascertainable, (2) derive

independent economic value from its secrecy and (3) be the subject of reasonable efforts

to maintain its secrecy."  *Hot Stuff Foods, LLC v. Dornbach*, 726 F. Supp. 2d 1038, 1044

(D. Minn. 2010) (citation omitted).  Ballast's common-law claim for misappropriation of

confidential information requires proof of essentially the same elements*. See*

*Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 898–99 (Minn. 1983).

Ballast has pleaded a plausible misappropriation claim:

First, Ballast has pleaded that its client information—including financial

characteristics, financial-planning reports, and investment portfolios of current and

prospective clients—was not generally known or readily ascertainable, as the information was personally developed over the years by Ballast's owner through client relations or obtained by Ballast via corporate acquisitions.  Am. Compl. ¶¶ 17–18, 27, 109, 121.

Second, this client information derived independent economic value from its secrecy, because it provided a competitive advantage to Ballast in acquiring new clients and providing investment-advisory services to current clients.  *Id.* ¶¶ 18, 109; *see also Electro-Craft Corp.*, 332 N.W.2d at 901 (finding independent economic value from secrecy where "a prospective competitor could not produce a comparable motor without a similar expenditure of time and money").

Third, Ballast has alleged that it made reasonable efforts to protect its client information with confidentiality agreements, an employee handbook containing a confidentiality policy that employees were required to sign, and a compliance manual containing a "Privacy, Confidentiality, and Cybersecurity policy." Am. Compl. ¶¶ 19, 33–35.[5]

---

[5]That said, Ballast's allegation that it made reasonable efforts to keep its client information secret seems to be undermined by the fact that Ballast also alleges that Bradley—who worked under Peterson in a mostly administrative capacity—had access to the same sensitive client information as Peterson, yet was *not* required to sign a non-solicitation or confidentiality agreement.  Am. Compl. ¶¶ 21, 23, 33.  Moreover, Ballast alleges that Peterson "also had access to confidential information relating to clients he did not service."  *Id.* ¶ 18; *see Electro-Craft Corp.*, 332 N.W.2d at 902–03 (finding

(continued...)

And finally, as described above, Ballast has plausibly alleged that Peterson misappropriated Ballast's client information by using it to solicit and serve Ballast's prospective and existing clients.  Am. Compl. ¶ 74.  Ballast has therefore pleaded plausible claims for misappropriation of trade secrets and confidential information.

### D.  Breach of Fiduciary Duty

Peterson and Bradley argue that Ballast has not plausibly pleaded that they breached their duties of loyalty and confidentiality to Ballast during their employment. "Under Minnesota law, the duty of loyalty prohibits an employee from soliciting his employer's customers for himself, or from otherwise competing with his employer, while he is still employed." *Hot Stuff Foods*, 726 F. Supp. 2d at 1043 (citing *Rehab. Specialists, Inc. v. Koering*, 404 N.W.2d 301, 304 (Minn. Ct. App. 1987)).  Moreover, "employees have a common law duty not to use trade secrets or confidential information obtained from their employer." *Eaton Corp. v. Giere*, 971 F.2d 136, 141 (8th Cir. 1992) (citing *Jostens, Inc. v. Nat'l Comput. Sys.*, 318 N.W.2d 691, 701 (Minn. 1982)).

With regard to Peterson, the Court has already found that Ballast has plausibly alleged that Peterson solicited clients during his paid leave of absence and during the

---

[5](...continued)
employer did not make reasonable efforts to maintain information's secrecy because, inter alia, "[e]mployee access to documents was not restricted").  As with the reasonableness of the restrictive covenants, however, the reasonableness of Ballast's efforts to maintain secrecy is best addressed on a full record.

wind-down period—and that he did so with the use of Ballast's confidential information.  The amended complaint further alleges that Peterson—actively working against Ballast's interests—solicited Bradley to quit her job with Ballast to help him set up a company to compete with Ballast, all while he continued to work for Ballast.  Thus, Ballast has pleaded a plausible claim of breach of fiduciary duty against Peterson.

With regard to Bradley, however, Ballast pleads no facts that plausibly suggest that Bradley breached any fiduciary duty to Ballast.  In support of its breach-of-fiduciary-duty claim against Bradley, Ballast mostly makes allegations about *Peterson's* misconduct, which Ballast attempts to connect to Bradley through vague insinuations. But Ballast does not plead that Bradley solicited or helped Peterson to solicit—or even that *Peterson* solicited—any clients prior to *Bradley's* departure from Ballast on June 24, 2022.[6]  Nor does Ballast plead that Bradley took confidential information with her when she left.  And even if Bradley quit so that she could lay the groundwork for Peterson's competing business, "[a]n employee has the right, . . . while still employed, to prepare to enter into competition with her employer," *Rehab. Specialists, Inc.*, 404 N.W.2d at 304 (citations omitted), so long as that preparation is not directly at her employer's expense, *Sanitary Farm Dairies, Inc. v. Wolf*, 112 N.W.2d 42, 48–49 (Minn. 1961) (stating an employee may prepare to compete immediately upon termination of employment, but

---

[6]Recall that Bradley left Ballast three months before Peterson signed the 2022 Agreement and more than seven months before Peterson resigned.

not act "in direct competition with the employer's business" while still employed
(quoting Restatement (First) of Agency § 393 cmt. e)).

