UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Ballast Advisors, LLC,<br><br>Plaintiff,<br><br>v.<br><br>Scott A. Peterson, Melinda M. Bradley, MMX Wealth Partners, LLC, and MMX WP, LLC,<br><br>Defendants,<br><br>and<br><br>Scott A. Peterson,<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>Ballast Advisors, LLC and Paul Parnell,<br><br>Counterclaim-Defendants. | Case No. 23-CV-03769-PJS-JFD<br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR RULE 37(e) SANCTIONS** |

## INTRODUCTION

Ballast requests this Court, as part of a discovery sanctions motion mostly involving an inadvertently non-disabled text message auto-deletion setting, to issue effectively a dispositive ruling on the entire case, against all Defendants, on all claims. That request is unsupportable both factually and legally.

The facts are straightforward. Years ago and to save phone space, Peterson enabled a 30-day automatic deletion setting for his phone's text messages. When Ballast threatened litigation upon his departure, Peterson should have turned that setting off, but, having

forgotten about the setting in the first place, he did not. That was a mistake, but it was not a scheme to hide evidence.

When Peterson later realized some discoverable text messages were lost from his phone, he tried to obtain and produce them from all the clients who followed him after he left Ballast. He was partially successful, because some clients, like him, had also deleted the text messages. But he never told them to do so.

Peterson was personally close to, and texted on non-business subjects, with nearly all the clients. According to Ballast, though, the subject of the text messages is indisputably Peterson's alleged client solicitations. But other undisputed evidence exists on that question. Every client attests Peterson did not solicit them, many through sworn affidavits. Ballast admits the client is in the best position to know whether they were solicited. Peterson likewise attests he did not solicit any client.

Notwithstanding this, the relief Ballast seeks from Peterson's inadvertence is dispositive sanctions requiring a litigation outcome contrary to the evidence. It asks the Court to take central issues purportedly in this dispute completely away from the jury, find Peterson solicited all the clients, and further find every other Defendant aided and abetted in that solicitation. In other words, according to Ballast, the jury should not be permitted to hear the consistent evidence from the two individuals involved in a communication—Peterson and the client; it should instead be forced to follow an irrebuttable factual presumption. That is contrary to the law, and it is not a proportionate response to an at best negligent preservation failure without any intent to deprive.

Ballast's motion should be denied in its entirety.

## FACTUAL BACKGROUND

### A. Peterson Does Not Intentionally Delete Any ***Text Message***, After Litigation Became A Possibility, With An Intent To Hide It From Ballast

#### 1. Peterson Enables a Text Message Auto-Delete Setting Long Before this Litigation

[redacted] (Peterson Dep. 31:14–32:15.)[1] [redacted] (*Id.* 31:5–12.) [redacted] (*Id.* 27:23–29:20; 30:1–32:15.) Ballast has no evidence Peterson's passive continuation of the auto-deletion setting was intent to deprive Ballast of evidence.

#### 2. Peterson First Learns Ballast Might Sue Him on February 23, 2023

Peterson departed Ballast on February 21, 2023. Ballast sent him a cease-and-desist letter on February 23, 2023. (ECF 151-1.) It was this date on which Peterson could reasonably believe litigation may occur.

Ballast offers no evidence that would suggest an earlier date of such anticipation. It instead offers suppositions.

Ballast alleges Peterson plotted his exit from Ballast "with the intent to call upon, solicit, and work with" clients. (ECF 150 at 1.) It offers no fact citation. The evidence does not support the allegation. Rather, [redacted]

[1] Deposition transcripts and other exhibits are attached to the Andersen Declaration submitted herewith.

[redacted] (ECF 164 at 10, 13-14.)

Ballast similarly alleges Peterson "initiated a scheme to transition clients away from Ballast and to a new wealth management firm." (ECF 150 at 3.) Its citation is not to evidence; it is to its own Complaint.

Ballast argues Peterson's sending to Marxer in April 2022 the draft employment agreement that Ballast was asking him to sign shows he knew litigation was imminent. (ECF 150 at 2 & 18.) The evidence does not support Ballast's inference. [redacted] (Marxer Dep. 74:4–16, 86:9–13; Peterson Dep. 280:3–10, 292:5–15, 321:21–322:24.) Peterson's seeking advice about Ballast asking him to sign a new contract is not evidence Peterson thought Ballast might sue him.

Ballast argues Peterson communicated with counsel in June 2022 about potentially leaving Ballast and clients potentially following (ECF 150 at 18; ECF 152-9.) Ballast also suggests Peterson consulted counsel in October 2022 about his employment agreement. (ECF 150 at 1 & 18.) For this assertion, Ballast cites an ASN document containing hearsay statements from Peterson. (ECF 152.) [redacted] (Peterson Dep. 164:20–165:4, 168:4, 169:10–12, 170:24–171:11; 339:23–340:20.) Regardless, Peterson's actions in June and October 2022 (if the ASN hearsay is

credited) show him preparing for a new job in compliance with his contract, not evidence of imminent litigation awareness.

