UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Ballast Advisors, LLC,

Plaintiff,

v.

Scott A. Peterson, Melinda M. Bradley, MMX Wealth Partners, LLC, MMX Management, LLC and Mark Marxer,

Defendants,

and

Scott A. Peterson,

Counter-Plaintiff,

v.

Ballast Advisors, LLC and Paul Parnell,

Counter-Defendants.

Court File No. 23-CV-03769 (PJS/JFD)

**PLAINTIFF AND COUNTER-DEFENDANTS BALLAST ADVISORS, LLC AND COUNTER-DEFENDANT PAUL PARNELL'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT AND COUNTER-DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .... iii

STATEMENT OF FACTS .... 1

ARGUMENT .... 21

I. LEGAL STANDARD .... 21

II. BALLAST'S BREACH OF CONTRACT CLAIM AGAINST PETERSON .... 22
- A. The Agreement is supported by valid consideration. .... 22
  - 1. The $500 payment .... 22
  - 2. The Retirement Benefit .... 23
  - 3. Continued employment .... 26
- B. The Agreement is not overbroad. .... 27
  - 1. The non-solicitation provision .... 27
  - 2. The confidentiality provision .... 30
- C. Bradley was bound by appropriate restrictions. .... 31
- D. Peterson breached the Agreement. .... 32
- E. Ballast is entitled to summary judgment on its breach of contract claim against Peterson. .... 34

III. MUTSA CLAIM AGAINST PETERSON .... 35
- A. MUTSA does not displace Ballast's other confidentiality-based claims. .... 35
- B. Ballast has shown MUTSA misappropriation. .... 35

IV. BREACH OF FIDUCIARY DUTY AND TORTIOUS INTERFERENCE AGAINST PETERSON .... 38

V. AIDING AND ABETTING AGAINST BRADLEY, MMX WEALTH PARTNERS, MARXER, AND MMX MANAGEMENT .... 38
- A. Bradley .... 39
- B. Marxer, MMX Management, MMX Wealth Partners ("MMX Parties") .... 40

VI. DAMAGES .... 41
- A. Cobb is not required to establish causation. .... 41
- B. Cobb apportions damages. .... 42

VII. EQUITABLE REMEDIES ........ 43

VIII. BALLAST AND PARNELL ARE ENTITLED TO SUMMARY JUDGMENT ON PETERSON'S COUNTERCLAIMS. ........ 44
- A. Four of Peterson's counterclaims fail for lack of a false statement. ........ 44
- B. Peterson's counterclaims fail for other reasons ........ 46
  - 1. Defamation ........ 46
  - 2. Defamation per se ........ 46
  - 3. Malicious injury ........ 47
  - 4. Intrusion upon seclusion ........ 47
  - 5. Appropriation ........ 48
  - 6. False Endorsement/Lanham Act ........ 49

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahern Rentals, Inc. v. EquipmentShare.com*,
59 F.4th 948 (8th Cir. 2023) ........ 36

*Am. Exp. Fin. Advisors, Inc. v. Topel*,
38 F.Supp.2d 1233 (D. Colo. 1999) ........ 36

*Amano v. Klavon*,
No. A21-0237, 2021 WL 5442339 (Minn. Ct. App. Nov. 22, 2021) ........ 28

*Auer v. City of Minot*,
896 F.3d 854 (8th Cir. 2018) ........ 32, 33

*B & Y Metal Painting, Inc. v. Ball*,
279 N.W.2d 813 (Minn. 1979) ........ 41

*Belanger v. Yorke*,
2020 ME 24, 226 A.3d 215 ........ 23

*Bennett v. Storz Broad. Co.*,
134 N.W.2d 892 (Minn. 1965) ........ 28

*Bergstrom v. Sears, Roebuck & Co.*,
532 F. Supp. 923 (D. Minn. 1982) ........ 25

*Bessemer Tr. Co. v. Branin*,
949 N.E.2d 462 (2011) ........ 33

*Blue Dane Simmental Corp. v. Am. Simmental Ass'n*,
178 F.3d 1035 (8th Cir. 1999) ........ 42

*C.H. Robinson Worldwide, Inc. v. Traffic Tech, Inc.*,
161 F.4th 1101 (8th Cir. 2025) ........ 30

*Cherne Indus., Inc. v. Grounds & Assocs, Inc.*,
278 N.W 2d 81 (Minn. 1979) ........ 36, 37

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ........ 41

*Davies & Davies Agency, Inc. v. Davies*,
298 N.W.2d 127 (Minn. 1980)........................................................................ 26

*Deluxe Fin. Servs., LLC v. Shaw*,
2017 WL 3327570 (D. Minn. Aug. 3, 2017) ............................................................ 37

*Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*,
844 N.W.2d 210 (Minn. 2014)........................................................................ 38

*Eldeeb v. Univ. of Minnesota*,
864 F. Supp. 905 (D. Minn. 1994), *aff'd sub nom. El Deeb v. Univ. of Minnesota*, 60 F.3d 423 (8th Cir. 1995)........................................................ 47

*Electro-Craft Corp. v. Controlled Motion, Inc.*,
332 N.W.2d 890 (Minn. 1983)........................................................................ 37

*Forest Lake Facilities, LLC v. Wells Fargo Bank, N.A.*,
2017 WL 4736716 (D. Minn. Oct. 19, 2017) .......................................................... 38

*Freeman*, *v. Duluth Clinic, Inc.*,
334 N.W.2d 626 (Minn. 1983)........................................................................ 26

*FSI Int'l, Inc. v. Shumway*,
2002 WL 334409 (D. Minn. Feb. 26, 2002) .................................................. 23, 24, 25

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*,
2007 WL 1964337 (D. Minn. June 29, 2007)............................................................ 41

*Guidant Sales Corp. v. Baer*,
No. 09-CV-0358PJS/FLN, 2009 WL 490052 (D. Minn. Feb. 26, 2009) .................... 22

*Haynes v. Monson*,
224 N.W.2d 482 (Minn. 1974)........................................................................ 33

*Honeywell Int'l Inc. v. Stacey*,
2013 WL 9851104 (D. Minn. 2013) ........................................................................ 29

*Hormozi v. Neist Media LLC*,
2024 WL 4772462 (D. Minn. Nov. 13, 2024) .......................................................... 49

*Hunt v. Cromartie*,
526 U.S. 541 (1999)........................................................................................ 22

*Iverson v. City of St. Paul*,
240 F. Supp. 2d 1035 (D. Minn. 2003) *aff'd*, 74 F. App'x 676 (8th Cir. 2003) ............................................................................................................ 21

*Johnson v. Evangelical Lutheran Church in Am.*,
2013 WL 1249151 (D. Minn. 2013) .......... 34

*Jostens, Inc. v. National Computer Systems, Inc.*,
318 N.W.2d 691 (Minn. 1982) .......... 36

*Keckhafer v. Prudential Ins. Co. of Am.*,
2002 WL 31185866 (D. Minn. Oct. 1, 2002) .......... 44, 47

*Kelley v. BMO Harris Bank N.A.*,
No. 19-CV-1756 (WMW), 2023 WL 4145827 (D. Minn. June 23, 2023)
*rev'd in part on other grounds, Kelley v. BMO Harris Bank Nat'l Ass'n*,
115 F.4th 901 (8th Cir. 2024) .......... 39

*Lake v. Wal–Mart Stores, Inc.*,
582 N.W.2d 231 (Minn.1998) .......... 47, 48

*Mannacio v. LG Elecs. U.S.A., Inc.*,
2020 WL 4676285 (D. Minn. Aug. 12, 2020) .......... 43

*Marvin Lumber & Cedar Co. v. Severson*,
2015 WL 5719502 (D. Minn. Sept. 28, 2015) .......... 30

*McKee v. Laurion*,
825 N.W.2d 725 (Minn. 2013) .......... 45

*Medtronic, Inc. v. Gibbons*,
527 F. Supp. 1085 (D. Minn. 1981), *aff'd,* 684 F.2d 565 (8th Cir. 1982) .......... 30

*Mercer Glob. Advisors Inc. v. Crowley*,
2023 WL 2531727 (N.D. Ga. Mar. 15, 2023) .......... 34

*Midland Nat. Bank of Minneapolis v. Sec. Elevator Co.*,
200 N.W. 851 (Minn. 1924) .......... 25

*Minnesota v. Fleet Farm LLC*,
679 F. Supp. 3d 825 (D. Minn. 2023) .......... 38

*Mobile Mini, Inc. v. Vevea*,
2017 WL 3172712 (D. Minn. 2017) .......... 33

*Moreland v. Kladeck, Inc.*,
2022 WL 1501122 (D. Minn. May 12, 2022) .......... 44, 49

*Morgan Stanley DW Inc. v. Rothe*,
150 F. Supp. 2d 67 (D.D.C. 2001) .......... 36

*MPAY Inc. v. Erie Custom Computer Applications, Inc.*,
2021 WL 3661507 (D. Minn. Aug. 18, 2021) ........................................................ 42

*Nat'l Sur. Co. v. Winslow*,
173 N.W. 181 (Minn. 1919)................................................................................. 25

*Pedersen v. Akona, LLC*,
429 F. Supp. 2d 1130 (D. Minn. 2006)................................................................. 25

*Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*,
318 F.3d 1284 (11th Cir. 2003) ........................................................................... 36

*Prime Therapeutics LLC v. Beatty*,
354 F. Supp. 3d 957 (D. Minn. 2018)............................................................. 29, 37

*Prow v. Medtronic, Inc.*,
770 F.2d 117 (8th Cir. 1985) ......................................................................... 29, 30

*R. L. Mlazgar Assocs., Inc. v. Focal Point, L.L.C.*,
2025 WL 2307002 (D. Minn. Aug. 11, 2025) ........................................................ 43

*Radke v. Brenon*,
134 N.W.2d 887 (Minn. 1965).............................................................................. 25

*In re RFC*,
399 F. Supp. 3d 827 (D. Minn. 2019)................................................................... 43

*Rivendell Forest Prod., Ltd. v. Georgia-Pac. Corp.*,
28 F.3d 1042 (10th Cir. 1994) ............................................................................. 36

*Roth v. Gamble-Skogmo, Inc.*,
532 F. Supp. 1029 (D. Minn. 1982)...................................................................... 27

*Scott v. Harris*,
550 U.S. 372 (2007)...................................................................................... 45, 46

*Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*,
2016 WL 5496340 (D. Minn. Sept. 28, 2016)....................................................... 41

*Sheehy v. Bodin*,
349 N.W.2d 353 (Minn. Ct. App. 1984)............................................................... 22

*Sherman v. Rinchem Co.*,
No. 10-CV-2062.................................................................................................... 46

