UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

BALLAST ADVISORS, LLC,

Plaintiff,

v.

SCOTT A. PETERSON; MELINDA M. BRADLEY; MMX WEALTH PARTNERS, LLC; MMX WP, LLC; MMX MANAGEMENT, LLC; and MARK MARXER,

Defendants.

SCOTT A. PETERSON,

Counter Plaintiff,

v.

BALLAST ADVISORS, LLC and PAUL PARNELL,

Counter Defendants.

Case No. 23-CV-3769 (PJS/JFD)

ORDER

---

Matthew T. Boos, Christopher J. Markuson, and Melissa R. Stumbras, FREDRIKSON & BYRON, P.A., for plaintiff and counter defendants.

Joel Andersen, Christopher T. Ruska, and Katie M. Connolly, NILAN JOHNSON LEWIS PA, for defendants and counter plaintiff.

This case tells a familiar story: a financial advisor leaves his firm, clients follow, and the jilted firm sues the departed financial advisor to enforce restrictive covenants.

Here, plaintiff Ballast Advisors, LLC ("Ballast") brings a host of claims against its former employee, defendant Scott A. Peterson, arising out of his alleged breach of restrictive covenants in his employment agreement. Ballast also brings aiding-and-abetting claims against another former employee, defendant Melinda M. Bradley, and against parties who allegedly helped Peterson build his new practice: defendants MMX Wealth Partners, LLC; MMX Management, LLC; and Mark Marxer.[1] Peterson responded with tort claims of his own against Ballast and its managing partner, Paul Parnell. This matter is before the Court on the parties' motions for summary judgment. ECF Nos. 162, 185.

What sets this case apart—aside from the level of acrimony and the sheer number of claims, defendants, counterclaims, and defenses—is the nature of one of the restrictive covenants at the center of this case. That provision goes beyond prohibiting Peterson from *soliciting* his former clients. It also effectively bars Peterson's *clients* from deciding to continue their relationship with him, even if the decision is entirely the client's, and even if Peterson did not prompt, induce, or solicit the client in any way.

The Court questions whether the Minnesota Supreme Court would find such a provision enforceable under Minnesota law, at least when it is applied to prevent a

[1]Ballast names "MMX WP, LLC" as a defendant in its Third Amended Complaint, but Ballast failed to assert any claims against this entity. *See* Defts.' Mem. at 1 n.1, ECF No. 164; Third Am. Compl. ¶¶ 5, 89–143, ECF No. 125. The Court therefore dismisses MMX WP, LLC as a party.

beneficiary (such as a patient or client) from making an independent decision to continue receiving services from a trusted fiduciary (such as a doctor or attorney). But because "[t]he Minnesota Supreme Court ought to be the one to decide this novel legal issue," the Court will certify this potentially dispositive question and stay this action pending its resolution. *Berkley Reg'l Ins. Co. v. Doe Battery Mfr.*, 173 F.4th 989, 990 (8th Cir. 2026); *see also* Minn. Stat. § 480.065, subd. 3.

## I. BACKGROUND

Ballast is a small wealth-management firm with offices in Minnesota and Florida. Parnell Decl. ¶ 3, ECF No. 190. Peterson joined Ballast's Minnesota office as an investment advisor in February 2017. Nease Decl. ¶ 3, ECF No. 189. In this role, Peterson provided investment-management and financial-planning services to existing Ballast clients and pitched his services to prospective clients. Parnell Decl. ¶ 4; Third Am. Compl. ¶ 19, ECF No. 125 ("TAC"). According to Ballast, Peterson did not personally solicit most of the clients he served. *See* TAC ¶ 20. Rather, Peterson's clientele consisted mainly of "clients from prior Ballast purchases, transitions from other advisors, or referrals from existing Ballast clients." *Id.*; *see also* Supp. Boos Decl. Ex. 3 at 6, 12–16, ECF No. 212 (listing the "source of each client serviced by Peterson").[2]

---

[2]Because many of the parties' exhibits comprise multiple documents with inconsistent (or nonexistent) Bates numbering, the Court cites to exhibits using the electronically generated page numbers at the top of the page, except in the case of

(continued...)

Peterson relocated from Minnesota to Punta Gorda, Florida, in 2019. Nease Decl. ¶ 3; TAC ¶ 18. There, Peterson began to work with Bradley, who was employed by Ballast as a client-service manager. Andersen Decl. Ex. G at 45:7–15, ECF No. 170-3 ("Bradley Dep."); Boos Decl. Ex. B, ECF No. 191-2. For the next three years, Bradley "worked almost exclusively for Peterson," assisting with "troubleshooting and resolving client problems; addressing client inquiries and concerns; and serving as a liaison between the clients and their advisor." TAC ¶¶ 27–28; *see also* Bradley Dep. 47:24–51:2 (agreeing that she was Peterson's "right-hand person"); Boos Decl. Ex. C, ECF No. 191-5. Through their employment, both Peterson and Bradley had access to "significant amounts of [Ballast's] confidential and proprietary information"—most notably, the names of current and prospective clients and financial information about those clients. TAC ¶¶ 29, 21; *see also* Nease Decl. ¶¶ 9–10; Parnell Decl. ¶ 10.

*A. The Restrictive Covenants*

In the spring of 2022, Ballast required its employees to sign a new employment agreement that contained the restrictive covenants that are the focus of this litigation (the "Employment Agreement"). Parnell Decl. ¶ 7; Andersen Decl. Ex. A at 148:18–19,

---

[2](...continued)
deposition transcripts.

ECF No. 170 ("Parnell Dep.").[3] Peterson executed the new Employment Agreement on September 23, 2022. Andersen Decl. Ex. D at 47:18–21, ECF No. 170-1 ("Nease Dep.").[4]

The Employment Agreement contains a "Confidentiality" clause, which prohibits Peterson from disclosing or using Ballast's "Confidential Information" "in any way"—except on Ballast's behalf—both during his employment and "at any time thereafter." Andersen Decl. Ex. J § 6(a), ECF No. 169-4 ("Emp. Agmt."); *see also* Parnell Dep. 163:14–19 (confirming that the Employment Agreement's confidentiality obligations "have no end date"); Mot. Hr'g Tr. 23:16–25:8, ECF No. 231 (Apr. 14, 2026) ("Tr."). "Confidential Information" is broadly defined as "any information pertaining to the Company's business . . . which is not generally known or readily ascertainable by the Company's competitors or the general public." Emp. Agmt. § 1(b) (providing a non-exhaustive list of examples, including trade secrets, proprietary information, and "Client names, lists or other information pertaining to the Company's business"). For purposes of this litigation, "Ballast considers 'confidential' and 'trade secret information' to be synonymous." Nease Dep. 147:4–6; *see also id.* at 109:20–110:6

---

[3]Peterson signed a non-compete agreement in 2017 as a condition of his employment, Andersen Decl. Ex. E, ECF No. 169-3, but Ballast does not seek to enforce that agreement in this case, *see* Mot. Hr'g Tr. 83:18–21, ECF No. 231 (Apr. 14, 2026).

[4]Bradley was "among those required to sign" the new Employment Agreement, but she resigned before doing so. Parnell Decl. ¶ 7.

(testifying that the terms "confidential information" and "trade secret information" are "used interchangeably").

The Employment Agreement also includes a clause that is labeled "Non solicitation," although the label is misleading. Emp. Agmt. § 7. The non-solicitation clause does two distinct things, only one of which has anything to do with solicitation. *See* Tr. 46:20–24 ("[T]he nonsolicitation clause really has built into it kind of a noncompete. . . . [I]t's not [a] noncompete in the world, but [a] noncompete with respect to . . . the Ballast clients, as well as a solicitation part."). First, Peterson is barred from "directly or indirectly" soliciting or attempting to solicit "any Client to do business with any Competing Business." Emp. Agmt. §§ 7, 7(a). The Court will refer to this as the "non-*solicitation* provision." Second, Peterson is restricted from "provid[ing] or sell[ing] to any Client any service or product that competes with, or is the same or substantially similar to, any service or product offered or provided by" Ballast—regardless of whether Peterson has solicited the client or even had any contact with the client. *Id.* § 7(a). The Court will refer to this as the "non-*service* provision." Both restrictions ran for a two-year "Restricted Period" following Peterson's resignation. *Id.* §§ 7(a), 1(g).

### *B. Establishing MMX WP and MMX Wealth Partners*

At about the same time that Ballast circulated the new Employment Agreement, Peterson was "considering [his] options." Andersen Decl. Ex. K at 79:3–15, ECF No.

170-6 ("Marxer Dep."); *see also* Peterson Decl. ¶ 5, ECF No. 167. Bradley, too, was unhappy at Ballast and "interviewing at other places." Bradley Dep. 53:3–54:9; *see also* Marxer Dep. 59:5–10. At Peterson's suggestion, Bradley resigned from Ballast in June 2022 to work as an operations director for MMX Management, LLC ("MMX Management")—a financial-services organization founded by Peterson's longtime friend, Mark Marxer. Bradley Dep. 31:3–20, 55:8–56:14, 66:14–19, 70:7–14; Marxer Dep. 19:25–20:10, 58:19–59:10, 64:7–65:14; TAC ¶¶ 40–41.

Meanwhile, Peterson began meeting with Marxer to discuss Marxer's plans to expand MMX Management "into the wealth management space." Marxer Dep. 53:12–54:14; *see also id.* at 56:18–57:5; Peterson Decl. ¶ 5. Specifically, the two contemplated a consulting and referral arrangement under which Peterson would provide investment-management services to Marxer's ultra-high-net-worth clients. *See, e.g.*, Marxer Dep. 95:14–17 (defining "an ultra-high-net-worth type client" as one with a "[m]inimum of 50 million anywhere to 2 billion" in assets under management); *id.* at 29:9–31:9, 41:15–19; Bradley Dep. 72:10–73:16; Andersen Decl. Ex. H at 337:24–338:15, ECF No. 170-4 ("Peterson Dep.").

In June 2022—a few weeks before Bradley's resignation—Peterson was introduced to Advisory Services Network, LLC ("ASN"), a compliance and licensing platform for financial advisors. Boos Decl. Ex. Q, ECF No. 191-38; Tr. 41:1–8 (describing

ASN as a "back office compliance shop"). Peterson, ASN, and Marxer worked out a "[d]ream structure" for the new venture under which Peterson would register with ASN, rather than building out his own compliance infrastructure. Boos Decl. Ex. S at 3, ECF No. 191-43; *see also* Tr. 41:1–8. Peterson would then deposit his payments from ASN into an LLC "servicing company," and the servicing company would make payments to Marxer's company under a flat-fee consulting agreement. Boos Decl. Ex. S at 3; *see also* Boos Decl. Ex. AA, ECF No. 191; Peterson Dep. 114:12–17. Marxer incorporated a new wealth-management "vertical"—MMX Wealth Partners, LLC ("MMX Wealth Partners")—in September 2022, Boos Decl. Ex. R, ECF No. 188-11, and Peterson entered into an Investment Advisor Representative Agreement with ASN and formed his own company—MMX WP, LLC ("MMX WP")—two months later, Boos Decl. Ex. U, ECF No. 191-49; *id.* Ex. W, ECF No. 191-55.