Because Ballast provides nothing more than speculation that Bradley breached a
fiduciary duty to Ballast, its breach-of-fiduciary-duty claim against her is dismissed.

### E.  Tortious Interference with 2022 Agreement

Ballast brings claims against Bradley, MMX WP, and MMX Wealth Partners for
tortiously interfering with the 2022 Agreement between Ballast and Peterson.  Under
Minnesota law, tortious interference with contract requires proof of (1) the existence of a
contract; (2) the alleged tortfeasor's knowledge of the contract; (3) intentional
procurement of the contract's breach by the alleged tortfeasor; (4) the alleged tortfeasor
acting without justification; and (5) injury to the plaintiff.  *Qwest Commc'ns Co. v. Free
Conf. Corp.*, 905 F.3d 1068, 1073 (8th Cir. 2018) (citation omitted).  "Procurement"—used
interchangeably with "inducement"—means that "the defendant *caused* the breaching
party to breach its contract."  *Id.* at 1074 (original emphasis).

Ballast has not plausibly alleged that Bradley, MMX WP, or MMX Wealth
Partners caused Peterson to breach his contract with Ballast.  Quite the opposite:

With regard to Bradley, the amended complaint repeatedly and emphatically
asserts that Peterson "solicited," "persuaded," and "induced" Bradley to leave Ballast in
order for her to help him set up a competing business.  Am. Compl. ¶¶ 60, 84, 131.  In

other words, the amended complaint alleges that Peterson decided for himself that he was going to leave Ballast to open a competing business and then persuaded Bradley to leave Ballast so that she could lay the groundwork for that business. The amended complaint does not come close to plausibly pleading that *Bradley* caused *Peterson* to breach the restrictive covenants in the 2022 Agreement.

With regard to MMX WP, the amended complaint alleges that Peterson created MMX WP just prior to resigning as part of his "long-running scheme" to solicit and serve Ballast clients. *Id*. ¶¶ 47–48, 54, 62. Ballast's allegation that *MMX WP* somehow induced *Peterson* to breach his restrictive covenants makes no sense.

Finally, with regard to MMX Wealth Partners: According to the amended complaint, MMX Wealth Partners did not enter the consulting-services agreement with MMX WP until March 17, 2023—which was months after Peterson decided to violate his restrictive covenants, weeks after Peterson left Ballast, and weeks after Ballast sent Peterson a cease-and-desist letter accusing him of violating his restrictive covenants. *Id*. ¶¶ 52, 57. The amended complaint does not even allege that MMX Wealth Partners had contact with Peterson or MMX WP prior to entering into the consulting-services agreement. Ballast's allegation that MMX Wealth Partners somehow induced Peterson to breach his restrictive covenants is not plausible.

For these reasons, Ballast's claims of tortious interference with the 2022 Agreement between Ballast and Peterson are dismissed.

### F. Tortious Interference with Ballast Client Contracts

Ballast claims that each defendant tortiously interfered with the "advisory agreements" between Ballast and its (former) clients by "procur[ing] the breach of [those] contracts." *Id.* ¶ 141. Ballast pleads no facts in support of this claim. For example, Ballast does not allege that anyone—either Ballast or a client—*breached* an advisory agreement. Ballast alleges only that some clients "terminated Ballast as their adviser of record" or "left Ballast" after Peterson's departure. *Id.* ¶¶ 62, 68. But *terminating* a contract is not the same as *breaching* it, and Ballast never plausibly alleges that any client breached any contract. Without a breach, there can be no tortious interference.

For these reasons, Ballast's claim for tortious interference with Ballast's contracts with its clients is dismissed as to all defendants.

### G. Tortious Interference with Prospective Economic Advantage

Ballast claims that Peterson, Bradley, MMX WP, and MMX Wealth Partners tortiously interfered with prospective economic advantages relating to Ballast's clients and prospective clients. To state a claim for tortious interference with prospective economic advantage, the plaintiff must allege facts establishing that (1) the plaintiff had

a reasonable expectation of economic advantage; (2) the defendant knew of that

expectation; (3) the defendant intentionally and wrongfully interfered with that

expectation; (4) the plaintiff had a reasonable probability of realizing that economic

advantage but for the defendant's interference; and (5) the plaintiff was injured. *Gieseke*

*ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014).