Ballast refers to Defendants' superseded first supplemental privilege log to claim Peterson's anticipated litigation in September 2022, because Defendants previously included a September 29, 2022, calendar invitation between Brian Leftwich and Ballast's corporate counsel (and not including Peterson) on their joint privilege log. (ECF 150 at 18; ECF 151-7.) The amended version of Defendants' joint privilege log shows the earliest privilege assertion as February 23, 2023. (Andersen Decl., Ex. C.) At Ballast's insistence that earlier communications were not privileged, Defendants produced to Ballast such immaterial communications (including the September 29, 2022, calendar invitation). (Andersen Decl., Ex. D.) [redacted], is not evidence Peterson knew Ballast might sue him.

### 3. Peterson Discovers Text Messages Were Lost as a Result of the Auto-Deletion Setting, So He Obtains and Produces Text Messages with Clients

During discovery, Peterson [redacted]. (Peterson Dep. 32:21–35:15.) Peterson frequently texted with clients, but on non-business issues, because he had lengthy personal relationships with them. (Andersen Decl. Ex. J, ¶ 11; Peterson Decl. ¶ 2.)

---

2 [redacted] (Andersen Decl., Exs. D, E at 13.)

Peterson, with counsel's assistance, took the initiative to seek from every at-issue client any text messages the client had with Peterson during the relevant period. Those clients provided the text messages to Defendants' counsel, and Peterson promptly produced the responsive text messages to Ballast. Some clients did not provide any text messages because they had themselves deleted the text messages.

None of the produced text messages show solicitation. (Andersen Decl., Ex. F.) Routine administrative assistance, personal greetings, meeting scheduling, compliance, and technical support predominate the texts. In fact, when account transfers are referenced, they are always client-initiated, and in several instances, Peterson directed clients to remain with, or contact, their original advisor or provider. (*See generally id.*)

For example in one thread, [redacted]. (Andersen Decl., Ex. F at 139.) [redacted]. (*Id.*) Likewise, another thread shows [redacted]. (Andersen Decl., Ex. F at 1.) [redacted] (*Id.*)

#### 4. Ballast Does Not Seek to Obtain Text Messages from Other Sources

Ballast did not serve any subpoena on any third party for the text messages it claims are missing. It also did not seek forensic review of any third party's phone to obtain deleted text messages.[3] For example, Ballast references five unproduced text messages with an ASN representative. (ECF 150 at 7.) While Ballast subpoenaed ASN for documents, it did not seek to retrieve those five text messages. (Andersen Decl., Ex. G.)

Ballast also hints at some impropriety by stating that some text messages obtained from the clients had been "selectively deleted." Peterson has no knowledge of any client's text deletion practices and affirmatively states he never instructed or suggested to a client to delete any text message. (Peterson Decl. ¶ 3.) At deposition, [redacted]. (Peterson Dep. 103:6–19; Andersen Decl. Ex. F at 179.) [redacted]. (*Id.* Ex. F.) The same client signed an attestation of non-solicitation and submitted an affidavit of non-solicitation. (ECF 167 at 10.)

[3] Relatedly, Ballast claims it "has no way of knowing how many Ballast clients did not or could not collect text messages." (ECF 150 at 10.) Ballast could have contacted those clients and asked, and/or subpoenaed them, and/or deposed them. It did not.

So, when confronted with a client who (i) produced messages showing routine, innocuous contact, (ii) whose production contains the very "gap" Ballast tries to weaponize, and (iii) who signed both an attestation and an affidavit confirming that Peterson did not solicit him, Ballast still chose not to ask basic follow-up questions of any witness. Ballast did not ask Peterson or the client about the gap, did not explore the client's deletion practices, and did not seek the missing message from the other source who could supply it. These facts underscore that Ballast had available avenues to clarify any perceived discrepancy but did not pursue them during discovery.

### B. Peterson Does Not Intentionally Delete Any ***<u>Email</u>***, After Litigation Became a Possibility, with an Intent to Hide It From Ballast

#### 1. Peterson Enables an Email Auto-Delete Setting Long Before This Litigation

As with his text messages, [redacted] (Peterson Dep. 31:5–12.) [redacted] (*Id*. 31:14–32:15.) [redacted] (*Id*. 39:21–40:11.)

#### 2. Ballast Complains about *Eight* Emails Not Being Produced

In this dispute regarding approximately 50 clients leaving Ballast to continue obtaining financial services from Peterson, Defendants produced nearly 30,000 documents comprising over 160,000 pages. (Andersen Decl. ¶ 2.) Ballast raises specific concerns about eight emails it claims were not produced.