*Surgidev Corp. v. Eye Tech., Inc.*,
648 F. Supp. 661 (D. Minn. 1986), *aff'd,* 828 F.2d 452 (8th Cir. 1987)................ 31, 37

*Swarthout v. Mut. Serv. Life Ins. Co.*,
632 N.W.2d 741 (Minn.Ct.App.2001) ........................................................................ 48

*Synergetics, Inc. v. Hurst*,
477 F.3d 949 (8th Cir. 2007) ....................................................................................... 38

*TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc.*,
2013 WL 6827348 (D. Minn. 2013) ..................................................................... 28, 35

*Tenant Const., Inc. v. Mason*,
2008 WL 314515 (Minn. App. Feb. 5, 2008) .............................................................. 26

*Tholen v. Assist Am., Inc.*,
528 F. Supp. 3d 1017 (D. Minn. 2021) ................................................................. 44, 46

*Timeless Bar, Inc. v. Illinois Cas. Co.*,
734 F. Supp. 3d 886 (D. Minn. 2024), *aff'd,* 144 F.4th 1072 (8th Cir.
2025) ........................................................................................................................... 39

*Varga v. U.S. Bank Nat. Ass'n*,
952 F. Supp. 2d 850 (D. Minn. 2013), aff'd, 764 F.3d 833 (8th Cir.
2014) ........................................................................................................................... 39

*Wagner v. Gallup, Inc.*,
989 F. Supp. 2d 782 (D. Minn. 2013), *aff'd,* 788 F.3d 877 (8th Cir.
2015) ........................................................................................................................... 48

*Walker v. Wanner Eng'g, Inc.*,
867 F. Supp. 2d 1050 (D. Minn. 2012) ....................................................................... 44

*Webb Pub. Co. v. Fosshage*,
426 N.W.2d 445 (Minn. Ct. App. 1988) ............................................................... 27, 28

*Witzman v. Lehrman, Lehrman & Flom*,
601 N.W.2d 179 (Minn. 1999) .............................................................................. 40, 41

*Young-Losee v. Graphic Packaging Int'l, Inc.*,
631 F.3d 909 (8th Cir. 2011) ....................................................................................... 24

**Statutes**

Minn. Stat. § 116B.02, subd. 5 .................................................................................... 24

Minn. Stat. § 325C.01, subd. 5 ..................................................................... 35

Minn. Stat. § 325C.07(b) ..................................................................... 35

**Other Authorities**

Fed. R. Civ. P. 56(c) ..................................................................... 21

## STATEMENT OF FACTS

### A. Parties

*Ballast, Parnell, Nease*

1. Ballast is headquartered in Minnesota and provides wealth management services, including investment management, and financial planning and consulting. (Parnell Decl. ¶ 3; Parnell 25:23-26:15.)[1]

2. Ballast has offices in Minnesota and Florida. (Parnell Decl. ¶ 3.) During the time that Scott Peterson worked with Ballast, Ballast had approximately 15 employees in Minnesota and three in Florida. (*Id.*) Ballast has been notice-filed in Florida since February of 2017. (Nease Decl., ¶ 2.)

3. Parnell is an owner and Managing Partner of Ballast. (Parnell Decl. ¶ 2.)

4. Andrea Nease was VP of Operations and Compliance when Peterson worked in Ballast's Florida office. Nease worked in that office with Peterson. (Nease Decl. ¶ 2.)

*Peterson and Bradley*

5. Peterson started as a Ballast investment advisor in February 2017, worked in its Florida office as of early 2019, and was paid by Ballast thorough February 21, 2023. (Nease Decl. ¶ 3.)

---

[1] Deposition transcripts were filed under seal by Defendants as Exhibits A (Parnell); D (Nease); G (Bradley); H (Peterson); and K (Marxer) to the Declaration of Joel Andersen in Support of Defendants' Motion for Summary Judgment, and are herein identified and cited by deponent's last name. Deposition exhibits are identified in backets after the transcript page:line numbers, followed by the Boos Declaration Exhibit in parentheses. Exhibits A to ZZZ are attached to the Boos Declaration; Exhibits 101 to 104 are attached to the Nease Declaration; Exhibits 1 to 2 are attached to Parnell's Declaration.

6. Peterson was registered as an investment adviser with Ballast through February 22, 2023. (Ex. A, 3.)

7. Peterson assisted Ballast clients with investment management and financial planning matters. (Parnell Decl. ¶ 4.)

8. Bradley started at Ballast as a client service manager in December 2019 in Florida. (Ex. B.)

9. Bradley was responsible for troubleshooting and resolving client problems; addressing client inquiries and concerns; managing client information; maintaining the client relationship management ("CRM") database; and serving as a liaison between the clients and their advisor. (Ex. C; Bradley 47:24-50:22.)

10. Bradley was Peterson's "right-hand person." (Bradley 50:23-51:2.)

**B. Ballast provided Peterson and Bradley with access to confidential information.**

11. Peterson and Bradley (while employed at Ballast) had access to Ballast confidential information, including information related to Ballast clients. (Nease Decl. ¶¶ 9, 10.)

12. Ballast expended significant time and expense developing its confidential information and its client relationships and goodwill. (Parnell Decl. ¶ 6.)

13. Ballast protects its confidential information in many ways.

a. Ballast requires passwords and restricts access to its confidential information. (*See* Nease 76:1-77:12.)

b. Ballast requires employees to sign acknowledgements of Ballast's employee handbook, which contains a confidentiality section. (Ex. D.)

c. Ballast trains its employees on security. (Nease 77:24-78:7.)

d. Ballast requires employees to execute confidentiality agreements. (Ex. E.)

e. Ballast requires acknowledgement of its Compliance Manual containing a Privacy, Confidentiality, and Cybersecurity Policy. (Ex. F.)

f. Employees execute employment agreements containing restrictive covenants. (Nease Decl. ¶ 4).

g. Peterson signed a restrictive covenant agreement in 2017. (Ex. G.)

h. He signed his second ("the Agreement") on September 23, 2022. (Ex. H.)

## C. The Employment Agreement

*Consideration*

14. In 2022, Ballast asked its employees to enter into new employment agreements. (Parnell Decl. ¶ 7.)

15. The consideration for Peterson's Agreement was a $500.00 bonus, the benefit detailed in Section 4(d) (which Peterson acknowledged as good and valuable consideration), and continued employment. (Nease Decl. 101; Ex. H, Recital D.)

16. Peterson and Ballast negotiated the Agreement, including Section 4(d). (Peterson 280:14-282:8.)

17. Parnell instructed Nease to print out the section of the LLC Agreement referred to in Section 4(d) and give it to Peterson, which she did. (Nease Decl. ¶ 7.)

18. Peterson sent a draft of the Agreement to his long-time friend, Marxer. (Marxer 71:4-73:16, [11] (Ex. I).)

19. Marxer and Peterson discussed the Agreement, including Section 4(d). (Boos Decl. J; Marxer 73:19-74:11, 86:4-13.)

20. After Section 4(d) of the Agreement was revised to include a 2% rather than a 1% payout, Peterson told Parnell that he would sign the agreement. (Parnell Decl. ¶ 8.)

21. Because Peterson confirmed he'd sign the Agreement, the $500 bonus payment was added to his paycheck. (Nease 43:6-14; 41:19-42:20.)

22. While waiting for Peterson to sign, Parnell told Peterson several times he was paid the $500 bonus as part of the consideration for the Agreement. (Parnell Decl. ¶ 8.) Ballast was informing employees about the consideration bonus. (Ex. 101.)

23. Peterson delayed signing for several months; Parnell told Peterson that he would need to sign it or be terminated, so Peterson signed. (Parnell Decl. ¶ 8; Ex. 102 (telling Peterson that Parnell expected him to provide the agreement by end of day); Ex. H.)

*Confidentiality and non-solicitation provisions*

24. In the Agreement, Peterson agreed to "protect the confidentiality of [Ballast's] Confidential Information" and that he would not, during his Ballast employment or after, use or disclose Ballast's Confidential Information. (Ex. H.)

25. Peterson agreed that for two years after termination, he would not, directly or indirectly, "[c]all upon, solicit or attempt to solicit or divert" any Ballast client to do business with a Ballast competitor, "provide or sell . . . any service or product" to a

Ballast client that competes with Ballast's services or products, or "[i]nduce or persuade" any Ballast client to alter or terminate their Ballast relationship. (*Id.*)

**D. Marxer and MMX Management add a wealth management vertical.**

*Marxer and MMX Management*

26. Marxer founded a financial services organization called MMX Management, LLC. (Marxer 20:3-10.) It had five employees in 2022, including Marxer, his partner Brian Leftwich, Bradley, and two others. (Marxer 21:4-12.)

27. MMX Management has several affiliated entities which Marxer refers to as "verticals," including MMX Global Partners, LLC, MMX Sports and Entertainment, LLC, and MMX Wealth Partners, LLC (which MMX Management "tried to help build"). (Marxer 40:25-41:19.)

28. Marxer and Leftwich were the only officers/employees of these three verticals. (Marxer 22:10-26:9.)

29. Marxer held himself out as Managing Partner of MMX Management and Managing Principal of MMX Wealth Partners. (Marxer 139:25-140:5, [21] (Ex. K).)

30. Marxer had wanted to expand MMX Management's alternative investment space into the wealth management space. (Marxer 52:8-12, 53:12-54:14.)

31. In a "Top 100 Finance" publication, Marxer described having "assembled a growing powerhouse team from investment banking, sports, entertainment, wealth management…" (Ex. L, 8.) The wealth management team included Peterson, Bradley Leftwich and Marxer. (Marxer 243:6-19.)

*Peterson and Bradley consider employment options – MMX Management hires Bradley*

32. By at least April 8, 2022, Marxer knew Peterson was "considering options." (Marxer 78:18-79:15.)

33. Peterson considered leaving Ballast and prepared for a business relationship with MMX Management. (Peterson Decl. ¶ 5.)

34. Bradley was exploring options, too. In April 2022, Peterson told Bradley to reach out to Marxer for a job. (Def. Br. ¶ 48; Bradley 56:6-12; Marxer 58:19-59:10.)

35. In April and May 2022, Peterson and Bradley met with other investment advisory firms to explored joining them as a team, of which Marxer was aware. (Peterson 293:15-295:2 [44]; Bradley 57:8-59:6 [5] (Ex. M).)

36. On May 25, 2022, MMX Management offered Bradley a job. (Ex. N.)

37. Bradley told Marxer she wanted it to be a good move for both her and Peterson. (Bradley 71:12-24; 75:9-24, [8] (Ex. O).)

38. By then, Peterson and MMX Management had discussed a "consulting" arrangement in connection with a wealth management firm. (Bradley 71:12-72:22.)