Peterson was not subtle about how he expected to attract clients to his new venture. A January 2023 business plan for MMX WP projected that Peterson would "bring over approximately $42,000,000" in assets under management "from existing clients." Boos Decl. Ex. CC at 25, 27, ECF No. 191-6; *see also* Bradley Dep. 290:17–20 (confirming that "existing clients" meant "clients that [Peterson] was servicing while at Ballast"); Boos Decl. Ex. EE at 4, ECF No. 188-4 (reflecting $45 million "Total Assets to be Transferred" in the "First 90 Days"). As early as October 2022, ASN noted in an

internal email that Peterson "does have a non-solicit, but he's confident that his clients will reach out to him once they learn from Ballast that he's gone." Boos Decl. Ex. AA. Similarly, Peterson's "Pre-Hire Interview Questionnaire" with ASN indicated that he was "connected to most of his clients on LinkedIn or they have his cell phone" and that Peterson "believes they will all reach out to him." Boos Decl. Ex. BB, ECF No. 191-3. It is important to emphasize that Peterson did and said all of these things while still employed by Ballast—and, of course, without telling Ballast.

*C. The Wind-Down Period and Farewell Email*

Peterson finally submitted his resignation to Ballast on February 3, 2023—roughly five months after Peterson executed the Employment Agreement and seven months after Bradley had left to work for Marxer. Peterson Decl. ¶¶ 4, 6; TAC ¶¶ 41–42. Ballast promptly terminated Peterson's access to its trading and report systems, but then it restored limited access after Peterson repeatedly assured Ballast that "his new job involved a different business model" and that he would not "pursu[e] Ballast clients." Parnell Decl. ¶ 13; TAC ¶ 43; *see also* Peterson Dep. 170:14–171:21. Relying on Peterson's "representations and assurances," Ballast agreed to a two-week wind-down period during which Peterson would call his "top 20 [to] 25 clients" and, using talking points approved in advance by Ballast, transition his clients to other Ballast advisors. Peterson Dep. 191:7–9; *see also id.* at 194:4–14, 196:11–14, 197:13–19;

Parnell Decl. ¶¶ 13–16; Andersen Decl. Ex. Q, ECF No. 170-8 (reflecting Peterson's notes from client calls made during the wind-down period); Boos Decl. Ex. TT, ECF No. 191-47 (same).

Peterson continued to work for Ballast until February 21, 2023. Nease Decl. ¶ 13. The following day, after Peterson had returned his laptop and keys, Ballast sent the following email from Peterson's email address to his former clients with the subject line "Update from Scott" (the "Farewell Email"):

> Dear [Client],
>
> I am writing to share that I am leaving Ballast to pursue another opportunity where I do not plan to work with retail investment advisory clients. While I am excited to start this new chapter in my life, it is also bittersweet. I am proud to have been with Ballast since its founding and know that I am leaving you in the capable hands of Managing Partner and founding member Paul Parnell.
>
> Many of you already know Paul or have worked with him directly in the past. Your Client Service Manager has not changed, so please feel free to reach out to [him or her] with any questions or concerns.
>
> I wanted to take this opportunity to let you know that I enjoyed the time I had with Ballast, the relationships that I have developed with my colleagues, and especially the clients that I have worked with over the years.
>
> I wish you all the best now and in the future!
>
> Sincerely,

Scott

Scott A. Peterson
Wealth Advisor

Boos Decl. Ex. UU, ECF No. 191-50.

The parties dispute "whether Peterson approved the content and/or timing of the email." Defts.' Mem. at 12; *compare* Parnell Decl. ¶ 17 ("I discussed the content of the farewell email with Scott Peterson and he approved its contents."), Nease Decl. ¶¶ 14–16, *and* Boos Decl. Ex. OO at 29–30, ECF No. 188-10, *with* Peterson Dep. 205:8–10 ("I'm attesting that I had no knowledge that they were going to send that email out."), *and id.* at 175:15–22, 178:8–10, 180:10–11, 202:13–204:14. It is undisputed, however, that the substance of the email more-or-less mirrored the substance of the talking points that Peterson was supposed to have used for his wind-down calls. *See, e.g.*, Peterson Dep. 161:21–23 ("So my talking points were . . . that I was leaving Ballast, right, they were in good hands. I was starting a new endeavor."); *id.* at 190:19–191:12, 197:15–19, 200:6–202:11, 205:14–208:7.

Nonetheless, Peterson now claims that he "became alarmed" when he learned about the email. *Id.* at 167:8–13 ("I was a little, if you want to say, distraught by the verbiage that was used and was sent from my email address."); Defts.' Mem. at 13 ("Peterson found the 'farewell' email highly offensive."). According to Peterson, the Farewell Email, coupled with his concern that his clients were not "getting the attention

that they deserve," Peterson Dep. 167:15–168:14, prompted his decision to begin "accept[ing] [Ballast] clients if they asked to work with him, without solicitation." Defts.' Mem. at 14.

*D. The Alleged Misappropriation*

While still employed by Ballast, between October 2022 and February 2023, Peterson assembled and shared at least three reports using information from Ballast's password-protected systems. Pl.'s Mem. at 12, 36, ECF No. 187; Tr. 4:14–9:10; Nease Dep. 76:1–77:12. First, in October 2022, Peterson shared with Bradley and ASN a "CUSIP" compilation reflecting the "universe of securities" owned by Peterson's Ballast clients. Tr. 39:3–21 (explaining that Peterson likely shared the CUSIPs so ASN could "clear them and make sure they will transfer over to the new custodian"); *see also* Boos Decl. Ex. QQ at 2, ECF No. 191-39 (reflecting ASN's "Cusip analysis," including ASN's impression that "most [positions] will flow over pretty fluidly"); Boos Decl. Ex. PP, ECF No. 191-36.

Second, Peterson prepared a "Firm Trading Profile" and shared it with Bradley and ASN on January 26, 2023. *See* Boos Decl. Ex. EE. The Firm Trading Profile reflected aggregated information about the "size, number, and make-up" of the accounts Peterson serviced at Ballast, including the total number of assets under management,

the "portfolio mix and trading history, the average number of positions in the accounts, and more." Pl.'s Mem. at 13; *see also* Boos Decl. Ex. EE; Tr. 43:4–20.

Finally, on February 6, 2023—three days after Peterson submitted his resignation to Ballast, but while he was still working for the firm—he provided Bradley with a "fairly complete list" of the clients he served at Ballast. Bradley Dep. 194:3–25; *see also id.* at 188:1–189:7. This "Client List" included client names, addresses, dates of birth, and Social Security numbers. *Id.* at 197:19–198:5.

After receiving the "Client List" from Peterson, Bradley manually entered information from the list into MMX's customer-relationship-management system. *Id.* at 190:9–193:23; *see also* Tr. 44:1–46:3. Bradley acknowledged that the Client List contained "confidential and private information," and she shredded the document after she finished entering the data. Bradley Dep. 202:7–203:14. Although Peterson insists that he "never used the client list . . . provided to Bradley, or the information Bradley uploaded from it, to solicit any client or to provide services to any client," Peterson Decl. ¶ 9, Bradley testified that she *did* use the information to help "transition clients over" to MMX WP, Bradley Dep. 204:21–205:22.

*E. The Alleged Solicitation*

Once the wind-down period ended, MMX WP (Peterson's company) and MMX Wealth Partners (Marxer's wealth-management "vertical") formally entered into a

consulting-services agreement, effective March 17, 2023. Andersen Decl. Ex. O, ECF No. 169-7. Pursuant to this agreement, MMX Wealth Partners would provide MMX WP with professional referrals, office space, and administrative support in exchange for quarterly payments. *See id.* at 5. Bradley began working for Peterson again, performing essentially the same functions she had performed at Ballast. *See, e.g.*, Bradley Dep. 84:25–86:3, 109:22–110:7, 116:9–13.

Before Peterson became registered to provide investment-management services through ASN on June 12, 2023, Boos Decl. Ex. A, ECF No. 188-1, Peterson assured ASN that "he expects to still bring over $60–70 M [from Ballast]," Boos Decl. Ex. BBB, ECF No. 191-4. Soon after, Peterson began contacting his former Ballast clients, purportedly to "check[] in to make sure they were okay." Peterson Dep. 385:19–86:5; *see also* Boos Decl. Ex. III, ECF No. 191-21, Ex. JJJ, ECF No. 191-24, Ex. KKK, ECF No. 191-27 (reflecting calls and texts from Peterson to former Ballast clients); Nease Decl. ¶ 20. Peterson left voicemails for several clients to inform them that he was "up and running" and that "everything is a go now." Peterson Dep. 380:7–385:22; *see also* Boos Decl. Ex. HHH at 3, ECF No. 191-18 (stating in a June 2023 email that Peterson was "calling his clients to transition over"); Bradley Dep. 83:1–23.[5] That August, Peterson and Bradley

---

[5]Ballast learned of some of Peterson's efforts. Within a day or two after Peterson left Ballast, the firm sent him a cease-and-desist letter. Boos Decl. Ex. YY, ECF No. 188-13. In July, at least one client emailed Ballast directly to report that Peterson "continues (continued...)

traveled to Minnesota to meet with several of Peterson's former Ballast clients—at least three of whom later left Ballast for Peterson's new company. *See, e.g.*, Bradley Dep. 91:5–93:24, 107:6–110:13, 122:15–19; Boos Decl. Ex. CCC at 40–41, ECF No. 188-2. Bradley prepared an "Introductory Meeting Agenda" for Peterson to use when meeting with clients who "haven't transitioned yet." Boos Decl. Ex. QQQ, ECF No. 191-40 (addressing the services MMX WP could offer, MMX WP's fee structure, and custodian arrangements); *see also* Bradley Dep. 113:22–114:13; Peterson Dep. 108:1–109:11. In total, Peterson admits to providing investment services to at least 45 former Ballast clients. *See, e.g.*, Boos Decl. Ex. CCC at 30–41; Ex. DDD at 15–25, ECF No. 188-3; Ex. EEE at 14–25, ECF No. 188-5; Ex. FFF, ECF No. 191-12; Ex. GGG, ECF No. 191-15. Peterson vehemently denies, however, that he *solicited* any of those clients. *See, e.g.*, Peterson Decl. ¶ 11; *id.* Ex. 3, ECF No. 167-3; Ex. 4, ECF No. 167-4.

## II. ANALYSIS

### *A. Standard of Review*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v.*

[5](...continued)
to reach out to former clients." Supp. Boos Decl. Ex. 6, ECF No. 212-2.

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When ruling on a summary-judgment motion, the Court views the record in the light most favorable to the nonmoving party and draws all reasonable inferences in his favor. *Stuart C. Irby Co., Inc. v. Tipton*, 796 F.3d 918, 922 (8th Cir. 2015).