With respect to Bradley, MMX WP, and MMX Wealth Partners, the tortious-

interference claim is implausible because, for the reasons described above, none of their

alleged "interference" with the relationship between Ballast and its prospective or

existing clients was "independently tortious or in violation of a state or federal [law]."

*Id.* Ballast has, however, plausibly alleged that Peterson's interference with Ballast's

existing clients[7] was independently tortious, because Peterson breached his fiduciary

duties and misappropriated confidential information. *See* Restatement (Second) of

Torts § 874 cmt. b ("A fiduciary who commits a breach of his duty as a fiduciary is

guilty of tortious conduct to the person for whom he should act.").

Citing *Gieseke*, Peterson argues that Ballast fails to "specifically identify a third

party with whom the plaintiff had a reasonable probability of a future economic

relationship." 844 N.W.2d at 221. But Ballast *has* identified third parties with whom it

---

[7]The claim fails as to Ballast's *prospective* clients because Ballast has not identified
a *prospective* client—stolen by Peterson—with whom Ballast had more than a "mere
hope of a contract" at some undetermined future date. *Id.* at 221–22 (quoting *United
Educ. Distribs., LLC v. Educ. Testing Serv.*, 564 S.E.2d 324, 329–30 (S.C. Ct. App. 2002)).

had a reasonable expectation of future economic benefit: the 60 existing clients who

allegedly terminated their relationships with Ballast as a result of Peterson's wrongful

interference.  That the clients were not each identified by name does not does not mean

that Ballast's claim is implausible.  *See Toyota Motor Sales, U.S.A., Inc. v. Allen Interchange

LLC*, Case No. 22-cv-1681 (KMM/JFD), 2023 WL 5206884, at *11 (D. Minn. Aug. 14,

2023).

That said, Ballast's claim that *all 60 clients* left Ballast as a result of wrongful

interference by Peterson seems highly implausible.  But this claim covers the same

ground as other (viable) claims against Peterson, and thus keeping this claim in the case

will neither prolong the litigation nor expand the scope of discovery.  Moreover, it is

certainly plausible that Peterson wrongfully interfered in the relationship between

Ballast and *some* of the 60 clients—in particular, those among the clients who are now

clients of Peterson.  For that reason, the Court will not dismiss this claim at this time.

### H.  Aiding and Abetting Peterson's Tortious Interference

Finally, Ballast alleges that Bradley and MMX Wealth Partners aided and abetted

Peterson's tortious interference.  A claim for aiding and abetting the tortious conduct of

another has three elements: (1) the primary tortfeasor committed a tort that caused an

injury to the plaintiff; (2) the defendant knew that the primary tortfeasor's conduct was

tortious; and (3) the defendant substantially assisted or encouraged the primary

tortfeasor in committing the tort. *Witzman v. Lehrman, Lehrman, & Flom*, 601 N.W.2d 179, 187 (Minn. 1999) (citing Restatement (Second) of Torts § 876(b)).

As explained above, Ballast has plausibly alleged that Peterson tortiously interfered with its prospective economic advantage. Ballast also alleges that Bradley and MMX Wealth Partners knew that Peterson's solicitation of Ballast's clients was tortious. Am. Compl. ¶ 151. Finally, Ballast alleges that Bradley, acting on behalf of MMX Wealth Partners and pursuant to the consulting-services agreement between MMX WP and MMX Wealth Partners, substantially assisted Peterson in interfering with the relationships between Ballast and its clients, including by flying to Minnesota to help Peterson transfer clients that he had poached from Ballast to MMX WP. *Id.* ¶ 61. Therefore, Ballast has pleaded a plausible claim against Bradley and MMX Wealth Partners for aiding and abetting Peterson's tortious conduct.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  Peterson's and MMX WP's motion to dismiss [ECF No. 16] is GRANTED IN PART and DENIED IN PART as follows:

    a.  Counts 8 and 11 in the amended complaint [ECF No. 14] against Peterson are DISMISSED WITHOUT PREJUDICE.

      b.      Counts 8, 9, and 12 in the amended complaint [ECF No. 14] against MMX WP are DISMISSED WITHOUT PREJUDICE.

      c.      Count 3 in the amended complaint [ECF No. 14] against MMX WP is DISMISSED WITH PREJUDICE.

      d.      The motion is denied in all other respects.

2.      Bradley's and MMX Wealth Partner's motion to dismiss [ECF No. 23] is GRANTED IN PART and DENIED IN PART as follows:

      a.      Counts 7, 8, 9, and 13 in the amended complaint [ECF No. 14] against Bradley and MMX Wealth Partners are DISMISSED WITHOUT PREJUDICE.

      b.      Counts 2 and 4 in the amended complaint [ECF No. 14] against Bradley and MMX Wealth Partners are DISMISSED WITH PREJUDICE.

      c.      The motion is denied in all other respects.

Dated:  December 11, 2024

           s/Patrick J. Schiltz
          Patrick J. Schiltz, Chief Judge
          United States District Court