Ballast first identifies ***four*** emails from April and May 2022 regarding Peterson sharing his then-draft Ballast employment agreement with Marxer. (ECF 150 at 12.) The fact Peterson did so, why he did so, and Marxer's responding advice, are not in dispute. (ECF 164 at 3, ¶¶ 20-22.)

Ballast next identifies emails with ASN in June 2022 that Peterson did not produce. Ballast obtained the emails from ASN. (ECF 150 at 13.)

Ballast next identifies emails in September-November 2022 where "Peterson produced some, but not all," of the emails. (ECF 150 at 13.) Ballast acknowledges some of these emails were obtained from other sources. (ECF 150 at 14 n.7.) Ballast identifies ***three*** emails that were not produced by any party or third party, with subjects "Sample Agreements for review", "Business plan", and "A check in from Advisory Services Network". (ECF 150 at 13.) That is correct. But Peterson had no obligation in fall 2022 to be preserving evidence.

Ballast then returns to its "selective deletion" innuendo regarding another three emails during January and February 2023. (ECF 150 at 14-15.) Contrary to Ballast's claims, Peterson produced two of those three emails, leaving just ***one*** unproduced:

- Ballast claim: "But an email with the subject 'Following up…' that Peterson viewed four times between January 27 and 30, 2023, was *not* produced by any Defendant." (ECF 150 at 14 (emphasis in original).) Peterson produced this. (Andersen Decl., Ex. H.)
- Ballast claim: "However, on February 8, 2023 . . . Peterson viewed a message with the subject 'Phone Call,' and no emails with that subject have been

produced by any Defendant." (ECF 150 at 15.) Peterson produced this. (Andersen Decl., Ex. I.)

Thus, in total, Ballast's sanctions motion regarding Peterson's pre-departure emails stem from Peterson not producing a total of eight emails.[4]

Ballast ultimately admits its review of Peterson's productions "does not suggest a clear pattern as to when or how [email] destruction occurred." (ECF 150 at 12.)

**3. Ballast Does Not Identify Any Unproduced Email Following February 23, 2023**

Ballast notes Peterson had an email auto-deletion setting enabled after February 23, 2023. But it does not identify any email from after that time it believes should have been produced but was not. Peterson denies intentionally deleting any email correspondence. (*See, e.g.,* Peterson Dep. 30:2–7, 40:23–41:6, 42:11–16, Ex. 1[5].) [redacted] (Andersen Decl. Ex. K.)

Third-party email activity shows the same thing. Subpoenaed ASN materials reflect zero post-departure Gmail traffic by Peterson. [redacted]

---

[4] In preparing this memorandum, out of an abundance of caution, Peterson—with counsel's assistance—again sought to determine if these eight emails were in Peterson's possession. They are not. (Peterson Decl. ¶ 4.)

[5] Andersen Decl. Ex. J.

[redacted] (Andersen Decl. Ex. L.)

### C. Every Client Attests They Were Not Solicited; Peterson Attests The Same; Ballast Admits It Cannot Dispute This

Ballast's sanctions request primarily targets missing text messages between Peterson and clients, and whether those text messages would show solicitation. But those text messages are not the only things evidencing Peterson's and each client's communications. Every client who moved from Ballast to continue obtaining financial services from Peterson signed an attestation that Peterson did not solicit them. (ECF 167-3.) Most of those clients also signed an affidavit reiterating the statements that Peterson did not solicit them. (ECF 167-4.) [redacted] (Parnell Dep. 276:17–277:22; ECF 164 at 14, ¶¶ 102-04.) Finally, Peterson likewise attests he did not solicit any of these clients. (ECF 167, ¶ 4.)

## ARGUMENT

Ballast's request, through a sanctions motion, to obtain dispositive relief on all its claims against all Defendants should be denied. Peterson did not intentionally destroy any evidence after becoming aware Ballast might sue him. An inadvertent failure to disable an auto-deletion setting is not grounds for sanction. Ballast admits there is no evidence of some intentional pattern of deletion. Ballast's request for dispositive sanctions is directly contrary to actual record evidence.

### A. Legal Standard

"[A] court imposing spoliation sanctions has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witness in a particular case, and other factors." *N. Am. Sci. Assocs., LLC v. Conforti*, 2024 WL 4903753, at *16 (D. Minn. Nov. 27, 2024) (quoting *Kelley as Tr. of BMO Litig. Tr. v. BMO Harris Bank N.A.*, 657 B.R. 475, 485 (D. Minn. 2022)). Under Federal Rule of Civil Procedure 37(e), lost ESI triggers remedies only if: (1) the ESI should have been preserved in the anticipation or conduct of litigation, (2) it was lost because a party failed to take reasonable steps, and (3) it cannot be restored or replaced through additional discovery. If those predicates are met and there is prejudice, the Court may order measures no greater than necessary to cure the prejudice under Rule 37(e)(1). Fed. R. Civ. P. 37(e)(1). If, in addition, the Court finds the party acted with the intent to deprive the opponent of the information's use in the litigation, it may employ the harsher measures in 37(e)(2), including adverse-inference instructions or issue-preclusive relief. Fed. R. Civ. P. 37(e)(2). Here, Ballast seeks sanctions under both prongs of Rule 37(e).