39. The plan was for Peterson to provide wealth management services to ultra-high-net-worth clients. (Bradley 73:5-16.) MMX Management's clients' net worth ranged from $50 million to $2 billion. (Marxer 95:5-17.)

40. At Ballast, Peterson's clientele was "smaller-end clients that typically we don't deal with" and "much smaller than [MMX Management's] typical client" in the alternative investment space. (Marxer 94:11-95:25.)

41. MMX Management had ultra-high-net-worth, family office, and institutional clients; Peterson told Marxer he was excited to work with them, including NBA players. (Marxer 205:15-209:4.)

42. Bradley signed her offer letter on June 9, 2022, and she started with MMX Management on June 27, 2022. (Bradley 66:14-19, [7] (Ex. N).)

43. Bradley resigned on June 13, 2022, effective June 24, 2022. (Ex. P.)

44. Bradley was directed by, and reported to, Marxer and Leftwich while employed by MMX Management. (Bradley 66:23-67:19; 69:20-25; Peterson 85:14-87:23)

*MMX Management and Marxer coordinate the structure of the wealth management arm and move forward with ASN.*

45. In June 2022, Peterson was introduced to Advisory Services Network ("ASN"), another registered investment advisory ("RIA") firm. (Ex. Q.)

46. Marxer, Leftwich, Bradley, Peterson, and ASN comprised the team that created and operated the new wealth management business for MMX Management. (Bradley 151:22-153:7.)

47. Bradley was the liaison between Peterson and MMX Management (Marxer and Leftwich), and also between MMX Management, Peterson, and ASN. (Bradley 142:12-143:21.)

48. MMX Wealth Partners LLC was incorporated in September 2022. (Ex. R.)

49. On October 17, 2022, Bradley circulated notes from a call between her, Peterson, Leftwich, and Marxer. (Ex. S.) In them, she wrote:

a. "Brian: Dream structure: Scott registered with ASN (what else he needs). ASN takes percentage. How do they pay out to him? Set up own agreement with MMX and Scott."

b. "ASN would pay Scott—deposit into service company—for tax purposes, set up LLC. St [sic] up consulting agreement from that company to MMX."

c. "Hard to have MMX own any part of servicing company and be compliant. Don't want anything where the SEC will have to open up that book."

50. On October 27, 2022, Peterson updated the team on his timeline to leave Ballast. (Ex. T.)

51. Peterson and Bradley signed agreements with ASN. (Ex. U.)

52. Bradley's duties with ASN mirrored those at Ballast when she supported Peterson. (*Compare* Exs. C *and* U.)

53. MMX Management had "a large role" in the structuring of the wealth management business. (Ex. V.)

54. On November 29, 2022, MMX Management instructed its legal counsel to set up Peterson's LLC for Peterson and name it MMX WP, LLC, and then MMX Wealth "will then have the consulting agreement with that LLC." (Marxer 149:19-150:5, [24] (Ex. W).)

55. MMX Management obtained the "MMX Wealth Partners" trade name. (Peterson 84:23-85:1; Marxer 50:17-52:12, [5] (Ex. X); Bradley 87:13-20.) It was Marxer's idea. (Bradley 87:13-20.)

56. Marxer wanted "MMX" in the name for MMX Wealth Partners and MMX WP, LLC for branding purposes because the MMX brand "has a very good reputation." (Marxer 30:9-31:1)

57. MMX Wealth Partners and MMX WP ultimately entered into a consulting agreement effective March 17, 2023. Bradley provided "administrative and overhead support" to Peterson (as listed on Exhibit A to the Consulting Agreement). (Bradley 244:2-245:16 [50] (Ex. Y).)

*Defendants intended to take Ballast clients.*

58. In December 2022, Leftwich wrote to Peterson: "I wanted to check in and see where things stand with you onboarding with ASN *as well as figure out where things are from generally with your existing clients, new clients, business plan. As well as ways we can help move that along*." (Ex. Z (emphasis added).)

59. Peterson responded that ASN was reaching out to Fidelity to "see what type of compensation they will provide in possibly rebating clients back for closure fees for Schwab." (*Id.*)

60. Schwab is Ballast's custodian/brokerage firm. (Parnell Decl. ¶ 12.) Fidelity is MMX Wealth's custodian. (Peterson 59:11-13.)

61. On October 17, 2022, ASN emailed that Peterson has a non-solicit "but he's confident that his clients will reach out to him once they learn from Ballast that he's gone." (Ex. AA.)

62. A Prehire Interview Questionnaire for ASN similarly indicates that "[h]e has a non-solicit with his current firm. He's had his agreement reviewed by an attorney.

He's connected to most of his clients on LinkedIn or they have his cell phone. He believes they will all reach out to him when they get the notice from Ballast that he's left." (Ex. BB.)

63. A January 2023 business plan produced by Defendants indicates the plan was to bring over 42 million dollars in AUM from existing clients. (Bradley 284:8-19; 287:2-16; 288:5-290:20, [65] at 24-27 (Ex. CC.)

64. "Existing clients" meant clients Peterson was serving while at Ballast. (Bradley 290:11-20.)

65. On January 3, 2023, ASN emailed an MMX/ASN Update noting that "Scott and Team are working on final expected AUM, account and household numbers", to be given to Fidelity regarding close out fees to potentially be reimbursed when clients transfer their accounts. (Bradley 234:8-235:17 [46] (Ex. DD).) It noted Bradley was gearing up for "a fair amount of paperwork", client agreements and custodian onboarding paperwork. (*Id.*; Bradley 235:14-17.)

66. On January 26, 2023, Bradley emailed ASN a "Business and Trading Profile" relating to Peterson's Ballast clientele, including "Total Assets to be Transferred" in the "First 90 Days" as 45 million AUM across approximately 250 clients. (Bradley [38] (Ex. EE).)

67. Bradley provided Marxer with calendars referencing meetings with Ballast clients. (Ex. FF.)

**E. Defendants prepare to launch the new wealth management firm, using Ballast's confidential information.**

68. On January 26, 2023, Marxer introduced Peterson as the one "who is going to be running our Wealth Partners platform." (Boos Decl., Ex. GG.)

69. Peterson met with a prospective Ballast client in late January 2023 on his personal cell phone, who later reached out to Ballast expressing concern over the security of her data. (Ex. HH.) Peterson had forwarded the prospective Ballast client's information to his personal email address. (Ex. II.)

70. Peterson noticed his resignation on February 3, 2023. (Ex. JJ.)

71. Leftwich responded to Peterson's resignation email: "Very much looking forward to working together!" Marxer responded "Welcome to the team!!!!" (Ex. KK.)

72. Marxer viewed his and Leftwich's role as building out the wealth management vertical so they could refer clients to it. (Marxer 202:15-203:5; Ex. LL (referring to "our wealth management business").)

*Peterson and Bradley take Ballast's confidential client information and trade secrets.*

73. Peterson met with Bradley and gave her printouts of a multipage spreadsheet containing a "fairly complete list" of all Ballast clients serviced by Peterson, including contact information, birthdates and SSNs. (Bradley 191:24-193:6, 194:9–195:12, 197:15-18.)

74. Bradley used this information to complete a spreadsheet for the new wealth management vertical. (Bradley 200:9-24.)

75. Peterson took the information from Ballast. (Ex. MM, Interrogatory 1).)

76. Peterson asked Bradley to upload the client information into the CRM system (called Wealthbox) for MMX Wealth. (Bradley 191:19-194:8; 183:2-6.)

77. On February 6, 2023, Bradley uploaded two spreadsheets containing the Ballast client information to MMX Wealth's CRM. (Bradley 182:23-183:16, 184:15-194:11, 200:9-24; 210:20-211:18, [34, 35, 36] (Ex. NN.)

a. The spreadsheets uploaded by Bradley are, and contained, Ballast confidential information and trade secrets. (Nease 147:22-148:25; Ex. NN; Ex. OO, Interrogatory 15.)

78. Bradley was unable to locate or produce the full Ballast client spreadsheet she uploaded to the CRM, having shredded the printouts because of the confidential information they contained. (Bradley 200:9-202:17.)

79. Peterson did not retain a copy of the Ballast client information that he gave to Bradley. (Peterson 238:25-239:25.)

80. Defendants used the Ballast client information at MMX Wealth. (Bradley 204:2-205:1.)

81. Peterson misappropriated the CUSIPs of current holdings of the Ballast clients he serviced and shared it with third parties, including Bradley/MMX Management, and on October 12, 2022 ASN responded that "most will flow over pretty fluidly." (Exs. PP, QQ.)

a. This constitutes Ballast trade secret and confidential information. (Nease 127:3-130:20; 159:21-161:4.)

82. Weeks before Peterson left Ballast, Peterson misappropriated Ballast trade secret and confidential information in preparing a "Firm Trading Profile Report" and providing it to Bradley/MMX and ASN. (Ex. EE.) It included information about the size, number and make-up of Ballast accounts Peterson serviced, the aggregate assets, portfolio mix and trading history, the average number of positions in the accounts, and more. (*Id.*)

a. This constitutes Ballast trade secret and confidential information. (Nease 11:15-112-22.)

**F. Peterson assures Ballast he will not be working with Ballast Clients.**

83. After resigning, Peterson repeatedly assured Parnell that he would be working with Marxer in alternative investments with ultra-high net worth clients like NBA players, and had no intention of competing with Ballast, seeking to work with Ballast's clients, or violating his Agreement. (Parnell Decl. ¶ 13; Parnell 80:20-81:2; Peterson 176:9-16; 169:14-170:2; Ex. OO, Interrogatories 6, 7, 9.)

84. Peterson admits as much, further stating that he was "respecting, obviously, the agreement I had signed.". (Peterson 168:18-170:2; 176:9-16.) He made similar representations to Nease. (Nease Decl. ¶ 11.)

85. Based on Peterson's assurances, Parnell agreed that Peterson would stay on for a wind-down period to assist in transitioning Ballast clients. (Peterson 170:14-171:21; Parnell Decl. ¶ 14; Ex. OO, Interrogatory 7.)

86. Without Peterson's assurances, it would have made no sense for Ballast to keep Peterson on and have him contact clients to transition them to Parnell. (Peterson 170:14-171:6.)

*Peterson and Ballast prepare talking points for Peterson's calls with clients.*

87. Ballast made an internal announcement about Peterson's departure and noted they would be working on transitioning Peterson's clients. (Ex. RR.)

88. Peterson and Ballast put together a plan whereby Peterson contacted certain clients to inform them of his departure using pre-approved talking points, which Nease sent to Peterson. (Peterson 194:2-14; 181:7-9; Ex. SS.)

89. Parnell discussed the talking points with Peterson. (Ex. 1, ¶ 15) Peterson told clients "[he] was leaving Ballast" and "they were in good hands". (Peterson 161:21-23.)