*B. Validity and Enforceability of the Employment Agreement*

In Count I, Ballast alleges that Peterson breached the Employment Agreement in at least three ways: (1) by using and disclosing Ballast's Confidential Information, in violation of the confidentiality clause; (2) by providing services to former Ballast clients, in violation of the non-service provision; and (3) by soliciting Ballast's clients, in violation of the non-solicitation provision. TAC ¶¶ 92–95. All parties move for summary judgment on Count I. ECF Nos. 162, 185. Peterson admits that he breached the non-service provision, Tr. 13:14–24, but he argues that Count I must nevertheless be dismissed because (1) the Employment Agreement is invalid for lack of independent consideration, and (2) the three restrictive covenants are unenforceable as overbroad and contrary to public policy, Defts.' Mem. at 15–19.

1. Consideration

Peterson first contends that the entire Employment Agreement is void for lack of consideration. Under Minnesota law, all contracts—including, of course, all restrictive

covenants—must be supported by consideration. *See, e.g.*, *Freeman v. Duluth Clinic, Ltd.*, 334 N.W.2d 626, 629 (Minn. 1983) ("A claim of lack of consideration, if proved, would also vitiate the entire agreement."). "The adequacy of consideration for restrictive covenants signed during an ongoing employment relationship will depend upon the facts of each case." *Id.* at 630.

Ballast alleges—and the Employment Agreement expressly states—that Peterson received the following as consideration for agreeing to the new restrictive covenants: (1) a one-time bonus of $500; (2) a new benefit payable on death, disability, or retirement (the "Retirement Benefit"); and (3) continued employment. Emp. Agmt. Recital D; *id.* § 4(d); *see also* Parnell Dep. 310:9–17; Nease Decl. ¶¶ 4–8. Because continued employment, without more, is plainly insufficient consideration for a restrictive covenant added midstream, *see, e.g.*, *Nat'l Recruiters, Inc. v. Cashman*, 323 N.W.2d 736, 740 (Minn. 1982), the Court addresses only the $500 bonus and the Retirement Benefit.

*a. One-Time $500 Payment*

The $500 bonus cannot satisfy the independent consideration requirement for two reasons. First, Ballast made "[a]bsolutely no distinction . . . between signers and nonsigners" of the new Employment Agreement. *Freeman*, 334 N.W.2d at 630. Under Minnesota law, a benefit can serve as consideration for a restrictive covenant only if a

signing employee receives "real advantages . . . which would not have been open to him if he had not signed the contract." *Davies & Davies Agency, Inc. v. Davies*, 298 N.W.2d 127, 130–31 (Minn. 1980). Here, Ballast paid the bonus to *everyone*, without regard to whether an employee had or had not signed the new Employment Agreement. *See, e.g.*, Nease Dep. 247:17–248:14. In fact, when an employee asked about the payment, Ballast's then-Vice President of Operations, Andrea Nease, told the employee that she was "the only one who noticed," called it "free money," and confirmed that "[e]veryone got the bonus at the same time!" Nease Decl. Ex. 101 at 3–4, ECF No. 192; *see also* Nease Dep. 246:8–248:14. That employee, like Peterson, received the payment even though she "didn't sign anything." Nease Decl. Ex. 101 at 4; *see also* Nease Dep. 42:21–24 (confirming that Peterson did not execute the new Employment Agreement before he received the bonus).

Second, the $500 payment also fails as consideration because it was not part of a bargained-for exchange. *See, e.g.*, *Baehr v. Penn-O-Tex Oil Corp.*, 104 N.W.2d 661, 665 (Minn. 1960) ("Consideration requires that a contractual promise be the product of a bargain."). It is undisputed that the $500 bonus was added to Peterson's paycheck in June 2022—months *before* he executed the Employment Agreement in September. Peterson Decl. Ex. 1, ECF No. 167-1 (showing a $500 "Miscellaneous Addition" on Peterson's June 3, 2022, paycheck); Nease Dep. 42:21–24; Parnell Dep. 312:10–12 (stating

that Peterson "was the last one to sign a new agreement"). Peterson testified that, at the time, he did not even notice that he had received the payment, much less know what it was for. Peterson Dep. 290:22–291:10. It goes without saying that a person cannot bargain for a benefit that he does not know exists. *Cf. State v. Schouweiler*, 887 N.W.2d 22, 25 (Minn. 2016) ("[A] promise given for 'past consideration' is not legally binding.").

Ballast's only response is that its managing partner, Paul Parnell, told Peterson "several times" that "he *had been* paid the $500 bonus as part of the consideration" for signing the new Employment Agreement. Parnell Decl. ¶ 8 (emphasis added). But Parnell's declaration states that these conversations occurred "[w]hile waiting for [Peterson] to sign the agreement"—that is, in the months *after* the $500 was paid. *Id.*; *see also* Tr. 107:9–11 ("There's no evidence at all in the record that Parnell told Peterson *in advance*, I paid you the $500 and so you need to sign this agreement.") (emphasis added).[6] An employer cannot retroactively turn non-consideration into consideration merely by labeling it as such. On this record, no reasonable jury could find that the $500 bonus was consideration for the restrictive covenants.

---

[6]Nease's testimony that the bonus was added to Peterson's paycheck only after he "said that he was going to sign the agreement" does not do the work that Ballast thinks it does. Nease Dep. 43:6–14 ("Scott was paid the bonus when we expected him to sign the agreement."); Pl.'s Mem. at 23. Nease said nothing in her testimony about whether, when Peterson "said that he was going to sign the agreement," Peterson knew anything about a supposed bonus. To the contrary, Nease testified that communicating about the bonus to Peterson was Parnell's responsibility, not hers, and she could not recall whether she—or anyone else—had ever done so. Nease Dep. 46:2–20.

*b. The Retirement Benefit*

That leaves the Retirement Benefit. Section 4(d) of the Employment Agreement describes a new benefit payable upon Peterson's "death, Disability or Retirement . . . provided that no Cause event or circumstance exists upon [his] employment termination date." Emp. Agmt. § 4(d). Peterson argues that the Retirement Benefit cannot support the restrictive covenants because (1) it is too indefinite to confer any real benefit, and (2) it violates the statute of frauds.

i. Indefinite or Illusory Benefit

Peterson first claims that the Retirement Benefit is essentially worthless (and, therefore, confers no benefit) because Ballast could withhold payment based on Ballast's "unilateral subjective interpretation" of the word "Cause." Defts.' Mem. at 17. Of course, "where the promisor may perform or not, solely on the condition of whim, the promise will not serve as consideration." 3 Williston on Contracts § 7:7 (4th ed., May 2026 update); *see also Welsh v. Barnes-Duluth Shipbuilding Co.*, 21 N.W.2d 43, 44 (Minn. 1945) ("Unless a promise is enforceable, the promisee receives nothing for his promise, and therefore it is without consideration."). But a promise is not illusory "if the words used do not leave an unlimited option to the one using them." 2 Corbin on Contracts § 5.32 (2026).

Rather than deferring to Ballast's "unilateral subjective interpretation," the Employment Agreement provides that "Cause" exists in only three limited circumstances: (1) if Peterson materially breaches an agreement with Ballast; (2) if Peterson is disqualified from serving as an investment advisor; or (3) if Peterson engages in conduct that "has . . . or is reasonably likely to adversely and materially affect" Ballast's "business activities." Emp. Agmt. § 1(a). As Ballast notes, the first "Cause" event is a question of law, the second is "an objective status out of Ballast's control," and the third uses standard commercial contract language routinely interpreted and enforced by courts. Pl.'s Mem. at 24–25 ("[T]he Cause definition captures only sufficiently egregious behavior using common legal standards[.]").

The Retirement Benefit was not rendered "illusory" merely because it was conditioned on Peterson's good conduct. And the discretion given to Ballast under the provision is a far cry from the type of "unfettered discretion" that could render illusory otherwise valid consideration. *Compare FSI Int'l, Inc. v. Shumway*, No. 02-CV-0402 (RHK/SRN), 2002 WL 334409, at *6 (D. Minn. Feb. 26, 2002) (holding that a benefit was not "sufficiently definite to be deemed consideration for the restrictive covenants" when the employer retained "unfettered discretion" to deny the benefit "based on subjective standards of sufficient 'diligence' and 'conscientiousness'"), *with Modern Controls, Inc. v. Andreadakis*, 578 F.2d 1264, 1268 (8th Cir. 1978) (concluding that, under Minnesota law, a

restrictive covenant was supported by consideration because an employer's option to release the employee from the non-compete and avoid paying the promised benefit was not "wholly unlimited"), *and Laclede Gas Co. v. Amoco Oil Co.*, 522 F.2d 33, 36–37 (8th Cir. 1975) (holding that, under Missouri law, a plaintiff's right of cancellation did not cause "a complete failure of consideration" because the right "was neither arbitrary nor unrestricted" and "was limited by the agreement in at least three ways").

Peterson also argues—for the first time in his reply—that the Retirement Benefit is too indefinite to serve as consideration because Ballast's board of directors retained discretion over the inputs that would be used to calculate the *amount* of the Retirement Benefit. *See* Defts.' Reply at 10, ECF No. 202 ("Ballast says Peterson would be paid a percentage tied to a 'liquidation sales price,' but the number depends on how Ballast's board applies internal unit percentages, expenses, 'other factors,' and 'Cause' determinations."); Emp. Agmt. § 4(d). This is a non-starter. First, "federal courts do not, as a rule, entertain arguments made by a party for the first time in a reply brief." *Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.*, 491 F. Supp. 2d 871, 878 (D. Minn. 2007); *see also Redking Foods LLC v. Minn Assocs. LP*, No. 13-CV-0002 (PJS/JSM), 2014 WL 754686, at *4 (D. Minn. Feb. 26, 2014) ("By raising this argument for the first time in its reply brief, RedKing violated Local Rule 7.1(c)(3)(B), which provides that '[a] reply memorandum must not raise new grounds for relief or present matters that do not relate to the

opposing party's response.'"). Second, even if the Court were to consider Peterson's argument, the Court would reject it. In assessing whether an agreement is supported by consideration, the Court determines only whether the parties exchanged *something* of legal value; it does not matter that the *value* of that "something" is variable or might later be influenced by a party's business judgments. *Cf. Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 919 (Minn. Ct. App. 2008) ("The amount of consideration is irrelevant so long as some benefit or detriment is proved."). Thus, the Retirement Benefit is sufficiently definite to serve as consideration for the restrictive covenants.

ii. Statute of Frauds

Finally, Peterson raises a statute-of-frauds challenge. Under Minnesota's statute of frauds, an agreement that "by its terms is not to be performed within one year from the making thereof" is unenforceable "unless such agreement, or some note or memorandum thereof, expressing the consideration, is in writing, and subscribed by the party charged therewith." Minn. Stat. § 513.01(1).[7] Peterson's argument is, by his counsel's own admission, "a bit . . . convoluted." Tr. 113:24–25. In essence, Peterson claims that § 4(d) of the Employment Agreement "does not explain the [Retirement]

---

[7]The Employment Agreement's two-year restrictive covenants plainly fall within the statute of frauds.

Benefit," so the consideration "is not sufficiently expressed in writing." Defts.' Mem. at 17.