Eighth Circuit requires both intentional destruction (bad faith) and prejudice for an adverse-inference instruction, which accords with Rule 37(e)'s post-2015 "intent to deprive" threshold for Rule 37(e)(2) sanctions. *See Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 460–61 (8th Cir. 2013) (because of the "gravity" of an adverse inference, district courts must make explicit findings of bad faith and prejudice); *Stevenson v. Union Pac. R. Co.*, 354 F.3d 739, 746–49 (8th Cir. 2004) (adverse inference requires intentional destruction indicating a desire to suppress the truth; routine policy-based deletions are not

enough). District courts likewise hold that any permissive adverse inference must remain rebuttable—the responding party must be allowed to present alternative explanations, lest a nominally permissive instruction become an irrebuttable presumption. *Rattray v. Woodbury Cnty., Iowa*, 761 F. Supp. 2d 836, 863–64 (N.D. Iowa 2010).

Rule 37(e) also codifies two limiting principles that defeat overbroad sanctions requests. First, the movant must make the affirmative showing that the ESI "cannot be restored or replaced through additional discovery"; when the substance is obtainable from other sources—third parties or co-custodians—severe sanctions are not authorized. Fed. R. Civ. P. 37(e). Second, any Rule 37(e)(1) sanction must be "no greater than necessary to cure the prejudice." *Id*. Even after a finding of intent under 37(e)(2), the 2015 Committee Notes caution that courts should use the listed measures sparingly and that a finding of intent does not require imposing them. *See also LifeScience Techs., LLC v. Mercy Health*, 2025 WL 961721, at *3 (E.D. Mo.) (recognizing adverse-inference instructions as an "extreme sanction" to be used with caution).

Courts also evaluate preservation efforts with sensitivity to a party's litigation sophistication, particularly for individual custodians using consumer devices that employ space-saving defaults. *Rao v. St. Jude Med. S.C., Inc.*, 631 F. Supp. 3d 678, 711 (D. Minn. 2022).

Against this backdrop, Ballast's requests underscore the extremity of the remedy it seeks. It asks the Court to (i) deem solicitation, causation, and aiding-and-abetting conclusively established (apparently supplanting its summary judgment motion and leaving only damages for trial), or (ii) alternatively issue a mandatory "must-presume"

adverse inference on solicitation and aiding-and-abetting. (*See* ECF 154.) Those are the most severe Rule 37(e)(2) measures—reserved for specific intent to deprive, and never appropriate when the information has been restored or replaced from other sources or where lesser, neutral measures would cure any proven prejudice.

Accordingly, the Court must first find irreplaceable loss and prejudice, and then tailor any relief to the least severe measure that cures that prejudice—reserving adverse-inference or issue-preclusion sanctions for the rare case of specific intent to deprive.

**B. Peterson's Preservation Obligation Arose February 23, 2023**

The duty to preserve ESI attaches when litigation is reasonably foreseeable, not when it is merely possible or when a party is simply exploring future employment options. *See* Fed. R. Civ. P. 37(e) & advisory committee's note to 2015 amendment (hereinafter "2015 note"). Objective litigation signals—such as demand letters or explicit acknowledgments that legal action is likely—rather than speculation about potential disputes based on pre-suit planning determine when obligations begin. *See Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 231-33 (D. Minn. 2019). Courts "look for significant signs of imminent litigation prior to the filing of a complaint and only impose a duty to preserve evidence when the signs are clear." *Keller v. Pepsi Bottling Grp., Inc.*, 2007 WL 9735622, at *4 (D. Minn.) (citation omitted).

February 23, 2023, was the objective trigger: the date when Ballast sent Peterson a cease-and-desist letter that both warned of legal action and instructed him to preserve ESI. Ballast's effort to backdate the trigger into 2022 fails because it rests on events that do not

objectively signal impending litigation; to wit: Peterson's transmission of a draft employment agreement in April–May 2022 and a suggestion that he consult counsel about that draft contract; (2) June/October 2022 communications that, according to Ballast and an ASN note, referenced legal advice about complying with a non-solicit; and (3) a no-longer-existing September 29, 2022, privilege log entry that Ballast says show anticipation of litigation. (*See* ECF 150 at 18.) Each fails to meet Rule 37(e)'s "reasonably foreseeable litigation" threshold.

First, reviewing or discussing a prospective employment agreement with Marxer—a longtime friend and business person—and being told to consult counsel before signing the contract say nothing about an objectively likely lawsuit. (*See Supra Facts* § A.2 at 4.) They evidence contract-compliance and, maybe, job-transition planning, not imminent litigation.