90. The talking points included, among others, that Peterson was pursuing a new opportunity he couldn't pass up, that it was a completely different business model that did not allow him to continue working with Ballast clients. (*See* Ex. SS.)

91. When making client calls, Peterson followed the talking points. (Peterson 140:2-140:11.)

92. Peterson prepared memos of some of the client calls he made in the interim period that were consistent with the talking points. (Ex. TT; Ex. 103.)

93. If clients asked him if they could work with him after he left Ballast, Peterson told them "no," that they did not have the option of working with him. (Peterson Dep. 163:2-19; 168:5-14; 190:6-191:20.) Peterson understood that it would breach his

Agreement if he provided wealth management services to them (Peterson 163:25-166:17.)

*Peterson approves farewell email consistent with his own statements to Ballast and clients.*

94. Peterson worked through February 21, 2023 and turned in his laptop and keys the next day. (Nease Decl. ¶ 13; Def. Br. ¶ 86).)

95. The day Peterson turned in his laptop, an email was sent to clients on his behalf, explaining that he had left Ballast (the "farewell email"). (See, e.g., Ex. UU.)

96. The farewell email was reviewed, approved and authorized by Peterson. (Ex. OO, Interrogatory 25; Nease Decl. ¶ 14.)

97. Parnell discussed its content with Peterson. (Ex. OO; *see also* Ex. 2.)

98. Peterson asked that the email be personalized from him to each specific client and asked Nease to send it on his behalf because he did not know how to do a mail merge. (Ex. OO, Interrogatory 25; Ex. 2.)

99. A mail merge allowed a personalized email to be sent from Peterson to each client without sending the emails manually, but it would need to be done from Peterson's computer—not using delegated access. (*See, e.g.,* Nease Decl. ¶ 15, Ex. 104.)

100. Nease told Peterson she would send the email when he turned in his laptop. (Nease Decl. ¶ 16; Ex. OO, Interrogatory 25.)

101. Nease sent the farewell email that day from Peterson's laptop using the agreed-upon mail merge process. (*See* Ex. UU; Nease Decl. ¶ 16.)

102. In response to a client forwarding the farewell email to Peterson, Peterson responded, "Sorry. I was going to call you before this went out. I was suppose [sic] to have a few days." (Peterson 219:16-24 [30] (Ex. VV).)

**G. Peterson's breaches interfere with Ballast's efforts to retain clients.**

103. Ballast worked to transition the clients serviced by Peterson to Parnell. (*See* Ex. WW.)

104. Ballast contacted clients to arrange meetings with Parnell. (*See* Ex. XX.)

105. Ballast sent a cease-and-desist letter to Peterson. (Ex. YY.) Peterson mentioned it to Bradley. (Bradley 249:8-21.)

106. In March 2023, a client told Ballast that "when she talked to Scott he stated that he had legal representation and that he could take his clients." (Ex. ZZ.)

107. In May 2023, a Ballast client said "Oh, I thought I was transferring over to Scott's new company?" and another client was evasive in response to Ballast scheduling efforts. (Ex. AAA.)

108. Around May 2, 2023, Peterson told ASN "he expects to still bring over $60-70M and will be working with Melinda." (Ex. BBB.)

109. Peterson's registration with ASN commenced June 12, 2023, after which he/MMX Wealth began onboarding Ballast clients. (Exs. A; CCC, Interrogatory 8.)

**H. Peterson admits he is servicing over 45 former Ballast clients.**

110. Defendants admit they have taken at least 45 Ballast client households. (Exs. CCC, Interrogatory 8; DDD, Interrogatory 6; EEE, Interrogatory 7; FFF.)

111. On November 9, 2023, Bradley and Peterson completed a "meeting frequency" chart for his/MMX Wealth's clients as of that time. Each of the 45 clients listed had been a Ballast client. (Bradley 261:15-263:10 [55] (Ex. GGG).)

**I. Peterson and MMX Management Call Upon, Divert and Solicit Numerous Ballast Clients.**

112. After leaving Ballast, Peterson reached out to Ballast clients to "catch up" and set up calls. (Bradley 83:1-4, 81-21-84:4.)

113. Peterson called Ballast clients to attempt to transition them over to MMX Wealth. (Bradley 95:10-96:6, [13] (Ex. HHH).)

114. Peterson wanted to ensure Ballast clients were being "taken care of" and "getting the attention they deserve" because they are "like family." (Peterson 167:21-168:3.)

115. In at least 42 instances, Peterson misrepresented the dates that he first communicated with Ballast clients on or after February 23, 2023. (*Contrast* Ex. CCC, Interrogatory 5 *with* Boos Decl., Ex. III.)

116. Peterson had numerous contacts with Ballast clients before they signed agreements with MMX Wealth and terminated with Ballast, and many of those communications were initiated by him. (*See* Ex. III (Contact Chart).)

117. Phone records produced by Peterson show numerous text communications with Ballast clients he later took. (Exs. JJJ, KKK; Nease Decl. ¶ 19.)

118. Peterson deleted every text from his cell phone from 2022 and 2023, including any with Ballast clients and with the MMX team; none have been produced,

and they are irretrievable. (Peterson 30:2-7; 30:18-31:4; 32:21-34:7; 40:12-41:18; Exs. LLL, MMM; Dkt. 150, 5–7.)

119. Bradley deleted her texts from 2022 and 2023 with Peterson, Marxer, and Leftwich. (Bradley 34:2- 40:8 [1] (Ex. NNN).)

120. Peterson and Bradley sent Ballast clients communications aimed at obtaining their business, many under the guises of "reaching out," checking in," or touching base." (*See, e.g.*, Ex. OOO; *see also* Peterson 380:7-386:15 (three solicitation voicemails).)

121. Peterson/MMX Wealth sent Ballast clients disclosures and requests for information in soliciting their business. (*See e.g.*, Bradley 127:11-132:10 [23], [24] (Ex. PPP).)

122. In discussions with Ballast clients before the clients had decided whether to transition to MMX Wealth, Peterson talked about the services he provided, what he could do for the prospect, and fee structure. (Bradley 112:17-114:11.)

123. In August 2023, Peterson and Bradley traveled to Minnesota to solicit Ballast clients. Bradley prepared an agenda for the meetings and sent it to Peterson. (Peterson 108:1-109:4 [18] (Ex. QQQ).)

124. The "Introductory Meeting Agenda" included, among other things, "Service provided and what we can do for the prospect." (Id.) Peterson would discuss with prospects how he was going to be able to help them with their wealth management planning services. (Peterson 115:9-17.) Peterson also discussed fees, the services

provided by MMX Wealth, and that he was part of Advisory Services Network. (Peterson 110:17-112:14.)

125. On the Minnesota trip, Peterson and Bradley solicited at least three clients that subsequently transitioned away from Ballast (Hughes, Sherwick, and Brennan). (Bradley 91-93; 107; 108:25-110:13; 122:15-19.)

126. On July 28, 2023, Peterson updated his LinkedIn profile to reflect his registration with ASN. (Ex. RRR.)

127. On August 28, 2023, Bradley (copying Marxer) emailed Peterson that "We need an executive summary from you by the end of the week. This should include the following: . . . Where things are currently, next steps, the narrative you are using to sell clients the opportunity, business plans for growth. Also, do you have an official date when you are moving to the east coast [of Florida]." (Ex. SSS.)

128. Also in August 2023, Marxer emails Bradley, "We need to get Scott to start focusing on a real business plan that's aggressive for growing his business." (Ex. TTT.)

129. Around November 6, 2023, Peterson and Bradley prepared a summary of MMX Wealth for the team saying: "Other clients have decided that they want to have a meeting with Paul [Ballast] first before deciding. Of those clients, we have been touching base with them to see how their meetings went and remind them that we are here if they have any questions or need anything." (Ex. UUU.)

130. The November 2023 summary notes that MMX Wealth had $23.363M in AUM with 130 accounts and 65 households. It says, "This is lower than what was originally anticipated to come over." (*Id.*)

131. In November 2023, Bradley sent a draft "summary" of the business to provide to Leftwich and Marxer "with the information they want to see." (Ex. VVV.)

132. Bradley discusses with Marxer, "to dos and projects" on the various affiliated verticals of MMX Management, including MMX Wealth. (Ex. CC; Bradley 284:8-288:4.)

133. MMX Management adds Morgan Marxer as another MMX Management employee approved by ASN and given access to the wealth management platforms. (Bradley 281:23-23 [65] (Ex. WWW).)

134. Parnell described the manner in which Ballast is calculating its damages. (Parnell 376:23-380.)

**J. Counterclaims**

135. On Friday February 17. 2023, what was meant to be Peterson's final day at Ballast, he to leave town, was not in the office, and returned to the office February 21st. (Nease Decl., ¶ 13.)

136. Peterson returned his company computer the next day. (*Id.*)

137. Peterson's counterclaims are based entirely on the farewell email sent on Peterson's behalf the day he returned his computer to Ballast. (Peterson 183:22–184:14; 191:24-193:9; Dkt. 76 Counterclaim ¶¶ 9–70.)

138. Peterson remained registered with Ballast through February 22, 2023. (Ex. A.)

139. Peterson testified that he did not personally write the farewell email, so the "whole email" is false, but later cabined his accusation to the line in the farewell email

that states "[m]any of [the email recipients] already know Paul or have worked with him directly in the past." (Peterson 175:18–19, 176:18–24, 177:15–16.)[2]

140. Peterson left Ballast for another opportunity; when given the chance to claim that the statement regarding retail investment advisory clients was false, Peterson could not. (Peterson 175:23–176:3.) Peterson did not tell Ballast clients he was going to be serving "retail" wealth management clients. (Peterson 161:24-162:10.)

141. Parnell knew many of the Ballast clients Peterson serviced at the time the farewell email was sent. (Parnell Decl. ¶ 5; Dkt. 167-03, 8, 10, 32, 34, 38, 55, 60, 80, 86.) The majority of them were Minnesota clients. (Nease Decl. ¶19.)

142. Peterson admits that parts of the farewell email are true. (Peterson 179:9-181:6.)

143. Peterson does not claim that he lost clients as a result of the farewell email or point to any harm other than being personally upset. (Peterson 185:2–6, 185:15–17, 184:23–189:23.)

## ARGUMENT

## I. LEGAL STANDARD

Summary judgment is appropriate only if there is "no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *Iverson v. City of St. Paul*, 240 F. Supp. 2d 1035, 1036 (D.

---

[2] Peterson also apparently claims that the farewell email's statement that Peterson's departure from Ballast "is also bittersweet" is false, though he cannot say how it was false other than that he would not have used those words. (Peterson 180:9–10, 14–15.)

Minn. 2003) *aff'd*, 74 F. App'x 676 (8th Cir. 2003). "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (internal quotations and citation omitted).