The Retirement Benefit consists of "an amount equal to two percent (2%), on a cash basis, of the liquidation sales price . . . of the Class A-1 Units of the Company." Emp. Agmt. § 4(d). The "Sales Price," in turn, is "calculated as a hypothetical liquidating event as defined in Section 4.6 of the Amended and Restated Limited Liability Company Agreement" (the "LLC Agreement"). *Id.* Peterson asserts that the Retirement Benefit provided by the Employment Agreement cannot be "explain[ed]" without referring to the LLC Agreement, and that the combination of the two writings does not satisfy the statute of frauds because the two writings are not "connected by internal evidence so clear that parol evidence is not needed to establish their relationship." Defts.' Mem. at 17–18 (quoting *Holmes v. Torguson*, 41 F.3d 1251, 1254 (8th Cir. 1994)).[8] Ballast meets Peterson's argument on its own terms, insisting that the cross-references between § 4(d) of the Employment Agreement and the LLC Agreement are clear. Ballast also offers evidence that Peterson was provided with a copy of the relevant portions of the LLC Agreement before he signed the Employment Agreement. *See* Pl.'s Mem. at 26; Nease Decl. ¶ 7.

---

[8]Notably, *Holmes* construed the "statute of frauds in Article 8 of the Minnesota Uniform Commercial Code," rather than the statute of frauds governing contracts that cannot be performed within one year, Minn. Stat. § 513.01. *See Holmes*, 41 F.3d at 1252.

Both parties miss the forest for the trees. The statute of frauds, as the name implies, is meant to shield parties from fraudulent claims about the *existence* of a contract by requiring that the contract's "essential terms" be reduced to writing. *S O Designs USA, Inc. v. Rollerblade, Inc.*, 620 N.W.2d 48, 54 (Minn. Ct. App. 2000); *Radke v. Brenon*, 134 N.W.2d 887, 890 (Minn. 1965) ("The statute expresses a public policy of preventing the enforcement by means of fraud and perjury of contracts that were never in fact made."); *Doyle v. Wohlrabe*, 66 N.W.2d 757, 761 (Minn. 1954) ("It was not enacted to make a fetish of literal statutory compliance or . . . of requiring a perfect written contract."). The writing need only "express the substance of the contract and its terms with reasonable certainty," and parol evidence may be used "to apply its terms or to identify its subject-matter." *Swallow v. Strong*, 85 N.W. 942, 944 (Minn. 1901).

Contrary to Peterson's assertion, the writing must only *express* the consideration; it need not go on to *explain* it. Defts.' Mem. at 17; Minn. Stat. § 513.01. Minnesota courts have held that even boilerplate recitals such as "for value received," *Osborne v. Baker*, 25 N.W. 606, 607–08 (Minn. 1885), or for "credit given and to be given," *Midland Nat'l Bank of Minneapolis v. Sec. Elevator Co.*, 200 N.W. 851, 856–57 (Minn. 1924), were sufficient expressions of consideration to satisfy the statute of frauds. Thus, one need not even look to § 4(d) to satisfy the statute of frauds. The Recitals in the Employment Agreement alone are sufficient: "Employee agrees and acknowledges that . . .

Employee received . . . the added benefit payable in accordance with Section 4.d (which Employee acknowledges is good and valuable consideration) . . . as consideration for the restrictions contained in this Agreement." Emp. Agmt. Recital D.[9] Accordingly, the Court finds that the Employment Agreement was supported by consideration.

2. Enforceability

Peterson argues that, even if the Employment Agreement is a valid contract, the non-service provision is unenforceable as a matter of public policy. Peterson's argument deserves to be taken seriously, even though he is not a terribly sympathetic messenger.

The non-*service* provision in the Employment Agreement (in contrast to the non-*solicitation* provision) prohibits Peterson from providing any services to his former Ballast clients, even if Peterson has done nothing whatsoever to encourage them to continue to seek his services. Emp. Agmt. § 7(a). The Court expressed serious concerns about this provision when it ruled on defendants' motions to dismiss:

---

[9]Moreover, a contract that ties a payment to an external definition or formula is no less "in writing" than one reciting a fixed sum. Were it otherwise, many contracts providing a stock option, profit interest, or formula-driven bonus would be unenforceable under the state of frauds.

And whether Peterson ever personally reviewed the LLC Agreement is beside the point. The statute of frauds asks whether the consideration is in writing—not whether either party read the writing.

> It is one thing to say that a financial advisor cannot solicit or initiate contact with a former client; it is quite another to say that the financial advisor's former employer can effectively bar the *client* from continuing her relationship with her financial advisor, even if the financial advisor has not solicited or even initiated contact with that client.

*Ballast Advisors, LLC v. Peterson*, No. 23-CV-3769 (PJS/TNL), 2024 WL 5075600, at *3 n.4 (D. Minn. Dec. 11, 2024); *see also* Mot. Hr'g Tr. 32:6–11, ECF No. 214 (Apr. 16, 2024) ("[I]t strikes me this is a problematic thing . . . forbidding the client to follow unsolicited the person . . . . [They]'re not selling widgets here. These are relationships of trust."). The Court deferred ruling on Peterson's public-policy arguments, though, because they "touch[ed] on a number of factual issues that need[ed] to be explored in discovery." *Ballast Advisors*, 2024 WL 5075600, at *3.[10] Now, with the benefit of a full factual record, the Court's concerns have only deepened.

In Minnesota, restrictive covenants in employment contracts "are looked upon with disfavor, cautiously considered, and carefully scrutinized." *Bennett v. Storz Broad. Co.*, 134 N.W.2d 892, 898 (Minn. 1965).[11] Traditionally, Minnesota courts hold that a

---

[10]The Court did, however, reject Peterson's argument that the restrictive covenants were "overly broad because they contain no geographic limitation." *Id.* at 3. Peterson renews this argument on summary judgment, and the Court renews its ruling.

[11]The Minnesota legislature recently reflected this disfavor when it passed a near-total ban on non-compete agreements. Minn. Stat. § 181.988; *but see Nelson v. SIS Software, LLC*, No. 24-CV-4180 (DWF/DJF), 2025 WL 2778058, at *5 (D. Minn. Sept. 26, 2025) ("Notably, [§ 181.988] does not ban non-disclosure or non-solicitation agreements and only applies to noncompete clauses that restrict an employee's activities 'after

(continued...)

restrictive covenant is enforceable only if it is reasonably necessary to protect the employer's legitimate business interests and if it does not unduly burden the employee's right to pursue his profession. *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 361 (Minn. 1998).[12] The problem with this "test" is that it focuses only on the employer and the employee, and ignores the interests of the employee's former clients. The non-service provision in the Employment Agreement does not merely regulate *Peterson's* conduct; it also purports to deprive his *clients* of their right to choose to continue their relationship with him. Those clients, of course, did not agree to the non-service provision, and likely did not even know of its existence.

This is a particularly acute concern in the fiduciary context. Paul Parnell, the founder and managing partner of Ballast, testified that a client's relationship with a financial advisor "can be a very close relationship . . . *more so than even a doctor at some times*." *See, e.g.*, Parnell Dep. 277:24–278:6 (emphasis added); *see also Prudential Secs., Inc.*

---

[11](...continued)
termination of the employment.'") (quoting Minn. Stat. § 181.988, subd. 1(a)). Peterson's Employment Agreement—executed in 2022—predates the statute, so it is subject to Minnesota's common-law approach. *See C.H. Robinson Worldwide, Inc. v. Traffic Tech, Inc.*, No. 19-CV-0902 (KMM/DTS), 2024 WL 4333210, at *8 n.14 (D. Minn. Sept. 27, 2024) (noting that § 181.988 "likely raises issues requiring novel judicial interpretation," but that it did not apply to the "provisions in this case . . . because the statute is not retroactive"), *aff'd*, 161 F.4th 1101 (8th Cir. 2025).

[12]In determining the enforceability of a restrictive covenant, Minnesota courts generally consider "the nature and character of the employment, the time for which the restriction is imposed, and the territorial extent of the locality to which the prohibition extends." *Bennett*, 134 N.W.2d at 899.

*v. Plunkett*, 8 F. Supp. 2d 514, 520 (E.D. Va. 1998) ("A broker-client relationship, like a lawyer-client or doctor-patient relationship, is a personal relationship dependent on personal trust."). Imagine, then, a court enforcing a non-service provision in the medical context, and telling a patient of an oncologist that she can no longer receive care from her oncologist for her rare form of cancer because he changed practices. Or in the legal context. Imagine a court telling a client that, three years into bet-the-company litigation, he can no longer be represented by his lawyer because his lawyer has changed firms. Or in the financial context. Imagine a court telling an elderly client of a financial advisor—a client who, over the years, has disclosed her most sensitive and private information to the advisor—that she has to start over with a stranger, because her advisor decided to start his own firm.

It is no exaggeration to state that banning a doctor, lawyer, financial advisor, or other fiduciary from continuing to provide services to a patient or client could inflict devastating harm on that patient or client. (Consider a suicidal patient who is suddenly cut off from his longtime psychologist.) Courts in other jurisdictions have recognized as much, distinguishing restrictive covenants that impact ordinary commercial relationships from those that impact fiduciary relationships, such as the relationship between doctor and patient,[13] lawyer and client,[14] and financial advisor and client.[15] *See,*

---

[13]*See, e.g., Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1283 (Ariz. 1999) ("[T]he (continued...)

*e.g.*, *ADP, LLC v. Rafferty*, 923 F.3d 113, 122 (3d Cir. 2019) (noting that New Jersey law has recognized two professions, attorneys and psychologists, where "a client's freedom to choose or the 'uniquely personal' nature of the relationship militate against enforcing any restrictive covenant") (citations omitted).

---

[13](...continued)
doctor-patient relationship is special and entitled to unique protection. It cannot be easily or accurately compared to relationships in the commercial context."); *Ohio Urology, Inc. v. Poll*, 594 N.E.2d 1027, 1031 (Ohio Ct. App. 1991) (declining to hold that "all covenants not to compete between physicians are *per se* unenforceable," but noting that the law's "measure of disfavor" for restrictive covenants "is especially acute concerning restrictive covenants among physicians, which affect the public interest to a much greater degree").

[14]*See, e.g.*, *Dwyer v. Jung*, 336 A.2d 498, 500 (N.J. Super. Ct. Ch. Div.) ("Commercial standards may not be used to evaluate the reasonableness of lawyer restrictive covenants. Strong public policy considerations preclude their applicability."), *aff'd*, 348 A.2d 208 (N.J. Super. Ct. App. Div. 1975); *Meehan v. Shaughnessy*, 535 N.E.2d 1255, 1262 (Mass. 1989) ("The strong public interest in allowing clients to retain counsel of their choice outweighs any professional benefits derived from a restrictive covenant."); *Law Offs. of Ronald J. Palagi, P.C., L.L.O. v. Howard*, 747 N.W.2d 1, 13 (Neb. 2008) (collecting cases and noting that "[t]he prohibition against restrictive covenants in agreements between lawyers is generally reasoned to be necessary to ensure the freedom of clients to select counsel of their choice").