Second, the June and October 2022 references to Peterson being told to consult a lawyer about non-solicitation obligations, even if credited,[6] still reflect compliance counseling, not litigation notice. (*See Supra Facts* § 4.) The touchstone is reasonable foreseeability of suit, and neither contract-compliance advice nor workforce-mobility planning, standing alone, satisfies that standard.

[6] Ballast does not present Exhibit A accurately. In one breath, Ballast claims Peterson consulted legal counsel. (ECF 150 at 3 (citing ECF 152).) In another, Ballast claims "Peterson represented to ASN that he had consulted legal counsel." (ECF 150 at 18 (citing ECF 152).) This document is not one authored by Peterson, and when deposed, Peterson testified [redacted] (Peterson Dep. 340:2-13.) Ballast elected not to depose ASN nor the document's author.

Third, Ballast's reliance on the superseded privilege-log entry does not move the trigger date. Ballast now has the at-issue document—it was produced and the entry was removed from the privilege log—so it cannot simultaneously treat the same document as both evidence it possesses and a basis to back-date Peterson's preservation duty. (*See supra* at 4–5.) Ballast cannot have it both ways. *North American Science Associates* underscores the difference. There, the duty date moved because the parties actually asserted work-product protection and withheld draft declarations prepared "in anticipation of litigation," alongside contemporaneous preservation activity—not because of a corrected log entry followed by production. *N. Am. Sci. Assocs.*, 2024 WL 4903753, at *18–20 (D. Minn.).

By contrast, the first objective litigation signal here is February 23, 2023, when Ballast sent a cease-and-desist letter warning of legal action and directing Peterson to preserve ESI. Viewed through that lens, most of Ballast's examples are pre-trigger items it highlights from 2022 and early 2023. (*See* ECF 150 at 12–15, 17–19.) As to anything after February 23, 2023, Rule 37(e) still requires irreplaceable loss and limits any relief—absent intent—to measures "no greater than necessary" to cure proven prejudice. *See* Fed. R. Civ. P. 37(e)(1).

### C. Ballast Has Not Shown Peterson Intended to Deprive it of Evidence That Should Have Been Preserved in Anticipation of Litigation, After February 23, 2023

Rule 37(e)(2) requires specific intent to deprive. *See Hallmark*, 703 F.3d at 460–61; *Keller*, 2007 WL 9735622, at *5. Negligence—even gross negligence—or imperfect preservation practices do not permit the remedies Ballast seeks. *In re Petters Co., Inc.*, 606

B.R. 803, 827 (Bankr. D. Minn. 2019), *aff'd sub nom*. *Kelley*, 657 B.R. 475; *see Vander Pas v. Bd. of Regents of Univ. of Wisconsin Sys*., 664 F. Supp. 3d 893, 907 (E.D. Wis. 2023) (concluding that conduct in failing to disable auto-delete function for text messages on work phone after her duty to preserve evidence arose amounted to gross negligence, rather than bad faith). The Eighth Circuit has emphasized that complaints about how ESI was handled "would at most prove negligence . . . not the sort of intentional, bad-faith misconduct required to grant an adverse presumption." *Auer v. City of Minot*, 896 F.3d 854, 858 (8th Cir. 2018). Rule 37's 2015 Notes likewise reject adverse-inference sanctions absent a finding that the party acted with the intent to deprive another of the information's use, and courts caution that adverse inferences are an "extreme sanction." Fed. R. Civ. P. 37(e)(2) & 2015 note; *Rao*, 631 F. Supp. 3d 678, 712 (D. Minn. 2022).

Ballast's theory is that Peterson's behavior—at best passive use of a previously enabled auto-delete function; at worst, failure to turn off that auto-delete—equals intentional destruction. That is not the law. Even significant preservation missteps are not enough for Rule 37(e)(2) remedies without proof of intent. *Auer*, 896 F.3d at 858.

**1. There is no evidence of targeted email deletions after February 23, 2023**

As to the emails, Ballast contends Gmail has "no auto-delete" and therefore any loss must have been targeted. (*See* ECF 150 at 23–24 & n.11.) But even if Gmail lacks a global retention rule, Gmail does automatically purge Trash after 30 days—i.e., a built-in housekeeping function that is not, by itself, evidence of intent. *See* Google Workspace Help

("Messages in the Trash are permanently deleted after 30 days.").[7] Critically, Ballast points to no forensic evidence that Peterson performed message-by-message culling to suppress adverse content; that evidentiary gap is dispositive under Rule 37(e)(2). *See Auer*, 896 F.3d at 858; Fed. R. Civ. P. 37(e)(2).