## II. BALLAST'S BREACH OF CONTRACT CLAIM AGAINST PETERSON

### A. The Agreement is supported by valid consideration.

"In determining whether a noncompete agreement is supported by independent consideration, courts examine whether the employee gained anything in exchange for signing the agreement." *Guidant Sales Corp. v. Baer*, No. 09-CV-0358PJS/FLN, 2009 WL 490052, at *2 (D. Minn. Feb. 26, 2009). Here, Peterson received a $500.00 bonus, the death, disability, and retirement benefit detailed in Section 4(d) of the Agreement (the "Retirement Benefit"), and continued employment. (PSOF 15, Ex. H.)[3] Ballast would need to prove *one* of these is valid consideration at trial. *See, e.g.*, *Sheehy v. Bodin*, 349 N.W.2d 353, 354 (Minn. Ct. App. 1984) (finding valid consideration where one of two proposed forms of consideration was valid).

#### 1. The $500 payment

*None* of the cases Peterson cites address whether a payment made prior to signing constitutes valid consideration. Peterson misinterprets the standard. The rule that past consideration is not consideration for a later contract "is not a rule about temporal proximity, but rather a necessary connotation of the rule that the benefits and detriments

[3] Citations to Plaintiff's Statement of Facts are cited as (PSOF __.)

on both sides of a contract must be bargained for." *Belanger v. Yorke*, 2020 ME 24, ¶ 20, 226 A.3d 215, 222.

Here, Nease added the one-time $500 bonus to Peterson's next paycheck after Peterson verbally committed to sign the Agreement. (PSOF 21.) Peterson received the $500 bonus "[f]or signing his new employment agreement," and affirmed that it was tied to the Agreement.[4] (PSOF 15, 21.) Further, by signing the Agreement, Peterson explicitly agreed that he had received a $500 bonus "as consideration for the restrictions contained in the Agreement." (Dkt. 169-4); *see also FSI Int'l, Inc. v. Shumway*, 2002 WL 334409, at *5 (D. Minn. Feb. 26, 2002) (finding agreement adequately supported by consideration if defendant agreed to receive a benefit as consideration).

### 2. The Retirement Benefit

Peterson's assertion that the Retirement Benefit is invalid because it is "indefinite, discretionary" and subject to "Ballast's unilateral subjective interpretation" relies on a strained reading of both the Agreement and relevant case law.

Peterson negotiated with Ballast to increase the Retirement Benefit from a 1% to a 2% payout, and only agreed to sign after the increase was included. He also discussed the terms of the Retirement Benefit with Marxer through several emails in April and May 2022, demonstrating full awareness of its terms. (PSOF 16, 15.) He also agreed in the Agreement itself that the Retirement Benefit constituted good and valuable consideration.

[4] Defendants attempt to transform Nease's statement to another Ballast employee that the bonus payment was "free money" into something it is not. (Def. Memo. ¶ 17.) In the same Teams chat, Nease confirms that the bonus "is consideration for your new employment agreement," and that Ballast "ha[s] to give you a bonus to get you to sign the contract by law." (Dkt. 170-05.)

(PSOF 15.) These facts are sufficient to establish the Retirement Benefit as valid consideration.

The Retirement Benefit does not leave too much discretion with Ballast. The benefit provides that if Peterson's employment is terminated due to his death, disability, or retirement and no Cause occurrence exists, Peterson would receive a percentage of the liquidation sale price of Ballast's Class A-1 units. "Cause" is defined as Peterson's material breach of an agreement with Ballast (a question of law), his disqualification from service as an investment adviser (an objective status out of Ballast's control), or his engagement in wrongful conduct that adversely and materially affected Ballast's business activities or is reasonably likely to do so. Though the last of these is not further defined, standards for conduct that has an "adverse and material" effect on another person are replete in the law. *See, e.g.*, Minn. Stat. § 116B.02, subd. 5 (defining "pollution, impairment, or destruction" to mean conduct that "materially adversely affects or is likely to materially adversely affect the environment"); *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 913 (8th Cir. 2011) ("To violate Title VII, the retaliation must be harmful enough that a reasonable employee would find it materially adverse.").

*FSI International*, cited by Peterson, is distinguishable. There, the court considered an employer's promise to pay 75% of the employee's compensation for one year if the employee could not find employment due to his noncompete. 2002 WL 334409, at *5. The employee was required to "conscientiously and diligently seek other employment," and the employer could suspend payments if it concluded he had not done so—though it was unclear if the employee was expected to take "a job flipping

hamburgers." *Id.* at *6. The court held that the promise was not sufficiently definite, emphasizing that it was "based on subjective standards," "provide[d] no clear guidance," and left the employer with "unfettered discretion." *Id.* Here, the Cause definition captures only sufficiently egregious behavior using common legal standards rather than giving Ballast "unfettered discretion" to deny the Retirement Benefit.

Nor is it true that the Retirement Benefit violates the statute of frauds for being "not sufficiently expressed in writing." The statute of frauds does not set forth a standard for construing written contracts; rather, it "expresses a public policy of preventing the enforcement by means of fraud and perjury of contracts that were never in fact made." *Radke v. Brenon*, 134 N.W.2d 887, 890 (Minn. 1965). The standard for expressing consideration is low. *See Nat'l Sur. Co. v. Winslow*, 173 N.W. 181, 184 (Minn. 1919) ("[t]he formal recital in such an instrument of 'value received,'" is "a sufficient expression thereof to satisfy the statute of frauds."); *see also Midland Nat. Bank of Minneapolis v. Sec. Elevator Co.*, 200 N.W. 851, 857 (Minn. 1924) (reference to "credit given and to be given" satisfied the statute of frauds.)

Peterson argues that because the Retirement Benefit relies on a sales price contained in a separate LLC Agreement, it would be "inappropriate to incorporate" it. But the writing "can consist of a series of writings internally connected by express or implied reference so as to show that they relate to the same subject matter" *Bergstrom v. Sears, Roebuck & Co.*, 532 F. Supp. 923, 932 (D. Minn. 1982); *see also Pedersen v. Akona, LLC*, 429 F. Supp. 2d 1130, 1138–39 (D. Minn. 2006).

Here, the Agreement references the LLC Agreement's Section 4.6, which explains how to calculate sales price. This is further evidenced by Section 4.7 of the LLC Agreement. (Dkt. 170-02 § 4.7 (stating that share calculation based on a liquidation event will be calculated "in accordance with Section 4.6(c)".) The calculation method laid out in Section 4.6 is that used to calculate the Sales Price in a liquidating event, which can then be used to calculate the Retirement Benefit. Peterson was also provided with the pertinent sections of the LLC Agreement in connection with his review and negotiations with Ballast. (PSOF 17.)

Peterson's claims that "the LLC Agreement was created years before the Agreement, makes no mention of the Agreement, and Peterson . . . has no authority to enforce the LLC Agreement" are legally irrelevant.

### 3. Continued employment

Continued employment that provides "real advantages" can constitute independent consideration. *See Davies & Davies Agency, Inc. v. Davies*, 298 N.W.2d 127, 130–31 (Minn. 1980); *Freeman*, *v. Duluth Clinic, Inc.*, 334 N.W.2d 626, 630 (Minn. 1983) ("The mere continuation of employment can be used . . ., but the covenant must be bargained for and provide the employee with real advantages."). Continued employment may work in tandem with other benefits to support "adequate consideration." *See Tenant Const., Inc. v. Mason*, 2008 WL 314515, at *2 (Minn. App. Feb. 5, 2008) (finding a $500 bonus along with continued employment to support a noncompete and nonsolicitation agreement).

Here, continued employment was part of the bargained-for exchange, as Peterson was told after delaying signing for over 5 months that he would need to sign the Agreement or be terminated. With that warning, he signed it. (PSOF 23.) Moreover, the consideration provided for in the Agreement is not an "either/or"—it is the *total* benefit of $500, the Retirement Benefit, and continued employment. (PSOF 23.)

**B. The Agreement is not overbroad.**

"Employers have a legitimate interest in protecting themselves against the deflection of trade or customers by the employee by means of the opportunity which the employment has given him." *Webb Pub. Co. v. Fosshage*, 426 N.W.2d 445, 450 (Minn. Ct. App. 1988) (internal quotations omitted). Minnesota courts generally consider trade secrets or confidential information and employer's goodwill to be protectable interests. *See Roth v. Gamble-Skogmo, Inc.*, 532 F. Supp. 1029, 1031 (D. Minn. 1982).

**1. The non-solicitation provision**

Peterson agreed that for two years after termination, he would not, directly or indirectly, "[c]all upon, solicit or attempt to solicit or divert" any Ballast client to do business with a Ballast competitor, "provide or sell . . . any service or product" to a Ballast client that competes with Ballast's services or products, or "[i]nduce or persuade" any Ballast client to alter or terminate their Ballast relationship. (Ex. Agreement.) Peterson now suggests numerous reasons why he should not have to keep that promise.

Peterson first claims, without explanation, that the Agreement's definition of "Client" is ambiguous and/or subject to different reasonable interpretations. A simple reading confirms this is not true. The Agreement defines "Client" as a person or entity:

- with whom Ballast has a current contractual or business relationship;
- about whom Peterson obtained or had access to confidential information obtained during Peterson's Ballast employment; or
- with whom Peterson had contact on behalf of Ballast within the previous 12 months and which (a) negotiated to contract with Ballast; or (b) was solicited to become a Ballast client.[5]

(Agreement § 1(c).) These terms are straightforward.

Peterson also claims that the definition of "Client" is overbroad because it includes Ballast clients Peterson never serviced or contacted. However, determining the enforceability of a noncompete provision requires a court to consider the circumstances of the underlying employment. *Amano v. Klavon*, No. A21-0237, 2021 WL 5442339, at *3 (Minn. Ct. App. Nov. 22, 2021); *see also Bennett v. Storz Broad. Co.*, 134 N.W.2d 892, 899–900 (Minn. 1965) (enforceability "must be determined on its own facts and a reasonable balance must be maintained between the interests of the employer and the employee.")

Here, Peterson had access to confidential customer information of *all* Ballast clients in his role as an investment advisor, not merely his own. (PSOF 11.) If an employee has "access to information on other [] customers which would aid him in soliciting their business, then restricting him from doing so would not be unreasonable." *Webb*, 426 N.W.2d at 450.

Peterson next claims that the Agreement insufficiently defines what it means to divert a client to a person or entity that competes with Ballast because it does not name

[5] At his deposition, Parnell noted that he "assumed" that sub-subparts (a) and (b) applied to all three subparts, but upon closer review, now disagrees with that assumption. (Parnell Decl. ¶ 11.)

the "services or products" Ballast provides. Ballast is an investment advisory firm, providing wealth management services including investment management and financial planning and consulting. A "Competing Business" is therefore another firm involved in providing investment advisory-related services. *See Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 963 (D. Minn. 2018) (accepting "Competitive Product" definition of "product or service that . . . (i) is of the same general type and (ii) is used for the same or similar purposes as a Company product or service").