[15]*See, e.g.*, *Leon M. Reimer & Co., P.C. v. Cipolla*, 929 F. Supp. 154, 158 (S.D.N.Y. 1996) (finding a restrictive covenant unreasonable to the extent that it "prohibit[ed] considerably more than the active solicitation or diversion of clients" by a certified public accountant); *Barney v. Burrow*, 558 F. Supp. 2d 1066, 1084 (E.D. Cal. 2008) ("[T]he public interest is better served with open competition in the securities field and access to advisors of clients' choice."); *Wachovia Secs., L.L.C. v. Stanton*, 571 F. Supp. 2d 1014, 1041 (N.D. Iowa 2008) (collecting cases "recogniz[ing] that restrictions on a financial consultant's ability to solicit former clients is contrary to the public interest").

Minnesota courts have not explicitly addressed whether enforcing a non-service provision in a fiduciary context is consistent with public policy. Hence, this is not a question that the Court can answer with confidence after cobbling together "relevant state precedent, analogous decisions, considered dicta, and . . . other reliable data." *C.S. McCrossan, Inc. v. Fed. Ins. Co.*, 932 F.3d 1142, 1145 (8th Cir. 2019) (explaining how federal courts sitting in diversity should "attempt to predict how the Minnesota Supreme Court would decide an issue") (cleaned up). Where, as here, the Court cannot "reach a sound decision without indulging in speculation or conjecture," the "better practice" is to certify the question to the Minnesota Supreme Court. *Kaiser v. Mem'l Blood Ctr., Inc.*, 938 F.2d 90, 93 (8th Cir. 1991); *see also* Minn. Stat. § 480.065, subd. 3 (permitting a court to certify a question of law "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this state").

As noted, the "most important consideration guiding" the decision whether to certify a question to a state court "is whether the reviewing court finds itself genuinely uncertain about a question of state law." *Johnson v. John Deere Co.*, 935 F.2d 151, 153 (8th Cir. 1991) (quoting *Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 426 (D.C. Cir. 1988)). But several additional considerations have influenced this Court's decision. First, the enforceability of the non-service provision will likely be dispositive of a number of issues in this case. Minn. Stat. § 480.065, subd. 3; Tr. 153:24–25 ("[A] lot will flow,

I think, from a possible ruling that [the non-service provision] is unenforceable.”). Second, as noted above, restrictive-covenant cases are a staple of this Court’s docket, as well as the dockets of the Minnesota state courts. This issue is certain to recur—a lot. *See, e.g.*, *Perkins v. Clark Equip. Co.*, 823 F.2d 207, 210 (8th Cir. 1987) (“One of the factors we look at when determining whether to certify an issue is whether it is likely to recur.”); *Friedlander v. Edwards Lifesciences, LLC*, No. 16-CV-1747 (SRN/KMM), 2016 WL 7007489, at *5 (D. Minn. Nov. 29, 2016) (concluding that “the Minnesota Supreme Court should have the opportunity—if it so chooses—to clearly decide” an issue after noting “the frequency with which this issue appears before this and other courts”).[16] And third and most importantly, this particular question implicates weighty and competing interests: the protection of legitimate business interests and the enforcement of contracts, on the one hand, and client autonomy and continuity of fiduciary relationships, on the other. *Cf. Elkins v. Moreno*, 435 U.S. 647, 662 n.16 (1978) (certifying a question *sua sponte* because the issue was one “in which state governments have the highest interest”); *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 777 (2005) (Stevens, J., dissenting) (“[P]rinciples of federalism and comity favor giving a State’s high court the

[16]In fact, this issue is currently being litigated in the Southern District of Iowa. *Choreo, LLC v. Lors*, No. 4:25-CV-0077-SMR-SBJ, ECF No. 172-2 at 1 (S.D. Iowa Mar. 16, 2026) (seeking certification to the Minnesota Supreme Court of the question whether a “no-service covenant in a financial advisor’s employment agreement impose[s] an unreasonable restraint on trade if it bars the advisor from serving former clients who freely follow the advisor to a new firm, without any solicitation on the advisor’s part”).

opportunity to answer important questions of state law, particularly when those questions . . . might well require the weighing of policy considerations for their correct resolution.").

As is hopefully obvious, the Court is not certifying this question in order to "avoid its responsibility to determine all issues before it." *Shakopee Mdewakanton Sioux Cmty. v. City of Prior Lake*, 771 F.2d 1153, 1157 n.2 (8th Cir. 1985). Indeed, if memory serves, this is the first time that the undersigned has certified a question to the Minnesota Supreme Court in his 20-plus years as a federal judge. At bottom, this case presents an important question of Minnesota public policy—a question regarding a subject matter that is of demonstrated interest to Minnesota legislators, and about which the Minnesota courts have provided virtually no guidance. *See* Minn. Stat. § 181.988 (banning nearly all non-compete agreements); *Berkley Reg'l Ins. Co. v. Doe Battery Mfr.*, 173 F.4th 989, 992–93 (8th Cir. 2026) (deciding to "let [the Minnesota Supreme Court] lead the way" when "the question involve[d] tradeoffs that a state's highest court is in a unique position to make"); *Hatfield v. Bishop Clarkson Mem'l Hosp.*, 701 F.2d 1266, 1267 (8th Cir. 1983) (en banc) (noting that it is "in the best administration of justice" to utilize a state's certification procedure "when the state law is in doubt especially on the underlying public policy aims") (cleaned up).

Accordingly, the Court certifies the following question to the Supreme Court of the State of Minnesota:

> Is a restrictive covenant unenforceable as against public policy when the restrictive covenant bars a fiduciary (such as a doctor, lawyer, or financial advisor) from continuing to provide services to a beneficiary (such as a patient or client) for a period of time after the fiduciary leaves a practice, firm, or other employer, even when the fiduciary has not solicited the beneficiary or otherwise influenced the beneficiary's decision to continue to seek the fiduciary's services?

The Court invites the Minnesota Supreme Court to reformulate this question "as it sees fit." *Berkley Reg'l Ins. Co.*, 173 F.4th at 993; *see also* Minn. Stat. § 480.065, subds. 4, 6(a)(3).

Because the Minnesota Supreme Court's response to the certified question will be determinative of the enforceability of the non-service provision—and will likely inform this Court's analysis of the enforceability of the non-solicitation provision and the confidentiality clause—the Court denies without prejudice both parties' summary-judgment motions regarding the enforceability of the three restrictive covenants. The Court will revisit the issue of enforceability after the Minnesota Supreme Court responds to the certified question.

*C. Defendants' Summary-Judgment Motion*

Peterson and his co-defendants also seek summary judgment dismissing each of Ballast's remaining claims: breaches of the non-solicitation provision and confidentiality clause (Count I); misappropriation of trade secrets and confidential information (Counts II and III); breach of fiduciary duty and the duty of loyalty

(Count IV); tortious interference with prospective economic advantage (Count V); and aiding-and-abetting (Counts VI and VII). ECF No. 162.

1. Breach of Non-Solicitation Provision and Confidentiality Clause

In addition to alleging breach of the non-service provision, Count I alleges that Peterson breached the non-solicitation provision and the confidentiality clause. *See* TAC ¶¶ 91–92, 94. Putting aside the parties' arguments about enforceability until the Minnesota Supreme Court responds to the certified question, the Court will now address the parties' arguments about breach and damages.

*a. Breach*

As to the confidentiality clause: There is no doubt that a reasonable jury could find that Peterson breached the confidentiality clause, as he all but concedes. *See* Tr. 25:9–28:13. Under the confidentiality clause, Peterson agreed not to "disclose, divulge, furnish, make accessible to anyone, or use in any way, any Confidential Information." Emp. Agmt. § 6(a). A jury could readily find that Peterson breached this clause by using Ballast's password-protected systems to compile the CUSIPs, the Firm Trading Profile, and the Client List, and then sharing those compilations with Bradley, ASN, or both. See Pl.'s Mem. at 36; Boos Decl. Exs. PP (CUSIPs), EE (Firm Trading Profile); Bradley Dep. 188:1–3, 193:19–194:25 (Client List).

The non-solicitation provision presents a closer question. Under this provision, Peterson could not "solicit or attempt to solicit . . . any Client to do business with any

Competing Business." Emp. Agmt. § 7(a). As this Court and countless others have recognized, conduct that is alleged to constitute "solicitation" falls along a spectrum from entirely passive receipt of a former client's business to aggressive pursuit of that business. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Kirk*, No. 25-CV-1926 (LMP/DTS), 2025 WL 1604092, at *6 n.5 (D. Minn. June 6, 2025) ("[W]hether a particular communication constitutes 'solicitation' is an incredibly fact-bound question that borders on the metaphysical.") (citation and quotation marks omitted).

Peterson urges that "[s]olicitation requires some element of attempted persuasion," *Benfield, Inc. v. Moline*, No. 04-CV-3513 (MJD/SRN), 2006 WL 452903, at *6 (D. Minn. Feb. 22, 2006), and that "there is a difference between soliciting and contacting," *UBS Fin. Servs. v. Christenson*, No. 13-CV-1081 (MJD/JSM), 2013 WL 2145703, at *5 (D. Minn. May 15, 2013). Peterson claims that he merely "check[ed] in" with former clients, and he emphasizes that "[m]eeting with a client or a potential client," in and of itself, "is not an act of persuasion." Tr. 21:12–13, 16.

The problem for Peterson is the timing, amount, and nature of the "checking in" he did in the months following his separation from Ballast. *See, e.g.*, Boos Decl. Exs. HHH, III, JJJ, KKK; Nease Decl. ¶ 20. To begin with, it appears that what promoted much of this "checking in" was Peterson's becoming registered to provide investment-management services through ASN on June 12, 2023. Boos Decl. Ex. A. Following his registration, Peterson left voicemails telling former clients that he was "up and

running" and that "everything is a go now." Peterson Dep. 381:14–385:8. That is not "checking in" on the clients; that is informing the clients of his availability to handle their accounts. Moreover, Bradley confirmed in an email that Peterson was "calling his clients to transition over." Boos Decl. Ex. HHH at 3. And in August 2023, two months after Peterson became registered, Peterson and Bradley traveled to Minnesota and met with several of Peterson's former Ballast clients—even staying in one former client's home. Bradley Dep. 91:5–93:24, 113:22–114:13; Boos Decl. Ex. QQQ. Peterson suggests that these meetings "could be" nothing more than "check[ing] in on how your kids are doing." Tr. 21:16–17. Perhaps. But a reasonable jury could readily conclude that these in-person meetings—organized around a prepared agenda— involved a lot more than Peterson asking former clients about their kids. *See* Boos Decl. Ex. QQQ; Supp. Boos Decl. Ex. 5, ECF No. 212-1.

In sum, Ballast has more than enough evidence to create a genuine dispute over whether Peterson violated the non-solicitation provision, the confidentiality clause, or both.