**2. Ballast's timeline theory does not establish post-departure concealment or intent**

Ballast leans on pre-February 23, 2023, items to suggest Peterson knew litigation was coming yet "failed to disable auto-delete." (*See* ECF 150 at 17–20, 22–23.) But the record shows a pre-departure transition away from personal Gmail: by mid-December 2022, MMX addresses were live and in use, consistent with winding down personal Gmail use before Peterson left Ballast. The ASN subpoena likewise reflects no post-departure Gmail traffic. (*See Supra* Facts § B.3.) That pattern is the opposite of a post-departure concealment motive. *See Paisley Park Enterprises, Inc.*, 330 F.R.D. at 232–37 (intent judged from concrete, contemporaneous facts, not hindsight).

This is also consistent with Ballast's theory of Peterson's wrongdoing. Ballast claims Peterson was using Gmail before leaving Ballast to hide his bad acts. (*See* ECF 150 at 23–24 & n.11.) But then, according to Ballast, Peterson would have no such motivation after leaving Ballast. So the lack of Peterson's Gmail usages after leaving Ballast is exactly what Ballast should expect.

**3. Ballast's "the missing texts prove solicitation" claim contradicts the record**

[7] https://support.google.com/mail/answer/7401?hl=en&ref_topic=3394652 (last visited March 4, 2026).

Ballast next invites the Court to infer that "missing texts" would prove solicitation because phone logs show texts around notable dates. (*See* ECF 150 at 5–11, 27–30.) But the available communications cut the other way (*see supra* Facts § A.3), and courts do not presume that hypothetical, unrecovered messages are more inculpatory than the ones in the record. *See N. Am. Sci. Assocs.*, 2024 WL 4903753, at *16, *22–26. Nor is this a case of refusal to collect: Peterson tried to obtain any text messages he lacked, while Ballast chose not to use any alterative discovery methods to obtain the text messages. (*See supra* Facts § A.3.) A party cannot manufacture "spoliation" prejudice by declining to pursue available discovery and then asking the Court to fill the gap with adverse inferences.

And here is what the undisputed record shows: Every client who moved with Peterson signed an attestation, and many also signed an affidavit, swearing that Peterson did not solicit their business. (*See supra* Facts § C.) Ballast admits it cannot rebut that evidence. (*See id.*) Against that record of *non-solicitation*, using Rule 37(e)(2) to impose a mandatory adverse inference of *solicitation* would be the sort of "extreme sanction" this District reserves for truly egregious conduct paired with proof of specific intent. *Rao*, 631 F. Supp. 3d at 712; Fed. R. Civ. P. 37(e)(2) & 2015 note.

#### 4. Ballast's approach to "missing texts" undercuts its claim of irremediable loss

Ballast further argues "efforts to retrieve missing texts have been exhausted," pointing to limits of iMessage metadata and a 2025 phone image. (*See* ECF 150 at 10–11, 20–21.) Yet Ballast simultaneously identifies five specific unproduced text messages with an ASN representative between December 2022 and May 2023, yet identifies no effort to

obtain those messages from ASN, the obvious alternative source. (*See* ECF 150 at 7, 21.) Ballast also hints that certain client productions were "selectively deleted," but it chose not to probe through ordinary follow-up discovery. (*See supra* Facts § A.4.)

**5. Ballast's "eight emails" theory collapses under the trigger date and the record**

Having received about 30,000 documents in discovery, Ballast complains it did not receive eight Peterson emails and then posits selectivity from their subject lines. (*See* ECF 150 at 12–15.) Four of those emails regard the undisputed (and immaterial) fact that Peterson shared his draft employment agreement Marxer; the other four are admittedly missing. They were all transmitted before Peterson has any preservation obligation. And Ballast admits that comparing the Ballast-laptop activity registry with productions "does not suggest a clear pattern as to when or how destruction occurred." (ECF 150 at 12.) That admission is at odds with the intent-to-deprive finding that Rule 37(e)(2) demands. *See Auer*, 896 F.3d at 858. Rule 37(e) does not authorize harsh sanctions for pre-trigger loss of minimal ESI.

**6. Ballast's reliance on *Paisley Park* and out-of-circuit cases does not supply the missing intent**

Peterson's circumstances are not like *Paisley Park*. There, principals failed to disengage auto-delete, but they also ignored preservation obligations, and then wiped and discarded their phones—twice for one custodian—after suit began and after the court had ordered ESI preservation. *Paisley Park Enterprises, Inc.*, 330 F.R.D. at 232. On those facts, the court found willful, intentional destruction and imposed sanctions. *Id.* at 236-37. That is qualitatively different behavior from what Ballast can prove here: passive settings and

sporadic gaps, with alternative sources available. In fact, the *Paisley Park* court observed, "Were the missing ESI only the result of Wilson and Staley's failure to disengage the auto-delete function on their phones, then the Court might consider the loss of evidence to be the result of mere negligence. But that is not the case here." *Id.*

Ballast's out-of-circuit cases do not change the Rule 37(e)(2) bar. *DR Distributors* and *Pable* are Northern District of Illinois preservation and "reasonable steps" cases that emphasize litigation holds, disabling auto-delete, and counsel's duty to supervise collection; they do not dispense with the separate, higher showing of intent to deprive required for adverse-inference or terminating measures. *See DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 856–67, 979–86 (N.D. Ill.) (describing a multitude of discovery issues over 62 pages of court opinion, detailing holds, custodian interviews, and auto-delete obligations; not finding intent to destroy, so imposing curative measures under Rule 37(e)(1)); *Pable v. Chicago Transit Auth.*, 2024 WL 3688708, at *6–10 (N.D. Ill.) (finding intent due to shifting explanations and misrepresentations).