Peterson next argues that the non-solicitation provision lacks a geographic restriction. Courts routinely enforce client-based restrictions that lack geographic limitations. *See Prow v. Medtronic, Inc.*, 770 F.2d 117, 121 (8th Cir. 1985) (restriction with unlimited geographic scope not unreasonable when limited in duration and customers to whom restriction applied).

Peterson complains that the Agreement prohibits more than solicitation. Correct. The Agreement also prohibits Peterson from providing competing services or products to Ballast clients and from calling upon or diverting the clients.

The cases Peterson cites in arguing that Ballast is "not permitted to prevent" Peterson from working with unsolicited Ballast clients are inapposite. In *Honeywell Int'l Inc. v. Stacey*, 2013 WL 9851104, at *8 (D. Minn. 2013), the court interpreted the meaning of solicitation—not whether an employment agreement could contain broader restrictions. The *Honeywell* court even noted distinguishable cases that "involve broader contractual language." *Id.* (citing *Al's Cabinets, Inc. v. Thurk*, 2003 WL 891419, at *4 (Minn. App. 2003) (enforcing clause that prohibited "attempt[s] to sell or market any

[competing] products" to employer's customers)). And in *C.H. Robinson Worldwide, Inc. v. Traffic Tech, Inc.*, 161 F.4th 1101, 1107 (8th Cir. 2025), the court found overbroad a covenant that could prohibit the employee from conducting business with *anyone* the employer could potentially do business with, which is not the case here.

Further, restrictive covenants that protect legitimate business interests yet allow the employee to work in the same industry are enforceable. *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085, 1094 (D. Minn. 1981), *aff'd,* 684 F.2d 565 (8th Cir. 1982) (finding enforceable a restrictive covenant that did not restrict employee from working in same area or industry—only restricted the customers with whom he would work); *Prow*, 770 F.2d at 121 (same). Peterson is not prevented from working as an investment advisor.

Should it be found that any discrete provision of the covenants is too broad, the Court may "blue pencil" it and find the remaining provisions enforceable. *Marvin Lumber & Cedar Co. v. Severson*, 2015 WL 5719502, at *8 (D. Minn. Sept. 28, 2015).

Peterson's suggestion that Ballast violated the non-solicit by sending out the "farewell" email on Peterson's behalf is absurd. Ballast's claims are not based on the farewell email, and it was not a Peterson attempt to gain business.[6]

**2. The confidentiality provision**

The confidentiality clause is not a never-ending customer non-solicit. Unlike the Iowa law case cited by Peterson, this is not a case where someone argues that evidence a client "followed" a departing adviser is a breach of the confidentiality clause. Ballast

[6] Ballast is not pursuing a claim that Peterson solicited Bradley in violation of an employee non-solicitation restriction.

argues that Peterson's misappropriation of Ballast's client list, among other things, shortly before leaving Ballast breached the confidentiality clause. (PSOF 73, 81, 83.) Ballast's evidence that Peterson breached his confidentiality clause is not an inevitable disclosure-type theory based on acceptance of business.

Second, Peterson argues that the provision has no temporal limit and it would be impossible for him to provide services *ever* to a former client. Not so. If, at the end of Peterson's restricted period, he solicited a Ballast client offering wealth management services, he could service the client, provided he did not use confidential information (e.g., the Ballast client list he took). Nothing about the confidentiality provision's duration creates a perpetual non-solicitation clause. Further, despite Parnell's out-of-context testimony that "or" and "and" can mean different things, the Agreement speaks for itself.

**C. Bradley was bound by appropriate restrictions.**

Peterson asserts that Ballast should be equitably estopped from "selectively" enforcing its covenants when Bradley had identical access to confidential information and goodwill but no non-solicitation restrictions. But *Surgidev Corp. v. Eye Tech., Inc.*, 648 F. Supp. 661, 698 (D. Minn. 1986), *aff'd,* 828 F.2d 452 (8th Cir. 1987), is distinguishable. It involved identical (and invalid) noncompetes, and plaintiff had allowed 28 employees to leave previously. Here, Bradley was subject to agreements not to use or disclose Ballast's confidential information. (PSOF 13.) Peterson's distinct non-solicitation restrictions reflect the enhanced risk that he could take clients from Ballast given his advisory role to clients he regarded as "family." (PSOF 13e, 13h, 114.)

**D. Peterson breached the Agreement.**

Peterson relies on recently-signed affidavits to argue that he didn't solicit. But Peterson may not "[c]all upon" or "divert"[7] any Ballast client to do business with a Ballast competitor, "provide or sell . . . any service or product" to a Ballast client that competes with Ballast's services or products, or "[i]nduce or persuade" any Ballast client to alter or terminate their Ballast relationship. Defendants admit to taking over 45 Ballast clients. (PSOF 110.) This constitutes breach.

Further, Peterson ignores (i) ample direct evidence of solicitation and (ii) Peterson's spoliation of a trove of direct evidence likely showing more solicitation. Peterson deleted from his cell phone every single text message related to this litigation and numerous relevant emails, and Ballast has moved for evidentiary sanctions. (*See* Dkt. 150). As the Eighth Circuit found in *Auer v. City of Minot*, 896 F.3d 854, 858 (8th Cir. 2018), it's "premature to grant summary judgment without evaluating" whether spoliation sanctions themselves could create a genuine dispute of material fact.

The record contains vast amounts of evidence that Peterson and Bradley/MMX solicited the taken Ballast clients and others that did not join them. (PSOF 112-132.) In one example, after obtaining his registration to serve investment clients on June 12, 2023, Peterson left a message to a Ballast client saying "everything is a go now, as far as with me leaving," and requested that she call him. (PSOF 120.) That same day, he called another Ballast client to say that he "can finally share some good news that [his] situation

[7] "Divert" means: "to turn from one course or use to another." https://www.merriam-webster.com/dictionary/divert

[there] in Florida is taken care of, so [he] is up and running," again requesting that Ballast client call him. (*Id.*) Alerting clients that his new firm was "up and running" and requesting that they call him is textbook solicitation. *See Mobile Mini, Inc. v. Vevea*, 2017 WL 3172712, at *6 (D. Minn. 2017).

Further, phone records show that, after leaving Ballast, Peterson initiated calls or texts to many of the Ballast clients he took. (PSOF 116.) The phone records also reveal Peterson's lack of credibility in in misrepresenting in his interrogatory answers the dates he first communicated with Ballast clients after leaving Ballast. In nearly every case, Peterson had multiple client communications well before his alleged first communication. (PSOF 115.)

Even with client-initiated contact, Peterson solicited. (PSOF 121-122.) "A seller, of course, is not free to tout his new business venture simply because a former client has fortuitously communicated with him first." *Bessemer Tr. Co. v. Branin*, 949 N.E.2d 462, 469 (2011). In *FCE Benefit Administrators v. George Washington Univ.*, the former employee was found to have solicited when, even though the customer made initial contact, the employee "assumed an active role" in the decision-making process, including soliciting quotes and preparing spreadsheets. 209 F. Supp. 2d 232, 239–40 (D.D.C. 2002).

Next, a non-solicitation provision can go beyond limiting only active solicitation. *See Haynes v. Monson*, 224 N.W.2d 482, 484 (Minn. 1974) ("[W]hen one has conducted a business in the same area for many years and has built a sizable clientele, active solicitation on his part is unnecessary to compete so as to defeat the covenant.

Solicitation by mere reputation and past business practices is more than sufficient."). This is pertinent here as Peterson had the time to cement his relationship with Ballast clients he took to the point where regards them as like "family." (PSOF 114.)

Finally, Peterson's "evidence" that he did not solicit Ballast clients is his own self-serving testimony and recently-executed affidavits from the clients he took, neither of which sufficiently rebut the objective, contemporaneous evidence of solicitation or excuse Peterson's unbridled spoliation. (PSOF 112-131, 118-19.) Where client declarations are contradicted by other evidence, summary judgment is precluded. *Mercer Glob. Advisors Inc. v. Crowley*, 2023 WL 2531727, at *6 (N.D. Ga. Mar. 15, 2023) (denying summary judgment where defendant submitted declarations from clients stating they had not been solicited and other evidence showed solicitation occurred).

Moreover, the affidavits contain the legal conclusion that the declarants' "decision was not the result of any direct or indirect solicitation" by Peterson. Whether Peterson's actions constituted solicitation is for the court to decide. *See Johnson v. Evangelical Lutheran Church in Am.*, 2013 WL 1249151, at *5 (D. Minn. 2013) (collecting cases excluding reports/affidavits asserting legal conclusions).

### E. Ballast is entitled to summary judgment on its breach of contract claim against Peterson.

Ballast has established that the Agreement is a valid contract, that Ballast performed its obligations under the Agreement, and that Peterson violated his obligations under the Agreement by providing at least 50 Ballast clients with the same or similar

services he provided at Ballast. Ballast is entitled to summary judgment with respect to each such Ballast client taken, of which there are at least 45. (PSOF 110.)

## III. MUTSA CLAIM AGAINST PETERSON

### A. MUTSA does not displace Ballast's other confidentiality-based claims.

MUTSA's displacement provision does not affect contractual remedies, nor does it displace civil remedies that are not based upon misappropriation of a trade secret. Minn. Stat. § 325C.07(b). Ballast has asserted that all of its confidential information rises to the level of a trade secret. But if the Court disagrees, Ballast asserts, alternatively, that its misappropriation of confidential information claim remains viable. *See TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc.*, 2013 WL 6827348, at *5 (D. Minn. 2013) ("MUTSA does not displace [plaintiff]'s claims to the extent that they are based on confidential information that does not reach the level of trade secrets.")

### B. Ballast has shown MUTSA misappropriation.

A trade secret is:

> Information, including a formula, pattern, *compilation*, program device, method, technique, or process, that:
>
> (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Minn. Stat. § 325C.01, subd. 5 (emphasis added.)

Under the MUTSA, even the compilation of non-trade secret information can constitute a trade secret, if it affords a competitive advantage and is not readily

ascertainable. It is the knowledge gained at the employer's expense that is protectible. *Jostens, Inc. v. National Computer Systems, Inc.*, 318 N.W.2d 691, 702 (Minn. 1982) (unique combination of elements can constitute a trade secret). A unique compilation can qualify as trade secret, even if all of the information is publicly available. *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1291 (11th Cir. 2003). The protectability of a compilation should be examined as a whole rather than "bit by bit." *See Rivendell Forest Prod., Ltd. v. Georgia-Pac. Corp.*, 28 F.3d 1042, 1045 (10th Cir. 1994).