*b. Damages*

Damages, however, are a different matter. Under Minnesota law, "[d]amages do not flow from the breach [of a restrictive covenant] as a matter of course. They must be proved." *B & Y Metal Painting, Inc. v. Ball*, 279 N.W.2d 813, 816 (Minn. 1979); *see also Jensen v. Duluth Area YMCA*, 688 N.W.2d 574, 578–79 (Minn. Ct. App. 2004) ("A breach

of contract claim fails as a matter of law if the plaintiff cannot establish that [it] has been damaged by the alleged breach."). Ballast seeks (only) lost-profits damages, Pl.'s Mem. at 42–43; Tr. 138:17–139:11, so Ballast must point to evidence from which a reasonable jury could find that "(a) profits were lost, (b) the loss was directly caused by the breach of the [restrictive covenants], and (c) the amount of such causally related loss is capable of calculation with reasonable certainty rather than benevolent speculation." *B & Y Metal Painting*, 279 N.W.2d at 816 (citing *Faust v. Parrott*, 270 N.W.2d 117 (Minn. 1978)).

This is where Ballast's claims falter. *See* Tr. 128:7–135:20, 173:11–174:2. Ballast alleges that Peterson's breaches of the Employment Agreement caused at least 45 clients to leave Ballast. *See generally* Gorowsky Decl. Ex. 1, ECF No. 166-1; Pl.'s Mem. at 16–17, 32, 35. In support of its allegation, however, Ballast cites little more than the fact that 45 clients left Ballast during Peterson's restricted period.

This isn't enough. To survive summary judgment, Ballast must offer evidence that would permit a jury to find, *on a client-by-client basis*, that a *specific* breach of a restrictive covenant by Peterson caused a *specific* client to leave Ballast. This is simple but-for causation: but for a breach by Peterson, the client would have remained with Ballast. Some former Ballast clients may have followed Peterson entirely of their own accord—without being solicited at all. Others may have left for reasons having little or nothing to do with Peterson, such as dissatisfaction with Peterson's successor. And still others may indeed have left because Peterson breached a restrictive covenant. Again,

Ballast may recover only those profits that it lost because of a breach by Peterson, and not for some other reason.[17]

Yet, for the vast majority of the clients Peterson allegedly poached, Ballast has "revealed nothing from which [a] jury could even begin to determine what, if any, profits were lost" as a result of a breach by Peterson, rather than for some other reason. *Faust*, 270 N.W.2d at 120. The law "certainly does not require that damages be calculable with absolute precision," but the law *does* require damages to "be ascertainable with reasonable exactness" and prohibits recovery based on "benevolent speculation." *Id.*

Ballast has offered sufficient evidence of causation with respect to only three clients—Sonya Hughes, Kathy Sherwick, and Robin Brennan. Ballast alleges that Hughes, Sherwick, and Brennan were "solicited" by Peterson during his trip to Minnesota and then "subsequently transitioned away from Ballast" as a result of that solicitation. Pl.'s Mem. at 19. Peterson's own notes from his meeting with Brennan

---

[17]Defendants frame much of their causation argument as a motion to exclude the testimony of Ballast's damages expert, Arthur Cobb. *See* Defts.' Mem. at 30–33 (arguing that Cobb's testimony "should be excluded" for failure to consider alternative causes or apportion damages). But the parties agree that the burden is Ballast's—not Cobb's—to establish causation by tying a wrongful act by Peterson to a quantifiable loss. Pl.'s Mem. at 41–42; Defts.' Reply at 20. The Court therefore construes the defendants' argument as a challenge to adequacy of Ballast's causation evidence, rather than as a *Daubert* motion. To the extent that defendants contest the admissibility of Cobb's testimony on other grounds, those challenges may be raised at the pretrial conference.

reflected that she "wanted to move forward in working with MMX Wealth Partners," Supp. Boos Decl. Ex. 5 at 6, and Bradley testified that Brennan thereafter signed a client agreement with MMX WP, Bradley Dep. 108:10–12. As to Hughes and Sherwick, Peterson's interrogatory responses indicate that they transitioned to MMX WP on May 23, 2024, and July 10, 2024, respectively. Boos Decl. Ex. CCC at 39–40. From this circumstantial evidence, a jury could infer (1) that Peterson solicited Hughes, Sherwick, and Brennan during the Minnesota trip, in breach of the non-solicitation provision; (2) that Peterson used Ballast's confidential information to transition these client accounts, in breach of the confidentiality clause; and that (3) but for Peterson's breaches, Hughes, Sherwick, and Brennan would have remained with Ballast.

The same cannot be said for the remaining 42 clients. Ballast identifies no testimony or other evidence connecting any specific breach by Peterson to any particular client's departure. *See* Tr. 133:17–135:20, 173:11–174:2. In resisting Peterson's summary-judgment motion, Ballast had "an affirmative burden 'to designate specific facts creating a triable controversy.'" *Crossley v. Georgia-Pacific Corp.*, 355 F.3d 1112, 1113 (8th Cir. 2004) (quoting *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1085 (8th Cir. 1999)). Merely asserting that "Ballast has ample evidence of causation," Pl.'s Mem. at 42, without actually *identifying* that evidence, will not do. The Court "is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support

the nonmoving party's claim." *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 915 (8th Cir. 2007).[18]

Accordingly, should the Court find that the non-solicitation provision and the confidentiality clause are enforceable, and should Peterson be found by the jury to have breached one or both of those covenants, Ballast's recoverable lost-profit damages will be limited to profits lost from Hughes, Sherwick, and Brennan.[19]

2. Misappropriation of Trade Secrets and Confidential Information

Most of Ballast's claims rest, at least in part, on Peterson's purported violation of contractual, statutory, and common-law confidentiality obligations. In addition to its claim for violation of the confidentiality clause in the Employment Agreement (Count I), Ballast asserts claims against Peterson for misappropriation of trade secrets under the Minnesota Uniform Trade Secrets Act ("MUTSA"), Minn. Stat. §§ 325C.01–.08 (Count II); misappropriation of confidential information (Count III); breach of fiduciary

[18]At the hearing, after making clear that it was "not ruling" and that it needed "to think about this more," Tr. 135:4, the Court discussed what type of evidence of causation and damages would be necessary if the case were to be tried. *See* Tr. 133:17–135:20, 173:11–174:2. The Court also indicated, however, that the issues of causation and damages would not be tried unless the Court determined that there was sufficient evidence in the summary-judgment record to permit a reasonable jury to find causation and damages—"and it sound like there's not." Tr. 173:5–9. Having reviewed the record, the Court determines that "there's not." Tr. 173:9.

[19]The Court expresses no view as to whether and how Ballast can prove damages flowing from any breach of the non-*service* provision, should the Court find that it is enforceable after the Minnesota Supreme Court responds to the certified question.

duty and the duty of loyalty (Count IV); and tortious interference with prospective economic advantage (Count V). *See* TAC ¶¶ 91, 94–95, 101–120, 123, 128–133.

*a. MUTSA Claim*

A MUTSA claim requires the existence of a trade secret and the improper acquisition, disclosure, or use of that trade secret. Minn. Stat. § 325C.01. "A trade secret is information that must (1) not be generally known or readily ascertainable, (2) derive independent economic value from its secrecy[,] and (3) be the subject of reasonable efforts to maintain its secrecy." *Hot Stuff Foods, LLC v. Dornbach*, 726 F. Supp. 2d 1038, 1044 (D. Minn. 2010). Peterson argues both that Ballast failed to "identify[] its trade secrets with reasonable particularity," Defts.' Mem. at 26, and that "[e]ven if Ballast *had* identified a trade secret," Peterson never "used any secret to solicit, or even service, any client," Defts.' Reply at 17–18 (emphasis added). The Court will address the arguments in turn.

First, Peterson claims that Ballast's alleged trade secrets "never moved beyond labels and categories" that were "broad enough to include everything." Defts.' Mem. at 26 (quoting Nease Dep. 122:7–123:22); *see also Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 897 (Minn. 1983) ("Without a proven trade secret there can be no action for misappropriation, even if defendants' actions were wrongful."). Whatever force that argument once had, Ballast has since narrowed its MUTSA claim to three specific reports: the CUSIP compilation reflecting the securities held by Peterson's

clients; the Firm Trading Profile describing Peterson's book of business; and the Client List with client names, contact information, birth dates, and Social Security numbers that Peterson gave to Bradley. *See* Pl.'s Mem. at 36.

A jury could easily find that all three reports are trade secrets. According to Ballast, the CUSIP compilation and Firm Trading Profile offered "valuable insight into [Peterson's] clients' investment positions, preferences, and future needs." Pl.'s Mem. at 37. And Peterson overstates the case law in arguing that a client list can never be a trade secret. *See* Defts.' Mem. at 27. While a client list is generally not protected when it contains only names and basic contact information, *see Lasermaster Corp. v. Sentinel Imaging*, 931 F. Supp. 628, 637 (D. Minn. 1996), a client list may qualify as a trade secret when it includes additional information about those clients, *see Cherne Indus., Inc. v. Grounds & Assocs., Inc.*, 278 N.W.2d 81, 90–91 (Minn. 1979); *see also Jostens, Inc. v. Nat'l Comput. Sys., Inc.*, 318 N.W.2d 691, 698 (Minn. 1982) ("[T]rade secrets lie somewhere on a continuum from what is generally known in a field to what has some degree of uniqueness, although there need not be the degree of novelty or originality required for patent or copyright protection."). It is undisputed that the Client List contained far more than just client names and basic contact information. *See* Bradley Dep. 197:20–198:5 (testifying that the Client List included client names, addresses, birthdays, and Social Security numbers). Moreover, each report was assembled using information from Ballast's password-protected systems, and the very fact that Peterson went

through the trouble of collecting the information is compelling evidence of the value of the information to him. *Cf. Cherne*, 278 N.W.2d at 90 (noting there would be "little purpose in taking such a quantity of documents if defendants did not believe the information was valuable"). Ballast has not asked the Court to hold that these compilations are trade secrets as a matter of law, however, so the Court will leave that issue to the jury.

Second, Peterson claims that he never "used" the alleged trade secrets, so Ballast cannot prevail on its misappropriation claim. Defts.' Reply at 17–18. Even if Peterson were correct (and the Court has its doubts), the "use" of a trade secret is not the only form of misappropriation prohibited under MUTSA. A defendant also misappropriates a trade secret if he acquires or discloses it while under "a duty to maintain its secrecy or limit its use." Minn. Stat. § 325C.01, subd. 3. Here, Peterson was under both a contractual duty and a common-law duty to maintain the secrecy of Ballast's trade secrets. *See* Emp. Agmt. § 6(a); *Eaton Corp. v. Giere*, 971 F.2d 136, 141 (8th Cir. 1992) ("[E]mployees have a common law duty not to use trade secrets or confidential information obtained from their employer."). A jury could readily find that he breached those duties. Accordingly, Peterson's motion is denied as to Count II.