By contrast, the Eighth Circuit is explicit: the "strong medicine" of adverse presumptions or case-ending sanctions for ESI loss requires proof that the party "acted with the intent to deprive" the opponent of the information's use; negligence—even grossly sloppy preservation—is not enough. *See Auer*, 896 F.3d at 858–60.

On this record, Ballast never clears Rule 37(e)(2)'s specific-intent bar. The Eighth Circuit treats adverse inferences and similar measures as "strong medicine" reserved for intentional, bad-faith destruction; complaints about auto-delete settings or imperfect retention "at most prove negligence," which is not enough. At the same time, Rule 37(e)

itself "recognizes that 'reasonable steps' to preserve suffice; it does not call for perfection," and courts in this District caution that the duty to preserve does not demand saving all potential evidence or "every single scrap of paper" in a business. *See* Fed. R. Civ. P. 37(e) & 2015 note; *Great Am. Ins. Co. v. Twin Cities Dance & Entm't Co., LLC*, 2025 WL 1754485, at *6 (D. Minn.); *Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, 247 F.R.D. 567, 570 (D. Minn. 2007). Ballast's authorities do not change that. With no proof that Peterson targeted any ESI or acted to deprive Ballast of their use, Rule 37(e)(2) remedies are off the table. At most, if Ballast could prove prejudice, the inquiry moves to Rule 37(e)(1) and "measures no greater than necessary to cure the prejudice."

### D. Absent intent under 37(e)(2), the only remedy available to Ballast—if it can prove prejudice—is under 37(e)(1), which limits relief to "measures no greater than necessary to cure the prejudice"

Rule 37(e)(1) is narrow by design. It applies only if the movant proves both that relevant ESI "cannot be restored or replaced through additional discovery" and that the loss caused prejudice; and even then, any remedy must be "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1) & 2015 note. Prejudice under Rule 37(e)(1) exists when spoliation prevents a party from presenting relevant evidence, and the Court may assess prejudice based on a "reasonable probability" that uniquely important, irreplaceable information was lost—while recognizing that the Rules place no fixed burden on either side considering the difficulty of proving the content of missing ESI. *Kelley*, 657 B.R. at 490–92. And because the prejudice inquiry "necessarily includes an evaluation of the information's importance in the litigation," any Rule 37(e)(1) measure must be strictly

tailored to cure a concrete trial disadvantage—not to punish imperfect preservation. *Id.* at 492; Fed. R. Civ. P. 37, 2015 note.

#### 1. Ballast has not shown irreplaceable loss

Ballast's own filings show that much of the material it complains about was restored or replaced from third parties and co-custodians. For emails, Ballast obtained *advisorpete@gmail.com* correspondence from ASN via subpoena and from other Defendants; for texts, Peterson collected and produced client-side threads (and Ballast highlights additional client threads it received). That forecloses Rule 37(e)(1)'s predicate for sanctions as to those items.

As to certain identified but unproduced items Ballast spotlights (e.g., "five unproduced texts" with an ASN representative), Ballast identifies no effort to obtain the messages from ASN itself, the obvious alternative source. (*See supra* Facts § A.4.) And as to the text messages with clients, Peterson made significant efforts to find and replace his missing text messages from other sources—the clients. (*See supra* Facts § A.3.) Ballast, however, made no such efforts. The rule requires the movant to show the information "cannot be restored or replaced through additional discovery," but Ballast has not made this showing.[8]

---

[8] Peterson acknowledges his ESI preservation obligations, and his duty to produce responsive documents to reasonable discovery requests. By identifying Ballast's choice not to seek the missing text messages from alternative sources, Peterson does not mean to shift a burden to Ballast. Peterson merely points out Ballast's failure, on this motion, to demonstrate with evidence that the text messages are irreplaceably lost.

### 2. Speculation about the contents is not "prejudice"

Prejudice under Rule 37(e)(1) is not established by hypothesizing that missing ESI "would have helped." Ballast relies on phone-bill entries and the fact that some iMessages do not appear in carrier logs to guess at the content of unrecovered messages; but that is inherently speculative—especially when the produced threads from clients and co-defendants cut against the inference Ballast urges and when the gaps often coincide with sources Ballast chose not to pursue. Rule 37(e)(1) requires a tie between the loss and a demonstrable trial disadvantage.