Client lists can be trade secrets. *Cherne Indus., Inc. v. Grounds & Assocs, Inc.,* 278 N.W 2d 81, 89-91 (Minn. 1979)**;** *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 76 (D.D.C. 2001) (customer lists of financial-services firm deserve trade-secret status); *Ahern Rentals, Inc. v. EquipmentShare.com,* 59 F.4th 948, 955 (8th Cir. 2023) (customer list a trade secret); *Am. Exp. Fin. Advisors, Inc. v. Topel*, 38 F.Supp.2d 1233, 1244 (D. Colo. 1999) (applying Minnesota law, "customer names and investment characteristics are viewed as trade secrets").

Here, Peterson (i) accessed Ballast's password-protected systems and printed a compilation of client names, social security numbers, birthdates, and other information, and gave it to Bradley who uploaded its contents to the CRM and shredded it (PSOF 13a, 73, 77-78); (ii) took and shared CUSIP compilations showing the universe of securities owned by the clients he serviced. (PSOF 81); (iii) compiled and shared information about the Ballast book of business he serviced. (PSOF 82.) These are trade secrets.

First, this information was not generally known or readily ascertainable. Peterson would not have been able to take it without his access to Ballast's software and systems. (PSOF 11.)

Second, the information has independent value from its secrecy. "Generally, if substantial time and money would be required of a competitor to develop the same information, that information has economic value." *Surgidev Corp. v. Eye Tech., Inc.*, 648 F. Supp. 661, 692 (D. Minn. 1986), *aff'd,* 828 F.2d 452 (8th Cir. 1987); *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 901 (Minn. 1983).

The Ballast client list could be used to target clients, tailor recommendations, and avoid the effort of assembling the information from scratch. (PSOF 12.) Further, the CUSIP list is a non-public compilation of the aggregate holdings of the Ballast clients Peterson serviced, giving a competitor valuable insight into the clients' investment positions, preferences, and future needs. Its value is underscored by the fact that Peterson took it. *See Cherne Indus. Inc.,* 278 N.W.2d at 90 (finding client list confidential, noting there would be "little purpose in taking such a quantity of documents if defendants did not believe the information was valuable.").

Third, Ballast took steps to maintain the information's secrecy. (PSOF 13.); *See Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 968 (D. Minn. 2018) (confidentiality agreements and password-protected documents showed reasonable efforts to maintain secrecy); *Deluxe Fin. Servs., LLC v. Shaw*, 2017 WL 3327570, at *3 (D. Minn. Aug. 3, 2017) (code of ethics, confidentiality policy, and employee handbook showed reasonable efforts to maintain secrecy).

Finally, while "use" of a trade secret is not required, Peterson shared the CUSIP and business profile with others, and Bradley admitted to using the taken Ballast client information. (PSOF 74,77,82.)

## IV. BREACH OF FIDUCIARY DUTY AND TORTIOUS INTERFERENCE AGAINST PETERSON

Peterson's misappropriation of Ballast's trade secrets/confidential information prior to leaving, his sharing it with third parties, and his lying to Ballast about his intent to take its clients all give rise to a genuine issue of material fact about whether he breached his fiduciary duties to Ballast. *See, e.g.*, *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 959 (8th Cir. 2007) ("[A]n employee may not use confidential information peculiar to or acquired from his employer, nor may the employee solicit customers for his rival company.").

Independently tortious or unlawful conduct supports a tortious interference claim. *See Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 218 (Minn. 2014); *see also Forest Lake Facilities, LLC v. Wells Fargo Bank, N.A.*, 2017 WL 4736716, at *2 (D. Minn. Oct. 19, 2017) (allowing tortious interference claim for breach of contract). Peterson breached his Agreement, violated the MUTSA, and breached his fiduciary duty to Ballast – at the very least, there is a genuine issue of material fact.

## V. AIDING AND ABETTING AGAINST BRADLEY, MMX WEALTH PARTNERS, MARXER, AND MMX MANAGEMENT

Aiding and abetting requires (1) the primary tortfeasor to commit a tort; (2) which the defendant must know constitutes a breach, and (3) the defendant must assist or encourage the breach. *Minnesota v. Fleet Farm LLC*, 679 F. Supp. 3d 825, 845 (D. Minn.

2023). The first element is satisfied because Peterson is liable for tortious interference with prospective economic advantage. The other Defendants also knew Peterson's actions were wrongful and assisted them in those actions regardless. *See Varga v. U.S. Bank Nat. Ass'n*, 952 F. Supp. 2d 850, 859 (D. Minn. 2013), aff'd, 764 F.3d 833 (8th Cir. 2014) (aiding and abetting "must be undertaken with some degree of knowledge (1) of its wrongful purpose and (2) that it is aiding the tortfeasor"). Further, Bradley's and Marxer's conduct, working as they were within the scope of their duties for MMX Management and within the scope of the services provided by MMX Wealth Partners, LLC, is the conduct of each entity. "[T]he intent of an agent or employee of the corporation will be imputed to the corporation when the agent or employee 'acted on behalf of the corporation." *Timeless Bar, Inc. v. Illinois Cas. Co.*, 734 F. Supp. 3d 886, 898 (D. Minn. 2024), *aff'd,* 144 F.4th 1072 (8th Cir. 2025)

**A. Bradley**

Before he left Ballast, Peterson invited Bradley to his apartment, gave her the Ballast client list, and asked her to enter the information into MMX Wealth's CRM, which she did. (PSOF 73,74,76.) Bradley knew Peterson still worked at Ballast, knew the information was confidential information, and shredded the document when finished uploading its contents. (PSOF 78.) At the least, Bradley was willfully blind to the wrongfulness of Peterson's actions, which constitutes knowledge. *See Kelley v. BMO Harris Bank N.A.*, No. 19-CV-1756 (WMW), 2023 WL 4145827, at *15 (D. Minn. June 23, 2023) *rev'd in part on other grounds, Kelley v. BMO Harris Bank Nat'l Ass'n*, 115 F.4th 901 (8th Cir. 2024) (knowledge for aiding and abetting "may be inferred from

deliberate acts amounting to willful blindness to the existence of a fact or acts constituting conscious purpose to avoid enlightenment.”). Her active participation in taking and uploading the confidential information was just one of her many acts that substantially assisted Peterson, including helping solicit Ballast’s clients. (PSOF 73, 66, 120, 123, 127.)

**B. Marxer, MMX Management, MMX Wealth Partners (“MMX Parties”)**

The MMX Parties, knowing about and advising on the restrictive covenants in Peterson’s Agreement, conceived, set up, coordinated and supervised the MMX Management’s wealth management “vertical”, and set up the corporate entities for that purpose. (PSOF 30-31, 36-39, 44, 46-49, 53-57.) They brought on Bradley and Peterson to run the business. (PSOF 68, 42.) They branded the business as MMX Wealth Partners and trademarked the name, as Marxer wanted. (POSF 55-56, 48.) MMX Management, Marxer, and Bradley actively pushed and assisted Peterson in his effort to take Ballast clients. (PSOF 58, 63, 77, 127-28); s*ee Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 185–86 (Minn. 1999) (“[A]ll who actively participate in any manner in the commission of a tort, or who procure, command, direct, advise, encourage, aid, or abet its commission, or who ratify it after it is done are jointly and severally liable’ for the resulting injury.” (cleaned up)). Marxer’s/MMX’s aiding and abetting is further underscored by their placing the firm under MMX’s “brand”, using their lawyers to incorporate the MMX entities involved in the wealth management vertical, preparing and entering into the consulting agreement used for the business, overseeing the business plan, supervising the business, and leading the business by requiring executive

summaries and business plans for growth (PSOF 131, p. 4 (Peterson and Bradley sending Marxer/MMX Management "status of where MMX is with the information they want to see"), and demanding to know "where things are currently, next steps, [and] the narrative you are using to sell clients the opportunity" (*Id.*; PSOF 54-58, 38, 49, 127-28, 63.)

These actions were undertaken with the knowledge that MMX Wealth's client base would be built by wrongfully taking Ballast clients and trade secrets. (PSOF 73-77, 80-82, 65-67, 63, 129.)

## VI. DAMAGES

Expert testimony must be relevant and reliable to be admissible. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2007 WL 1964337, at *2 (D. Minn. June 29, 2007) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."). Cobb's report is admissible, and Defendants' argument is flawed both legally and factually.

### A. Cobb is not required to establish causation.

Defendants incorrectly say Cobb's report must be excluded because Cobb did not establish causation. But *B & Y Metal Painting, Inc. v. Ball*, 279 N.W.2d 813, 816 (Minn. 1979) does not address an expert opinion; it discusses the requirement that a *party* must prove causation. Cobb is Ballast's damages expert, and as such, offers his opinion on the damages Ballast suffered. Expert witnesses may assume liability for the purpose of calculating damages. *Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*, 2016 WL 5496340, at *5 (D. Minn. Sept. 28, 2016) (admitting opinion of damages expert who did

not offer opinion on causation). As discussed, Ballast has ample evidence of causation, including that Peterson breached his non-solicit, improperly took and serviced Ballast clients, and Ballast lost profits as a result.

Defendants' citation to *Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1040 (8th Cir. 1999) for the proposition that Cobb must establish causation and consider other causal factors in his opinion is misplaced. *Blue Dane* was analyzing a *causation* expert's opinion. Cobb is a *damages* expert. *See MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 2021 WL 3661507, at *2 (D. Minn. Aug. 18, 2021) (allowing expert's lost profits damages opinion and holding it was not for expert to determine whether allegedly dissatisfied customers would have left even absent defendant's misconduct).

**B. Cobb apportions damages.**

Cobb's report breaks down the terminated value and annual revenue per client taken by Peterson. (*E.g.*, Cobb Report 15–19.) Should it be found that Peterson did not inappropriately solicit or service Ballast clients—or that he did not improperly use Ballast's trade secret and confidential information or tortiously interfere with select business relationships—the damages amount may be reduced by the revenue apportioned to that client.

The claim that Cobb failed to appropriately apportion damages between defendants is another red herring. Peterson solicited and provided services to Ballast clients in contravention of his Agreement, misappropriated confidential and trade secret information, and tortiously interfered with Ballast's prospective economic advantage,

resulting in all of Ballast's damages. Thus, in the first instance, he is 100% responsible for Ballast's damages. Any Defendant found liable for aiding and abetting Peterson would be jointly and severally liable for the damages. *See R. L. Mlazgar Assocs., Inc. v. Focal Point, L.L.C.*, 2025 WL 2307002, at *15 (D. Minn. Aug. 11, 2025) (aiding and abetting allows a party to be held jointly and severally liable for an underlying tort by the primary tortfeasor.).