*b. MUTSA Displacement*

Peterson next contends that if Ballast's MUTSA claim survives, MUTSA's displacement provision sweeps away Ballast's remaining claims based on the same conduct. *See* Minn. Stat. § 325C.07(a) (displacing "conflicting tort, restitutionary, and other law . . . providing civil remedies for misappropriation of a trade secret"). Under this provision, Ballast may "maintain its separate causes of action" only "to the extent that the causes of action have 'more' to their factual allegations than the mere misuse or misappropriation of trade secrets." *Micro Display Sys., Inc. v. Axtel, Inc.*, 699 F. Supp. 202, 205 (D. Minn. 1988).[20]

Ballast considers its "'confidential' and 'trade secret information' to be synonymous," Nease Dep. 147:4–6, but it pleads MUTSA and non-MUTSA claims in the alternative because it is possible that the jury will find that some of its information is confidential but not protected as a trade secret. *See TE Connectivity Networks, Inc. v. All Sys. Broadband*, No. 13-CV-1356 (ADM/FLN), 2013 WL 6827348, at *5 (D. Minn. Dec. 26, 2013); *see also* Pl.'s Mem. at 35; Tr. 54:13–55:11. Because Ballast has left this issue in the hands of the jury, the Court will not address the MUTSA-displacement question until the jury has spoken. *See USI Ins. Servs. LLC v. Bentz*, No. 1:18-CV-0255, 2023 WL

[20]Peterson also argues that MUTSA displaces Ballast's claim for breach of the confidentiality clause in the Employment Agreement. But that claim seeks a "contractual remed[y]" and thus is plainly exempted from MUTSA's displacement provision. Minn. Stat. § 325C.07(b)(1).

5670683, at *21 (D.N.D. Apr. 21, 2023) ("Given the jury has yet to determine the 'trade secret' status of the information, the Court cannot make the legal conclusion the claims, if any and to what extent, are displaced by the [Uniform Trade Secrets Act].").

*c. Breach of Fiduciary Duty and Duty of Loyalty*

Ballast next alleges that Peterson breached the "fiduciary and other duties" he owed to Ballast as its employee, "including duties of loyalty, honesty, faithfulness, candor, and confidentiality." TAC ¶ 122. To the extent Ballast's claim is premised on Peterson's use of Ballast's confidential information or trade secrets, *see id.* ¶ 123, the claim survives summary judgment for the same reasons as Ballast's common-law claim for misappropriation of confidential information. But Ballast also asserts something "more," *see Micro Display Sys.*, 699 F. Supp. at 205—namely, that Peterson lied "to Ballast about his intent to take its clients." Pl.'s Mem. at 38.

Peterson spent a great deal of time at the hearing emphasizing the difference between (impermissible) competing and (permissible) preparing to compete. *See* Tr. 31:16–35:25. Peterson is correct that an employee may prepare to compete with his employer, but, at the same time, an employee "cannot feather his own nest at the expense of his employer while he is still on the payroll." *Sanitary Farm Dairies, Inc. v. Wolf*, 112 N.W.2d 42, 48 (Minn. 1961); *see also Rehab. Specialists, Inc. v. Koering*, 404 N.W.2d 301, 304–05 (Minn. Ct. App. 1987) (noting that "[a]n employee has the right . . . while still employed, to prepare to enter into competition with her employer," but that

her "duty of loyalty prohibits her . . . from otherwise competing with her employer, while she is employed").

Peterson insists that everything that he did before his departure from Ballast falls in the "preparation" category. The record would permit a jury to find otherwise. While still employed at Ballast, Peterson compiled and shared reports containing Ballast's confidential information. *See* Tr. 26:20–22 (conceding that Peterson "disclosed certain things that are in the confidential information paragraph [of the Employment Agreement] to third parties"). Ballast also alleges that Peterson breached the duty of loyalty during the wind-down period by misrepresenting his intentions. *See* Pl.'s Mem. at 38. Peterson repeatedly assured Parnell that his "new job involved a different business model" and that he did not plan to "pursu[e] Ballast clients," Parnell Decl. ¶ 13—even though Peterson had already entered secret agreements with ASN and Marxer to establish a wealth-management firm, and even though Peterson represented to his new partners that he anticipated "bring[ing] over approximately $42,000,000" in assets under management "from existing clients," Boos Decl. Ex. CC at 27. Whether this conduct represents "preparation for a change in employment [or] outright disloyalty" is for the jury to decide. *Sanitary Farm Dairies*, 112 N.W.2d at 49.

Finally, Peterson's argument that Ballast cannot tie any breach of fiduciary duty to a quantifiable loss misunderstands the remedy. A fiduciary who breaches his duty of loyalty must forfeit his compensation for the period of disloyalty—whether or not the

breach causes any measurable harm. *See Rice v. Perl*, 320 N.W.2d 407, 410–11 (Minn. 1982); *Perl v. St. Paul Fire & Marine Ins. Co.*, 345 N.W.2d 209, 212–13 (Minn. 1984). Peterson's motion is therefore denied as to Count IV.

*d. Tortious Interference with Prospective Economic Advantage*

Ballast's final claim against Peterson alleges that he tortiously interfered with prospective economic advantage with respect to both "clients and prospective clients." TAC ¶ 129. Under Minnesota law, a claim for tortious interference with prospective economic advantage has five elements: (1) the plaintiff had a reasonable expectation of economic advantage; (2) the defendant knew of that expectation; (3) the defendant intentionally and wrongfully interfered with that expectation; (4) the plaintiff had a reasonable probability of realizing that economic advantage but for the defendant's interference; and (5) the plaintiff was injured. *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014).

The Court previously dismissed this claim insofar as it applied to *prospective* clients because Ballast failed to identify a single "*prospective* client—stolen by Peterson—with whom Ballast had more than a 'mere hope of a contract' at some undetermined future date." *Ballast Advisors*, 2024 WL 5075600, at *7 n.7 (quoting *Gieseke*, 844 N.W.2d at 221–22). The Court now addresses this claim as it applies to Ballast's *existing* clients.

Peterson claims that Ballast has not established that his conduct was "independently tortious or unlawful." *Gieseke*, 844 N.W.2d at 218. Ballast devotes only two sentences of its brief to this point, arguing that "Peterson breached his [Employment] Agreement, violated the MUTSA, and breached his fiduciary duty to Ballast." Pl.'s Mem. at 38. The first theory fails because a breach of contract is not a tort. *See, e.g.*, *Brand Advantage Grp., Inc. v. Henshaw*, No. 20-CV-0225 (JRT/HB), 2020 WL 1891772, at * 8 (D. Minn. Apr. 16, 2020) (holding that an employer "must allege more than a breach-of-contract" to "show a fair chance of success" on a tortious-interference claim based on an employee's alleged violation of contractual restrictive covenants). The second theory also cannot save Ballast's tortious-interference claim. If a jury finds that Peterson violated the MUTSA, that claim will displace any tortious-interference claim based on the misappropriation of trade secrets. *See* Minn. Stat. § 325C.07(a); *Micro Display Sys.*, 699 F. Supp. at 205.

That leaves Peterson's alleged breach of fiduciary duty. Even if this claim could support Count V's "independently tortious" requirement, Count V would fail for other reasons. Tortious interference with prospective economic advantage is committed when a defendant interferes with a *non-contractual* relationship—generally by unlawfully preventing an anticipated contract from being *formed*. *See, e.g.*, *Gieseke*, 844 N.W.2d at 216–19; *C.H. Robinson Worldwide, Inc. v. Traffic Tech., Inc.*, 60 F.4th 1144, 1150–51 (8th Cir. 2023) (affirming district court's dismissal of tortious-interference claim

in restrictive covenant case); *CH Bus Sales, Inc. v. Geiger*, No. 18-CV-2444 (SRN/KMM), 2019 WL 1282110, at *12 (D. Minn. Mar. 20, 2019) ("Courts in this District have dismissed tortious interference with prospective economic advantage claims when the plaintiff identifies no prospective business relationship with a third party that it was unable to pursue or lost out on because of the defendant's conduct.") (cleaned up) (quotation omitted). Ballast has not pointed to any *non-contractual* relationship with which Peterson allegedly interfered; instead, Ballast complains about Peterson's interference with *existing* contractual relationships between Ballast and its clients. The Court therefore grants Peterson's motion for summary judgment on Ballast's claim for tortious interference with prospective economic advantage.

5. Aiding-and-Abetting

Finally, Ballast alleges that Bradley and MMX Wealth Partners (Count VI) and MMX Management and Marxer (Count VII), aided and abetted Peterson's tortious interference with Ballast's prospective economic advantage. TAC ¶¶ 134–143. A claim for aiding and abetting the tortious conduct of another has three elements: (1) the primary tortfeasor committed a tort that caused an injury to the plaintiff; (2) the defendants knew that the primary tortfeasor's conduct was tortious; and (3) the defendants substantially assisted or encouraged the primary tortfeasor in committing the tort. *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999).

Ballast's aiding-and-abetting claims are predicated entirely on its tortious-interference claim against Peterson, which the Court has just dismissed. *See* TAC ¶¶ 135, 140. Therefore, the Court also dismisses the aiding-and-abetting claims in Counts VI and VII.

*D. Cross-Motions on Counterclaims*

Peterson's *six* counterclaims against Ballast and Parnell arise out of a single brief, polite email.[21] Countercl. ¶¶ 27–70, ECF No. 76; *see also* Peterson Dep. 192:8–193:9; Boos Decl. Ex. UU. Specifically, Peterson alleges that the Farewell Email that Ballast sent to his former clients from his Ballast email address constituted defamation (Count I), defamation *per se* (Count II), malicious injury (Count III), intrusion upon seclusion

[21]This may be a good time to remind the attorneys for all of the parties that "[t]his Court has repeatedly criticized the filing of 'kitchen-sink' or 'shotgun' complaints—complaints in which a plaintiff brings every conceivable claim against every conceivable defendant." *Gurman v. Metro Hous. & Redevelopment Auth.*, 842 F. Supp. 2d 1151, 1153 (D. Minn. 2011). The same can be said of "shotgun" counterclaims and "shotgun" answers.

Shotgun pleading is bad enough. But "shotgun retention" at summary judgment is worse. Here, the parties have taken exhaustive discovery and compiled a full factual record. That factual record makes it unmistakably clear that some of the numerous claims, counterclaims, and defenses that were initially pleaded should have been abandoned, because they ended up having no evidentiary support, because they are duplicative of stronger claims or defenses, or because they have fatal legal flaws. Throwing everything up against a wall erodes credibility and conveys weakness; abandoning weak claims and defenses builds credibility and conveys confidence in the remaining claims and defenses. The Court urges the attorneys for all parties to take these comments to heart.

(Count IV), appropriation (Count V), and false endorsement (Count VI). *See generally* Countercl. Both Peterson and the counter defendants seek summary judgment on all counterclaims. ECF Nos. 162, 185.

1. Appropriation

Under Minnesota law, tortious appropriation occurs "when one 'appropriates to his own use or benefit the name or likeness of another.'" *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 233 (Minn. 1998) (quoting Restatement (Second) of Torts § 652C (Am. L. Inst. 1977)). Ballast argues that Peterson's appropriation claim fails because he "cannot show commercial value associated with [his] name or likeness that accrued to Ballast through the farewell email." Pl.'s Mem. at 48; *see also* Tr. 172:8–10 ("[T]here's just no evidence in the record of any benefit that Ballast did gain from [sending] this out.").