Certain asserted gaps—Peterson planning a new firm and its internal setup (ECF 150 at 29)—are not elements of any pleaded claim and are addressed by alternative sources (co-Defendants' productions and ASN emails) that Ballast already obtained or chose not to pursue. Other asserted gaps—primarily client text message conversations—are not gaps at all, because alternative evidence exists, which Ballast admits it cannot challenge. That alternative evidence is the clients' own attestations; [redacted] (*See supra* Facts § C.) If Peterson does not call those clients as trial witnesses, Ballast can seek to do so, and would have every opportunity to cross-examine them on their attestations and affidavits.

### 3. At most, any cure here should be minimal and neutral

Ballast relies on inapposite authority in requesting relief that is disproportionate to any prejudice it alleges. (ECF 150 at 31.) *Safelite Group, Inc. v. Lockridge* involved a formal cease-and-desist letter that triggered the preservation duty in August 2021, an

immediate suit, and a record showing the movant had exhausted counterparty and carrier avenues, yet could not restore or replace critical text content. 2024 WL 4343038, at *4-5. The court, finding negligence not intent, adopted a balanced Rule 37(e)(1) remedy: each side could present the preservation lapse and argue for or against a permissive inference; no must-presume instruction issued. *Id.* at *7, 9. That calibrated cure contrasts with Ballast's requested issue-preclusion and must-presume relief—and with Ballast's decision not to subpoena counterparties (e.g., ASN) for the very messages it identifies.

*Doe v. District of Columbia* involved a Rule 37(e)(1) motion for systemic failures by a government defendant—litigation holds not forwarded; government phones wiped, lost, or auto-deleted after the duty attached. 2023 WL 3558038, at *13–16 The court found moderate prejudice and tailored relief to a single disputed issue (adequacy of the employer's response), allowing a permissive spoliation instruction and fees; it rejected broad content presumptions, in part because "[t]here . . . is a hardline rule: a party cannot be awarded the sanctions listed in subsection (e)(2) under subsection (e)1. *Id.* at *16. Any Rule 37(e)(1) measure here would have to be similarly narrow and neutral, not the sweeping, dispositive relief Ballast seeks.

If the Court were to find some specific prejudice that cannot be cured by ordinary proof at trial, the remedy should be the least-restrictive option that truly cures it—such as allowing the parties (both sides) to elicit that certain messages were not recoverable, to present the existing third-party replacements, and to argue fair inferences about diligence and available sources—while prohibiting counsel from asserting the contents of missing communications or inviting the jury to presume they were favorable or unfavorable. That

approach accords with Rule 37(e)(1)'s limit to "measures no greater than necessary" and avoids converting Rule 37(e)(1) into an end-run around Rule 37(e)(2).

**E. No fees should be awarded to Ballast**

Even if the Court were to find some prejudice, Rule 37(e)(1) permits only measures "no greater than necessary to cure the prejudice," not fee awards untethered to a concrete, trial-level disadvantage. Fed. R. Civ. P. 37(e)(1). When, as here, Ballast bypassed obvious substitutes (e.g., ASN texts it identified, discovery requests directed at clients) and substantial content was in fact restored or replaced from third parties and co-custodians through Defendants' own efforts, fee-shifting is inappropriate.

*Vogt* does not help Ballast. (*See* ECF 150 at 32-33.) The case involved unique, irreplaceable video, and the court found intent and issued a Rule 37(e)(2) adverse-inference instruction, then limited fees to amounts the plaintiff "would not have incurred but for" the loss. *Vogt v. MEnD Correctional Care, PLLC*, 2023 WL 2414551, at *17 (D. Minn.). Here, there was no intent to destroy, and Ballast did not make efforts to obtain evidence from alternative sources. On this record, Rule 37(e)(1) is the only possible hook, and that rule permits measures "no greater than necessary to cure the prejudice," not fee awards untethered to a concrete, trial-level disadvantage or to costs the movant chose to incur. Fed. R. Civ. P. 37(e)(1).

## CONCLUSION

Defendants respectfully request that Ballast's motion for Rule 37(e) sanctions be denied in its entirety.

Respectfully submitted,

NILAN JOHNSON LEWIS PA

Dated: March 4, 2026

By: *s/ Joel Andersen*
Joel Andersen (#0352573)
Katie M. Connolly (#0338357)
Christopher T. Ruska (#0401745)
250 Marquette Avenue South, Suite 800
Minneapolis, MN 55401
(612) 305-7500
jandersen@nilanjohnson.com
kconnolly@nilanjohnson.com
cruska@nilanjohnson.com

ATTORNEYS FOR DEFENDANTS AND
COUNTERCLAIM-PLAINTIFF