Moreover, Ballast seeks the same damages under each theory of liability—that is, whether Ballast lost clients due to Peterson's violation of his Agreement, his misappropriation of confidential information or trade secrets, his breach of fiduciary duty, or his tortious interference, the clients are still gone and the damages are the same. *See In re RFC*, 399 F. Supp. 3d 827, 844 (D. Minn. 2019) (plaintiff "sought the same damages under both its breach of contract and indemnification claims"); *see also Mannacio v. LG Elecs. U.S.A., Inc.*, 2020 WL 4676285, at *3 (D. Minn. Aug. 12, 2020) (allowing a single benefit-of-the-bargain damages model despite numerous different claims).

## VII. EQUITABLE REMEDIES

Defendants do not clarify what equitable remedies they are referring to. Nonetheless, Ballast, as an SEC-registered investment adviser, was notice-filed to conduct business in Florida at all relevant times. (PSOF 2.) Peterson was ultimately responsible for ensuring he was appropriately registered in Florida. (PSOF 6, ¶ 14, pp.8-9.)

## VIII. BALLAST AND PARNELL ARE ENTITLED TO SUMMARY JUDGMENT ON PETERSON'S COUNTERCLAIMS.

Peterson's counterclaims are based entirely on the farewell email. (PSOF 137.) Because the email does not satisfy the elements of any of Peterson's counterclaims, his claims must be dismissed.

### A. Four of Peterson's counterclaims fail for lack of a false statement.

Peterson's claims for defamation, defamation per se, malicious injury, and false endorsement fail because farewell email contains no false statements, which is a required element of those claims. *See Walker v. Wanner Eng'g, Inc.*, 867 F. Supp. 2d 1050, 1054 (D. Minn. 2012) (defamation); *Tholen v. Assist Am., Inc.*, 528 F. Supp. 3d 1017, 1024 (D. Minn. 2021) (defamation *per se*); *Keckhafer v. Prudential Ins. Co. of Am.*, 2002 WL 31185866, at *5 (D. Minn. Oct. 1, 2002) (malicious injury); *Moreland v. Kladeck, Inc.*, 2022 WL 1501122, at *2 (D. Minn. May 12, 2022) (false endorsement (Lanham Act)).

Defendants do not specify a statement from the email that was supposedly false. Peterson testified that the "whole email" is false, but later cabined his accusation to the line reading, "[m]any of [the email recipients] already know Paul or have worked with him directly in the past." (PSOF 139.)[8] Further, the day it was sent, Peterson admitted to a client that he knew it was being sent, saying, "I was going to call you before this went out. I was suppose [sic] to have a few days." (PSOF 102.)

---

[8] Peterson also apparently claims that the farewell email's statement that his departure from Ballast "is also bittersweet" is false, though he cannot say how it was false other than that he would not have used those words. (PSOF 139.)

Peterson's client affidavits directly refute Peterson's testimony, with several affiants acknowledging knowing Parnell. (*E.g.*, Dkt. 167-03, 8, 10, 32, 34, 38, 55, 60, 80, 86.) Parnell *did* know many of the Ballast clients Peterson serviced at the time the farewell email was sent. (PSOF 141.) "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Additionally, the farewell letter said that Peterson was leaving Ballast to pursue another opportunity, was not at the time intending to work with retail investment advisory clients, and was glad for the client relationships he made while at Ballast. In fact, the "endorsement" contained in the farewell email—that Peterson was leaving Ballast clients in the "capable hands" of Parnell—was the same message he relayed to the 20–25 clients he called regarding his resignation. (PSOF 96.) Peterson told clients "[he] was leaving Ballast" and "they were in good hands") (PSOF 89.) And when asked by Ballast clients whether they could work with him after he left Ballast, Peterson told them "no"! (PSOF 93.) Moreover, the farewell email was consistent with the talking points Peterson admits he followed. (PSOF 91.)

Further, "[m]inor inaccuracies do not amount to falsity," and "[a] statement is substantially true if it would have the same effect on the mind of the reader or listener as that which the pleaded truth would have produced." *McKee v. Laurion*, 825 N.W.2d 725, 730 (Minn. 2013). In other words, even if Peterson did not type the farewell email, it does not make otherwise true information false. Were this email unsigned and written in the

third person, the information itself would still be accurate, and the effect on the reader—letting Ballast clients know that Peterson was moving on and that their accounts would be transitioned to Parnell—would have been the same. Because Peterson cannot point to any actual falsity, his claims for defamation, defamation per se, malicious injury, and false endorsement must be dismissed.

**B. Peterson's counterclaims fail for other reasons.**

**1. Defamation**

Peterson was not harmed by the farewell email. *See Sherman v. Rinchem Co.*, No. 10-CV-2062 PJS/FLN, 2011 WL 3471057, at *6 (D. Minn. Aug. 8, 2011), *aff'd,* 687 F.3d 996 (8th Cir. 2012) (element of defamation is that statement "tends to harm [plaintiff's] reputation"). Peterson does not claim that he lost clients as a result of the email or point to any harm other than being personally upset, which is insufficient. (PSOF 143.) *See Tholen v. Assist Am., Inc.*, 528 F. Supp. 3d 1017, 1024 (D. Minn. 2021) (emotional harm damages insufficient for defamation claim)

**2. Defamation per se**

The farewell email was not "peculiarly harmful to the person in his business." *Anderson*, 262 N.W.2d at 372. In *Anderson*, the Court distinguished between a case where a lawyer was charged with being a "shyster" and a case where a lawyer was accused of being habitually "slow" in the payment of personal debts—stating that "[i]n the one case the remarks affect the person's professional capacity; in the other they do not." *Id.* at 372 n.3. The only statements in the farewell email that relate to Peterson's business, trade, or professional conduct are that he was leaving Ballast to pursue another

opportunity, and did not plan to work with retail investment advisory clients. Since it was accurate at the time, and consistent with Peterson's representations to Ballast and the talking points he used with clients (PSOF 89-91), it does not amount to falsity that is peculiarly harmful to Peterson's business.

**3. Malicious injury**

Peterson has not demonstrated malicious intent and harm. *See Keckhafer v. Prudential Ins. Co. of Am.*, 2002 WL 31185866, at *5 (D. Minn. Oct. 1, 2002) (providing elements of malicious injury claim, including demonstration of malicious intent to injure and damage as a "direct result of the defendant's untrue words"). Malice is "actual ill will, or a design to causelessly and wantonly injure plaintiff." *Eldeeb v. Univ. of Minnesota*, 864 F. Supp. 905, 912 (D. Minn. 1994), *aff'd sub nom. El Deeb v. Univ. of Minnesota*, 60 F.3d 423 (8th Cir. 1995) (internal quotations omitted). Peterson points to no facts that would allow a factfinder to decide that Ballast or Parnell acted with ill will or with intent to carelessly and wantonly injure him. (PSOF 83) (Parnell stating his belief at the time the farewell email was sent that Peterson did not plan to work with retail advisory clients); (PSOF 85) (Peterson confirming he had no intent at that time to work with Ballast clients). The farewell email was consistent with what Peterson told Parnell and clients, and consistent with common sense. As Peterson identified no damages resulting from the farewell email this claim fails.

**4. Intrusion upon seclusion**

The farewell email was not "highly offensive." *See Lake v. Wal–Mart Stores, Inc.,* 582 N.W.2d 231, 233 (Minn.1998) (providing elements of an intrusion upon seclusion

claim, including an intension intrusion that "would be highly offensive to a reasonable person"). Whether something is "highly offensive" is a question of law "if reasonable persons can draw only one conclusion from the evidence." *Swarthout v. Mut. Serv. Life Ins. Co.,* 632 N.W.2d 741, 745 (Minn.Ct.App.2001). The interference must be a "substantial one, of a kind that would be highly offensive to the ordinary reasonable [person], as the result of conduct to which the reasonable [person] would strongly object." *Id.* at 745; *see, e.g.*, *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 235 (Minn. 1998) (finding the distribution and unlawful accessing and saving of nude photographs to be "highly offensive").

Here, a reasonable person who had been honest with their employer about post-employment plans would not strongly object to the content. This claim fails.

**5. Appropriation**

Peterson cannot show commercial value associated with Peterson's name or likeness that accrued to Ballast through the farewell email. *See Wagner v. Gallup, Inc.*, 989 F. Supp. 2d 782, 791 (D. Minn. 2013), *aff'd,* 788 F.3d 877 (8th Cir. 2015) (providing elements of an appropriation claim, including that the appropriation be done "for the purpose of accruing to the defendant's benefit the commercial or other value associated with the name or likeness"). The individuals who received the email were Ballast clients, not Peterson's clients, and because of Peterson's restrictive covenants, he could not service them for two years. There was no benefit or value to accrue.

### 6. False Endorsement/Lanham Act

The farewell email was not likely to cause consumer confusion. *See Moreland v. Kladeck, Inc.*, 2022 WL 1501122, at *2 (D. Minn. May 12, 2022) (providing elements of a false endorsement claim, including likelihood of consumer confusion). The likelihood of consumer confusion is determined by asking "whether the relevant average consumers for a product or service are likely to be confused as to the source of a product or service or as to an affiliation between sources based on a defendant's use." *Hormozi v. Neist Media LLC*, 2024 WL 4772462, at *3 (D. Minn. Nov. 13, 2024) (internal quotations omitted). An email about Peterson's departure from Ballast sent from Peterson's email address would not confuse the average Ballast client serviced by Peterson about whether Peterson and Ballast were affiliated. In fact, the email specifically stated that Peterson was leaving Ballast, showing that he and Ballast were *no longer affiliated*.[9]

## CONCLUSION

For the reasons set forth above, Plaintiff and Counterclaim-Defendant Ballast and Counterclaim-Defendant Parnell request that the Court deny Defendants' Motion for Summary Judgment and grant their Motion for Partial Summary Judgment on Count I and Cross Motion for Summary Judgment.

[9] To the extent Peterson relies on the allegation in his counterclaim that "Desouza was confused when he received the [farewell] email," Peterson has offered no evidence of that confusion. (Dkt. 76, Counterclaim ¶ 21.) Desouza's response to the email stated that his "only concern" was whether Parnell would spend as much time with him or if someone would be hired to replace Peterson. (*See id.* ¶ 20.)

Dated: March 10, 2026

*s/ Matthew T. Boos*
Matthew T. Boos (#0237310)
Melissa R. Stumbras (#0400800)
Christopher J. Markuson (#0504387)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street
Suite 1500
Minneapolis, MN 55402-4400
(612) 492-7000
mboos@fredlaw.com
mstumbras@fredlaw.com
cmarkuson@fredlaw.com

***Attorneys for Plaintiff/Counter-Defendants***