Ballast's argument misunderstands the tort. The tort of appropriation does not ask whether Ballast *benefitted* from using Peterson's name and email address to send the Farewell Email. Rather, it asks about Ballast's *purpose* for doing so. *See, e.g.*, *Kovatovich v. K-Mart Corp.*, 88 F. Supp. 2d 975, 986–87 (D. Minn. 1999) ("To tortiously appropriate an individual's name, one must appropriate for the *purpose* of taking advantage of that individual's name, or reputation."); Restatement (Second) of Torts § 652C cmt. b (noting that a defendant may be liable for appropriation whenever he "makes use of the plaintiff's name or likeness for his own purposes and benefit"—even if "the use is not a

commercial one," and even if "the benefit sought to be obtained is not a pecuniary one").

A defendant's purpose may be inferred from context. *See Kovatovich*, 88 F. Supp. 2d at 985–88. For instance, in *Kovatovich v. K-Mart Corporation*, a terminated pharmacy manager sued K-Mart for appropriation based on K-Mart's continued use of her name in customer solicitations. *Id.* at 986–87. The solicitations were sent on K-Mart letterhead, "plainly bore the Plaintiff's name as the author of the correspondence," and included "commentary that was designed to solicit business." *Id.* at 987. In opposing K-Mart's summary-judgment motion, the plaintiff offered evidence that, after her termination, several customers notified K-Mart that they planned to use a different pharmacy "because the Plaintiff was no longer at the store." *Id.* More generally, the plaintiff also argued that "customers will frequently visit a particular pharmacy because of their loyalty to a pharmacist who works there." *Id.* From these facts, the court held that a jury could infer that K-Mart appropriated the plaintiff's name for the purpose of leveraging her "business good will" and preserving its customer relationships. *Id.* at 985, 987–88.

The facts here are at least as favorable to Peterson. Although the parties dispute whether Peterson approved the content and timing of the Farewell Email—a dispute that the jury will have to resolve—Ballast concedes that the message was sent from Peterson's Ballast email address to clients with whom Peterson had built relationships

during his tenure at the firm. *See* Nease Decl. ¶¶ 14–15. If Ballast truly thought that there was "no value to be gained in 'appropriating' Peterson's name," Pl.'s Reply at 8, ECF No. 208, then it is difficult to understand why Ballast chose to send the Farewell Email in Peterson's name and from Peterson's account. Regardless, that question—"why?"— is yet another question for the jury. *See Kovatovich*, 88 F. Supp. 2d at 988. Accordingly, the cross-motions are denied as to Count V.[22]

2. Other Counterclaims

As discussed at length during the hearing, Peterson's other counterclaims suffer from numerous problems. *See* Tr. 156:2–172:6. For starters, to recover on his defamation claim, Peterson must show not only that the Farewell Email was false, but that it harmed his reputation or "lower[ed] him in the estimation of the community." *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980). Peterson identifies four allegedly false statements: (1) the subject line, "Update from Scott"; (2) the sign-off, "Sincerely, Scott," paired with Peterson's Ballast signature block; (3) "I am leaving Ballast"; and (4) "I do not plan to work with retail investment advisory clients." Defts.'

[22]Ballast also argues that Peterson has "no evidence of damages or 'peculiar harm.'" Pl.'s Reply at 8; *see also* Pl.'s Mem. at 21 ("Peterson does not claim that he lost clients as a result of the [farewell] email or point to any harm other than being personally upset."). But pecuniary damages are not an element of appropriation under Minnesota law. *Cf. Wagner v. Gallup, Inc.*, 989 F. Supp. 2d 782, 792 (D. Minn. 2013) (concluding that a plaintiff's testimony of "emotional distress and mental anguish" was sufficient evidence of damages to survive summary judgment) (citing Restatement (Second) of Torts § 652H cmt. c).

Mem. at 12–13; *but see* Peterson Dep. 175:15–22 (claiming that "the whole email" was "false or inaccurate").

Even accepting the (dubious) argument that these statements were false, Peterson's defamation claim fails because none of the statements in the Farewell Email are "capable of conveying a defamatory meaning." *McKee v. Laurion*, 825 N.W.2d 725, 731 (Minn. 2013). Whatever the Farewell Email's provenance, a jury could not reasonably find that the email exposed Peterson "to public hatred, contempt, ridicule, or degradation." *Phipps v. Clark Oil & Refin. Corp.*, 408 N.W.2d 569, 573 (Minn. 1987) (citation omitted). That some recipients of the email felt "very unhappy and confused" that Peterson was leaving Ballast—which he *was*—does not amount to actionable reputational harm. Countercl. ¶ 15; *see also* Andersen Decl. Ex. W at 4, 8, ECF No. 170-13; *cf. Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 28 (Minn. 1996) ("Minnesota law imposes a reputational harm prerequisite in defamation actions."). Count I is therefore dismissed.

When the Court noted the problems with Peterson's defamation counterclaim at the hearing, Peterson's counsel claimed to "rest more on [the] defamation per se" counterclaim. Tr. 156:25–157:1. That is an odd place to rest. If the Farewell Email was not defamatory, it necessarily was not defamatory *per se*. The only distinction between the two causes of action is that, if a statement is defamatory *per se*, "general damages are presumed and [a plaintiff] may recover without any proof of actual harm." *Longbehn v.*

*Schoenrock*, 727 N.W.2d 153, 161 (Minn. Ct. App. 2007). To recover under either cause of action, a plaintiff must prove that the statement was defamatory. *Schlieman v. Gannett Minn. Broad., Inc.*, 637 N.W.2d 297, 307 (Minn. Ct. App. 2001) ("'[D]efamatory per se' defines a rule of damages, not of defamatory meaning."). Count II is therefore dismissed for the same reasons as Count I.

Peterson's final three counterclaims merit little discussion:

His malicious-injury claim fails because Peterson has not offered any evidence that Ballast or Parnell "maliciously intended to injure" him by sending the Farewell Email—a message that said little more than Peterson was leaving and he wished his clients well. *Marudas v. Odegard*, 10 N.W.2d 233, 235 (Minn. 1943) (recognizing a cause of action "for malicious wrong or malicious injury" distinct from a defamation claim); Boos Decl. Ex. UU.

Peterson's intrusion-upon-seclusion claim fails for similar reasons. The tort requires an intentional intrusion "upon the solicitude of another or his private affairs or concerns." *Swarthout v. Mut. Serv. Life Ins. Co.*, 632 N.W.2d 741, 744 (Minn. Ct. App. 2001) (quoting Restatement (Second) of Torts § 652B). But the Farewell Email was sent from Peterson's *Ballast* email address—that is, from a company-owned account—using the company-owned laptop that Peterson had relinquished the day before. Ballast's use of its own account and own equipment to send a notice to its own clients about its own business—a notice that said absolutely nothing about the personal life of Peterson—

cannot be considered an intrusion into Peterson's private affairs. And even if it *were* an intrusion, a brief, professionally-worded departure notice—conveying the same message that Peterson claims to have shared with the same clients in the days leading up to the email—could not be considered "highly offensive to the ordinary reasonable [person]." *Id.* at 745 (quoting Restatement (Second) of Torts § 652B cmt. d) (alteration in original); *see also* Boos Decl. Ex. SS, ECF No. 191-44 (reflecting Peterson's talking points, including that he would "be sending out a letter later this week").

Finally, Peterson's false-endorsement claim—which is based on the triviality that the Fairwell Email announced that he was *leaving* Ballast when he had *left* hours earlier—is also dismissed. Rather than being "likely to cause confusion" as to Peterson's "affiliation, connection, or association," the Farewell Email eliminated any mistaken belief that Peterson was affiliated, connected, or associated with Ballast. 15 U.S.C. § 1125(a)(1)(A). Moreover, Peterson has not offered evidence that any recipient of the Farewell Email was confused or likely to be confused "as to the origin, sponsorship, or approval" of Ballast's or Parnell's products or services. *Id; see also Dryer v. Nat'l Football League*, 814 F.3d 938, 944–45 (8th Cir. 2016) (affirming summary judgment dismissal of false-endorsement claim when the plaintiffs "failed to present any evidence" of "misleading or false statements regarding [the plaintiffs'] *current* relationship with the [defendant]") (cleaned up) (emphasis added).

For these reasons, Counts III, IV, and VI are also dismissed.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendants' and counter plaintiff's motion for summary judgment [ECF No. 162] is GRANTED IN PART and DENIED IN PART as follows:

   a. The motion is GRANTED insofar as plaintiff's recoverable damages for lost profits based on any violation of the non-solicitation provision or the confidentiality clause are limited to those profits lost from Sonya Hughes, Kathy Sherwick, and Robin Brennan.

   b. The motion is GRANTED with respect to Counts V, VI, and VII of plaintiff's Third Amended Complaint [ECF No. 125]. Those counts are DISMISSED WITH PREJUDICE AND ON THE MERITS.

   c. All claims against defendants Melinda M. Bradley; MMX WP, LLC; MMX Wealth Partners, LLC; MMX Management, LLC; and Mark Marxer are DISMISSED WITH PREJUDICE AND ON THE MERITS.

   d. The motion is DENIED WITHOUT PREJUDICE with respect to liability for breach of the non-service provision in Count I as described herein.

   e. The motion is DENIED in all other respects.

2. Plaintiff's partial motion for summary judgment [ECF No. 185] is GRANTED IN PART and DENIED IN PART as follows:

   a. The motion is GRANTED insofar as the Court finds that the parties' contract was supported by consideration and was not vitiated by the statute of frauds.

   b. The motion is DENIED WITHOUT PREJUDICE with respect to liability for breach of the non-service provision in Count I as described herein.

   c. The motion is DENIED in all other respects.

3. Counter defendants' cross-motion for summary judgment [ECF No. 185] is GRANTED IN PART and DENIED IN PART as follows:

   a. The motion is GRANTED with respect to Counts I–IV and Count VI of counter plaintiff's counterclaims [ECF No. 76]. Those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

   b. The motion is DENIED in all other respects.

4. Pursuant to Minn. Stat. § 480.065, subd. 3, the following question is CERTIFIED to the Supreme Court of the State of Minnesota:

> Is a restrictive covenant unenforceable as against public policy when the restrictive covenant bars a fiduciary (such as a doctor, lawyer, or financial advisor) from continuing to provide services to a beneficiary (such as a

patient or client) for a period of time after the fiduciary leaves a practice, firm, or other employer, even when the fiduciary has not solicited the beneficiary or otherwise influenced the beneficiary's decision to continue to seek the fiduciary's services?

a. The Court acknowledges that the Minnesota Supreme Court, as the receiving court, may reformulate this question. Minn. Stat. § 480.065, subd. 6(a)(3).

b. The names and addresses of the parties' counsel are attached as an Appendix to this Order. Minn. Stat. § 480.065, subd. 6(a)(4).

c. The Clerk of Court is directed to forward a copy of this Order of Certification to the Minnesota Supreme Court and to furnish to the Minnesota Supreme Court such part of the record of this case that it may request. Minn. Stat. § 480.065, subd. 5.

5. This action is STAYED pending resolution of the certified question.

Dated: September 30, 2026

/s/ Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge